UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 2011-89 (WOB-CJS)

ELIZABETH A. OSBORN                                    PLAINTIFF

VS.

JOHN M. GRIFFIN, ET AL.                                DEFENDANTS


and


CIVIL ACTION NO. 2013-32 (WOB-CJS)

LINDA G. HOLT, ET AL.                                  PLAINTIFFS

VS.

DENNIS B. GRIFFIN, ET AL.                              DEFENDANTS

<u>MEMORANDUM OPINION AND ORDER</u>

These cases are before the Court on numerous motions for summary judgment (Docs. 422, 423, 424, 427, 432, 433, 434, 435, 436), a motion to dismiss a counterclaim (Doc. 400), a motion to disregard the deposition testimony of Dennis B. Griffin (Doc. 541), plaintiffs' joint motion for leave to file a surreply (Doc. 553), and objections to three orders of the United States Magistrate Judge (Docs. 556, 559, 563).

The Court previously heard oral argument on these motions, after which it took them under advisement.  (Doc. 565) (Minute

Entry).  After further study, the Court now issues the following Memorandum Opinion and Order.

<u>**TABLE OF CONTENTS**</u>

I.   Factual and Procedural Background

II.  Analysis

     A.  Discovery/Evidentiary Matters

         1.  The Court overrules all objections to the
         orders of the Magistrate Judge. ***Infra* at 38-41.**

         2.  The Court denies Defendants' motion to
         disregard Dennis Griffin's deposition testimony.
         ***Infra* at 41-43.**

     B.  Breach of Fiduciary Duty and Related Tort Claims

         1.  The Court denies Defendants' motion for
         summary judgment to the extent that it alleges
         Plaintiffs' claims for breach of fiduciary duty
         are barred by the statute of limitations. ***Infra*
         at 45-48.**

         2.  The Court holds that Dennis and Griffy
         breached their fiduciary duties to the *Holt*
         plaintiffs as a matter of law with respect to the
         claims arising out of the 1985-86 stock
         transactions. ***Infra* at 48-50.**

             a.  The Court holds that a triable
             issue of fact exists as to Defendants'
             argument that the *Holt* plaintiffs would
             have no interest in Griffin Industries'
             stock absent the 1985 plan. ***Infra* at
             50-52.**

             b.  The Court holds as a matter of law
             that the affirmative defense of res
             judicata does not bar the *Holt*
             plaintiffs' claims arising out of the
             1985-86 stock transactions. ***Infra* at
             52-55.**

             c.  The Court holds that a triable
             issue of fact exists with respect to
             the equitable defense of acquiescence

to the *Holt* plaintiffs' claims arising out of the 1985-86 stock transactions. *Infra* **at 55-56.**

d. The Court holds that a triable issue of fact exists with respect to the affirmative defense of laches to the *Holt* plaintiffs' claims arising out of the 1985-86 stock transactions. *Infra* **at 56-58.**

3. The Court holds as a matter of law that Defendants are entitled to summary judgment on all claims arising out of the ownership of the Cold Spring property. *Infra* **at 58-60.**

4. The Court holds that Dennis and Griffy breached their fiduciary duties to Plaintiffs as a matter of law with respect to the transfer of the Craig Protein stock and the sales of land to Martom Properties. Triable issues of fact remain, however, with respect to the equitable defense of acquiescence, the affirmative defense of laches, and the defense that Plaintiffs accepted the benefits of the transactions. *Infra* **at 60-66.**

C. Professional Negligence Claims

1. The Court holds as a matter of law that the *Holt* plaintiffs' claims for professional negligence against Keating, Meuthing & Klekamp are barred by the statute of limitations. *Infra* **at 66-71.**

D. RICO Claims

1. The Court holds as a matter of law that the *Holt* plaintiffs cannot invoke the doctrine of equitable tolling and their claims are thus barred by the statute of limitations. *Infra* **at 74-77.**

2. The Court holds as a matter of law that Betsy cannot invoke the doctrine of equitable

tolling and her claims are thus barred by the statute of limitations. ***Infra* at 77-79.**

E.  Counterclaim Against Betsy

1.  The Court holds as a matter of law that Defendants' counterclaim against Betsy fails to state a claim upon which relief can be granted. ***Infra* at 79-81.**

*Factual and Procedural Background*

**A. Introduction**

These cases arise out of a dispute among the children of John L. Griffin ("Father"), founder of Griffin Industries, Inc. ("the Company"), and his wife, Rosellen Griffin ("Mother"). The Griffins had twelve children, eleven of whom were living at the times relevant to this lawsuit, six boys and five girls.

Founded by Father in 1943, Griffin Industries is a rendering company that grew into a multi-million dollar business with operations in several states. At all relevant times, the brothers were active in the family business. John M. Griffin ("Griffy") and Dennis B. Griffin ("Dennis") were board members of Griffin Industries, and Robert was the CEO and President of the Company. Plaintiffs were not involved in the management of the Company.

In the present cases, four of the sisters -- Elizabeth ("Betsy"), Linda, Judith ("Judy"), and Cynthia ("Cyndi") -- have sued three of their brothers: Griffy, Dennis, and Robert Griffin ("Robert"), as well as other defendants. Generally speaking, plaintiffs allege that Griffy and Dennis, who were fiduciaries of their parents' estate plans, breached their duties to plaintiffs, beneficiaries of those estates, by failing to follow the terms of their parents' wills and trusts.

Plaintiffs allege that defendants took these wrongful actions as part of their larger scheme to retain control of Griffin Industries and to enrich themselves at their sisters' expense.

**B. Real Properties and Stock in Dispute**

Between 1964 and 1978, Father and Mother purchased land in various locations: Jackson, Mississippi ("the Jackson Property"); Henderson, Kentucky ("the Henderson property"); several properties in Pendleton County, Kentucky ("the Bradford property," "the Jay Gee property," and "the Adams property"); and Scott County, Indiana ("the Scott property"). These properties, which were titled in either Father's name or in both Father and Mother's names, were used by the Company in its operations. Griffin Industries paid all real estate taxes, insurance, and improvements on these properties, and written leases on several of the properties were made between Father and the Company.

On February 8, 1974, property was purchased at the intersection of U.S. 27 and Old Alexandria Pike in Cold Spring, Kentucky ("the Cold Spring property"). The deed for the property was in the name "John L. Griffin, Trustee," although Father was not then the trustee of any known trust. (Doc. 428-5, Deed). The property was thereafter used as Griffin Industries' headquarters.

Griffin Industries Board minutes of meetings conducted prior to this purchase state that the Board "authorized Dennis Griffin to negotiate for an option" on the property. (Doc. 430-5 at 2) (Minutes of 7/12/73).

Dewey McDougal, an accountant who was employed at Griffin Industries at the time, testified that the Company, rather than Father, paid for the purchase of the Cold Spring property with Company funds. (Doc. 430-4, McDougal Decl. ¶¶ 2-3; McDougal Depo. Doc. 409-1 at 23-29).

The check used to purchase the property was drawn on an account of Father's law firm, Paxton & Seasongood, later known as Thompson, Hine & Flory. (Doc. 473-8). The subject line on the letter accompanying this check states: "Griffin Industries, Inc. – Cold Spring, Kentucky Property." (*Id.*).

Correspondence between Father's law firm and the sellers of the Cold Spring property identifies Griffin Industries as the purchaser. (Doc. 430-118 at 14) ("This office represents Griffin Industries, Inc. and Dennis B. Griffin, its Vice President, who, on behalf of Griffin Industries, Inc. executed the September 28, 1973 agreement with you for the purchase of the Ragan estate property at the intersection of U.S. Route 27 and Old Alexandria Pike in Cold Spring, Kentucky.").

Following the purchase, McDougal placed the property in the Company's "fixed asset register." (*Id.* ¶ 4).

Board meeting minutes from after the purchase reflect the Company's plans to use Company funds to remodel and improve the Cold Spring property. (Doc. 430-8). Further, Board minutes from October 18, 1974, state that the Company was taking out a mortgage to finance part of the construction of a new office building on the property:

> RESOLVED, FURTHER, that John L. Griffin, as Trustee, be, and he hereby is, authorized to execute, acknowledge and deliver a mortgage to said Falmouth Deposit Bank of Falmouth, Kentucky to secure said note, **said mortgage to be on the real estate held of record in the name of John L. Griffin, Trustee, and acquired by the Company** from George Ragan and others by deed recorded in Deed Book 143, page 42 of the Campbell County Court records.

(Doc. 430-9 at 3) (emphasis added).

It is undisputed that, at all relevant times, Griffin Industries paid for all taxes, maintenance, improvement, insurance, and other expenses associated with the Cold Spring property.

Father's tax returns from 1982-1985 show that he did not include the Cold Spring property on the schedules of real property from which he received rental income. (Def. MSJ Exh. 122).

In 1981, Griffin Industries bought a Dublin, Georgia rendering company called Craig Protein, Inc., with Father holding 23.86 percent of its stock and Griffin Industries holding the remaining shares.

## C. **Father's Stroke, Mother's Death, and Ensuing Changes**

Father suffered a massive stroke on Labor Day in 1983. The parties dispute the extent of his mental impairment following the stroke. At this time, Mother was also gravely ill with Parkinson's Disease.

Shortly thereafter, at defendants' request, Leonard Meranus,[1] outside counsel for Griffin Industries, analyzed Father's and Mother's estate plans. In a Memorandum dated September 27, 1983, Meranus's firm opined that if Father predeceased Mother, then the "non-working children" -- i.e., those other than Dennis, Griffy, Robert, and another brother, Jim -- would end up with a majority of Griffin Industries' stock. (Doc. 428-18 at 3).

On November 16, 1983, Dennis and Griffy obtained power of attorney for Mother. (Doc. 428-19).

Defendants also consulted Meranus in early 1984 about how to structure Griffin Industries' stock "to insure that the four

---

[1] Meranus was an attorney at Paxton & Seasongood.

10

working children retain control of the Company." (Doc. 428-21, Internal Law Firm Memorandum to Meranus).

Mother died on August 20, 1985. Under the terms of her estate plan, her 15,291 shares of Griffin Industries stock and other property passed to Father, who was still alive.[2] Under Father's then-existing estate plan, at his death his Griffin Industries stock would pass to his eleven children in equal amounts. (Doc. 428-8 at GTE 00041, Fourth Codicil to Father's Will).

Shortly after Mother's death, however, Dennis and Griffy took a series of actions:

- On September 4, 1985, Dennis and Griffy moved the Campbell Probate Court to remove Father as Executor of Mother's will on the grounds that he was "unable to act as such executor by reason of a recent stroke and current paralysis which have rendered him unable to appear before the Court or sign a statement declining his appointment as executor." (Doc. 428-23). Dennis and Griffy were substituted as Co-Executors in Father's place;

---

[2] Mother had executed her Last Will and Testament in 1967, naming Father as Executor. (Doc. 430-108). Under her will, she devised to Father her interest in their home and personal property. She also created a revocable trust, to which the residuary of her estate was to pass.

On March 28, 1973, Mother executed a codicil to her will that bequeathed her 15,291 shares of Griffin Industries stock to Father if he survived her, and otherwise to her trust. (*Id.*).

On December 31, 1981, Mother restated her trust to name Star Bank as Trustee and to provide that all assets of the trust would be divided into equal portions for her eleven children. (Doc. 430-109).

- On September 25, 1985, Dennis and Griffy obtained Father's power of attorney (Doc. 428-24);

- On October 10, 1985, Dennis and Griffy had the then-Trustee of the Griffin Family Trust removed and themselves appointed as Co-Trustees;

- On November 14, 1985, Father made Dennis and Griffy the Co-Trustees of Father's 1967 Trust (Doc. 428-10 at 30); and

- By letter dated November 21, 1985, Meranus indicated that Father's ownership in the Griffin Family Trust and his stock in Griffin Industries were being transferred to Father's 1967 Trust. (Doc. 428-25). Father's life insurance policies were also transferred from the bank to Griffin Industries.

As a result of these changes, Dennis and Griffy became Executors of their Mother's will; had power of attorney for Father; and were Trustees for the 1967 Trust, which would receive Father's property upon his death.

### D. **The 1985 "Redistribution" Plan**

Dennis and Griffy then consulted with counsel to develop a plan to "redistribute" the Griffin Industries stock held by Mother and Father. The following key elements were chosen by Dennis and Griffy, with Meranus's legal advice, after a meeting on November 26, 1985:

- Father would disclaim all the Company stock left to him by Mother. Although this caused the stock to revert to Mother's estate, under which it should have then poured over into the trust and be distributed to all her children equally, **the redistribution plan called instead for Mother's Estate to sell that stock (13.6% of the Company) to the six brothers;**

- Father would sell 4% of his Company stock to his grandchildren's trusts, thereby reducing his holding to below 50%. The grandchildren's trusts would then give the six brothers a five-year option to re-purchase the shares at 60% of their book value;

- After the sale of stock to the grandchildren, **the sons[3] would purchase Father's remaining Company stock, but at a "minority" discount since his holding would then be less than 50%.**

(Doc. 428-28) (emphasis added).

In total, this series of transactions would transfer 66.6% of Griffin Industries stock to the six brothers, leaving Dennis, Griffy, Robert, and Jim in control of 87.6% of the Company's stock.

A family meeting was held on November 29, 1985, at the Drawbridge Inn in Fort Mitchell, Kentucky. The parties agree that the above "redistribution" plan was the topic of discussion at this meeting, but they dispute what the brothers told their sisters. The sisters allege that Dennis told them that their parents' wills were a "mess" because they had not prepared for the possibility that Mother would predecease Father; that this was causing a huge financial strain on the Company and the Company could go bankrupt; that there could be a $5 million tax bill; and that their parents intended for all the Company stock to go to the boys. (Holt Depo. Doc. 410-5 at 176; Holt Depo.

---

[3] Ultimately, only four of the six sons purchased these remaining shares: Dennis, Griffy, Jim, and Robert. (Doc. 428-30 at 2).

Doc. 410-4 at 52-53, 60, 112-13, 116; Prewitt Depo. Doc. 410-1 at 60, 66-69, 79, 90; Roeder Depo. Doc. 410-3 at 154-55).

The *Holt* plaintiffs allege that these representations were false because: (1) the Company had previously purchased life insurance to cover its obligations to purchase Father's Company shares upon his death; (2) their parents' estate plans had given extensive consideration to Mother predeceasing Father; and (3) the statements were contrary to the intentions set forth in their parents' estate plans.

A second meeting was held shortly thereafter at Dennis's house, attended by a financial planner. (Prewitt Depo. Doc. 410-1 at 70). The planner told the girls about a local company that went bankrupt due to poor financial planning, and he explained how the 1985 plan would work. Plaintiffs allege that Dennis threatened that if the girls didn't agree to the plan, the brothers would buy them out "here and now." (Linda Depo. Doc. 410-5 at 177).

The redistribution plan was then executed. On December 2, 1985, Father disclaimed his interest in Mother's Company stock. (Doc. 430-20 at GII50959). In turn, Griffin Industries' Board of Directors waived the Company's rights to buy back Mother's shares and terminated the stock-purchase agreement that gave it certain rights to buy back both Father's and Mother's shares.

(Doc. 470-23). The same day, Mother's Estate sold her stock to the six brothers for approximately $5.7 million.[4] (Doc. 428-30) (Meranus's notes of Drawbridge meeting; Doc. 430-20 at GII50936-57). The cash proceeds of this sale poured over into Mother's trust.

Thereafter, Dennis, Griffy, Jim, and Robert purchased Father's shares in Griffin Industries.

On or about September 3, 1987, Dennis and Griffy distributed most of Mother's remaining estate to her trust -- just under $2 million. The money was distributed 38% to Father (because he had previously disclaimed 62% of his interest in Mother's trust), and the rest was distributed to seven of the eleven children. (Doc. 428-39).[5]

In 1988, Dennis arranged for Star Bank, the Trustee of Mother's trust, to take title to the Scott County property from Mother's trust, after which the Bank then sold the property to Griffin Industries for $5,000. (Doc. 428-40) (Letter from Leonard Meranus Letter to Star Bank). Prior to this transfer, Griffin Industries had been leasing the Scott County property

---

[4] At the time of the Darling merger in 2010, that stock generated proceeds of $550,000,000.

[5] The four oldest brothers disclaimed their shares of this money and it was divided equally among the sisters. (Doc. 428-40).

from Mother at an annual amount of $6,600. (Doc. 428-41). The $5,000 proceeds from this sale were added to Mother's trust and distributed to the beneficiaries.

A final distribution from Mother's estate was made on April 27, 1990. (Doc. 428-42).

### E. **Betsy's 1990 Federal Lawsuit**

By letter dated May 7, 1990, Betsy's counsel wrote to Meranus demanding that Mother's Estate distribute to Betsy her share of the Griffin Industries' stock that was held in Mother's trust at the time of her death. This letter further stated:

> Thereafter, the Estate's co-executors wrongfully sold and transferred this stock to the male children and to the exclusion of the female children and the rights of Griffin Industries, Inc. These transactions contravene the terms of the Will and constitute breaches of fiduciary duties owing to, among others, Elizabeth Griffin Osborn.

(Doc. 430-11).

Betsy thereafter moved to vacate the final settlement and reopen Mother's estate. The probate court, however, found that Betsy lacked standing and that her exceptions were untimely. (Doc. 430-11 at 91).

Betsy filed her first lawsuit in this Court on December 7, 1990, on behalf of herself and derivatively on behalf of other shareholders, against Dennis, Griffy, Meranus, Thompson Hine, Star Bank, and Griffin Industries. (Cov. Civil Case No. 90-

16

209). Betsy alleged various claims, including breach of fiduciary duty and fraud, arising out of the redistribution of the Griffin Industries' stock in 1985-86 after Mother's death. The *Holt* plaintiffs were shareholders within the derivative claim.

On November 29, 1991, Dennis, Griffy, Robert, Marty, and Thomas, along with Meranus, met with Father at Thompson Hine's offices. Meranus's notes of this meeting state:

> The purpose of the meeting was to advise Mr. Griffin of the law suit which Betsy Osborn had filed against Dennis, John M., TH&F and me in United States District Court in Kentucky and to advise him that Betsy's attorneys were attempting to obtain his medical records. **It was also for the purpose of reviewing Mr. Griffin's estate plan with him to determine whether it still reflected his wishes, and if so, to recommend certain changes in his will and trust to clarify certain points that had been raised by Betsy as to his intentions in the litigation.**

(Doc. 537-5 at 2) (emphasis added).

These notes state that Dennis explained Betsy's lawsuit to Father; that he appeared upset and angry about it; that Meranus then reviewed the 1985 plan and the sale of the Griffin Industries stock from Mother's estate to the boys; and that Father indicated his agreement that the boys should get stock and the girls should get cash. (*Id.*).

Further, Meranus stated:

> **I told Mr. Griffin that because of the issues Betsy had raised in the litigation, he could help clarify**

17

**the situation, if he wanted to do so, by ratifying the 1985 sale of his stock to the boys and by making certain changes in his will and his trust to make it clear that only the five girls, or their heirs, would participate in his estate.** I showed Mr. Griffin a Sixth Codicil to his Will and the Fourth Amendment to his Trust Agreement and asked him to read them to see if he understood them and wanted to sign them. Mr. Griffin read the documents and indicated that he wished to execute them. Mr. Griffin can articulate a number of words very clearly, including "yes" and "no."

(*Id.* at 3) (emphasis added).

The day after this meeting, Father executed the Sixth Codicil to his will and the Fourth Amendment to his trust. The Sixth Codicil, states: "I have provided for my sons in other ways, including my sale of my Griffin Industries stock. . . . I now change my Will so that my other property will go to my trust as set out in my Will. In this way, my other property will go to my five daughters or their children." (Doc. 428-8). The Fourth Amendment to the trust states: "I have provided for my sons in other ways, including my sale of my Griffin stock. I again approve that sale. I now change my [] Trust so that at my death, the rest of the trust property shall go to my five daughters equally, free of trust, and the trust shall end." (Def. MSJ Exh. 106).

Also during this litigation, Father executed an affidavit dated January 20, 1992, which states:

1. I want my children, including my daughter, Elizabeth Griffin Osborn, to know that I approve of the sale of my stock in Griffin Industries, Inc. to my sons.

2. I want my sons to have the company now and my daughters to have cash when I die.

3. I changed my will and my Trust to show what I want. Copies of the changes to my will and my trust are attached. [referencing the Sixth Codicil and Fourth Amendment, discussed above].

4. I know that my daughter, Elizabeth Griffin Osborn, has sued my sons, Dennis and John M. Griffin, and my attorney, Leonard S. Meranus. I do not agree with the lawsuit and want my daughter to stop it.

(Def. MSJ Exh. 106).

Cyndi testified that the only thing she knew about this lawsuit was that Dennis and Griffy told her that Betsy's husband was greedy, that they otherwise would not discuss it, and that Dennis told her that she didn't need to know anything about it because he had it "taken care of." (Roeder Depo. Doc. 409-4 at 30-32).

Betsy's case settled in early 1993, but the settlement was not finalized until December. By order dated September 29, 1993, this Court noted that an offer of settlement had been made by defendants; that a fairness hearing with respect to the derivative claims was scheduled for September 24, 1993; and that defendants' counsel were directed to mail to each shareholder of Griffin Industries a copy of an attached notice. (Case No. 90-209, Doc. 179). The attached notice stated:

An offer of settlement in the above-captioned matter has been made by Defendants. A hearing to determine the fairness of the settlement with respect to the derivative claim will be held at 3:00 p.m. on Friday, September 24, 1993, in Courtroom 220, United States Post Office and Courthouse, 700 Scott Street, Covington, Kentucky 41012.

The settlement of the derivative claim will involve the payment by Defendant Griffin Industries, Inc. of $10,000.00 to each of the following shareholders of stock in Griffin Industries or beneficiaries of trusts which were shareholders of stock on January 1, 1986:

> Elizabeth Griffin Osborn
> Linda Holt
> Cynthia L. Roeder
> Thomas Griffin
> Janet E. Means
> Judith E. Prewitt
> Martin W. Griffin

Persons objecting to such settlement must state such objection in writing by noon, 12:00 p.m., Friday, September 24, 1993, addressed to the Clerk of the United States District Court for the Eastern District of Kentucky, Room 201, 700 Scott Street, P.O. Box 1073, Covington, KY 41012.

A copy of the pleadings are available for inspection during normal business [hours] at the office of the Clerk of Court.

(*Id.*). The next day, defendants' counsel certified compliance with the Court's order. (Case No. 90-209, Doc. 181).

The docket indicates that the fairness hearing was held as scheduled. Cyndi testified that she asked Dennis about the hearing, telling him she was scheduled to be on a field trip with her daughter, and Dennis said that she didn't need to

attend and that he would "take care of it" for her. (Roeder Depo. Doc. 410-3 at 209-10; Doc. 410-3 at 209-11). Judy testified that she never received any notice regarding the fairness hearing. (Prewitt Depo. Doc. 410-1 at 39, 188, 191). Cyndi testified that she was not aware that the Court had approved any settlement in the case. (Roeder Depo. Doc. 410-3 at 207).

Linda testified that Griffy showed her, Cyndi, and Judy a document related to the settlement of Betsy's case, which he told them they needed to sign. (Holt Depo. Doc. 413-1 at 54). Linda asked him what it was, and he told her it didn't concern her. (*Id.*). Judy asked Griffy exactly what Betsy got, and he said "very damn little." (*Id.* at 55). Cyndi testified similarly. (Roeder Depo. Doc. 410-3 at 196-98). Judy also testified that Denny said the document did not pertain to them but they had to sign it; that it would bring the family back together and keep Father off the stand; and that he said that "whatever Betsy would settle for that the girls would also receive." (Prewitt Depo. Doc. 410-1 at 36-37). Judy testified that when she later received her settlement check for $10,000, she "assumed that's what Betsy had received." (*Id.* at 38). Cyndi testified that she was not aware of the terms of Betsy's settlement. (Roeder Depo. Doc. 410-3 at 207).

In any event, none of the *Holt* plaintiffs attended the fairness hearing on the derivative claims.

The Court thereafter entered an order dismissing the derivative claims as settled (Doc. 182), closing the case in its entirety on December 22, 1993. (Doc. 187). Pursuant to the settlement agreement, the record of the case was sealed.

Pursuant to the settlement, Father executed the Fifth Amendment to his trust and the Seventh Codicil to his will. This Codicil states:

> This Seventh Codicil is to my Last Will and Testament dated January 20, 1967. **This Seventh Codicil is made pursuant to a Contract that I have entered into with Dennis B. Griffin, John M. Griffin, and Elizabeth Griffin Osborn on Dec. 21, 1993. I agreed in the Contract not to hereafter change the provisions of either my Last Will and Testament, or this Seventh Codicil.** The terms of said Contract are incorporated herein by reference.
>
> I now change my Last Will and Testament, and all previous Codicils, to provide that all of my property is devised and bequeathed to my 1967 Trust as is set forth in my Last Will and Testament. **I have previously made a Fifth Amendment to my Trust, dated this same date, which, together with this Seventh Codicil to my Last Will and Testament, <u>will cause all of my property to go to my five daughters or their children at my death.</u>**

(Doc. 424-4) (emphasis added).

This codicil expressly incorporates the settlement agreement, which stated that "all of the property that [Father] now owns, and the additions thereto or the substitutions

22

therefore, that he has not consumed, **will be divided equally among his five daughters** or their children, per stirpes." (Def. MSJ Exh. 19) (emphasis added).

The Fifth Amendment to Father's trust, executed concurrently with the Seventh Codicil, states in part:

> I now change my January 20, 1967 Trust to provide that at my death, the Trust property shall go to my five daughters equally, free of trust, and the Trust shall end. If any of my daughters dies before me, her part shall go to her children, as the Trust now provides. **All of the Trust terms which are different from this change are revoked.**

(Doc. 424-5) (emphasis added).

Dennis and Griffy also agreed to transfer a total of 1,390 of their personal shares of Griffin Industries' stock to Betsy and some additional shares to be held in trust for Betsy's children; Thompson Hine agreed to pay Betsy consideration; and the parties agreed to keep the agreement confidential. (Doc. 430-23, Settlement Agreement) (filed under seal).

### F. Father's Death and Ensuing Property Transfers

One month after the settlement of Betsy's lawsuit, Richard Ruebel, a member of Meranus's law firm, wrote a memorandum to Meranus stating that he had reviewed Father's estate plan "to determine whether and under what conditions Dennis Griffin and John M. Griffin, as the executors of Mr. Griffin's estate and the trustees of his trust, would be authorized to sell the stock

of Craig Protein which is currently owned by Mr. Griffin (or his trust)." (Doc. 428-50). Ruebel concluded that Dennis and Griffy could not make a sale of the stock to Griffin Industries "because such a sale would constitute a prohibited act of indirect self-dealing." (*Id.*). After a lengthy discussion of the law of self-dealing, Ruebel suggested that it might pass muster under Kentucky law if, prior to his death, Father granted an option to Griffin Industries to purchase the Craig Protein stock.

On a document dated March 4, 1995, Father gave an "option" to purchase his Craig Protein stock to two other sons, Marty and Thomas, stating:

> As a favor to me and to help the family, I want you to keep working with the company. If you do, in return when I die, you will have the right [] to buy my Craig [Protein] stock for the price the taxes are paid on. I want all of the brothers and sisters to honor this agreement.

(Doc. 430-147 at TH000679).

Father died on April 9, 1995. At that time, the Jackson property, Henderson property, and Jay Gee property were held in his trust, and the Bradford property and the Adams property were still owned in his name. Father also still personally owned 1000 shares of Craig Protein stock.

In an opinion letter dated May 19, 1995, Ruebel stated that he had "reviewed Kentucky law concerning the authority of an

24

executor to sell real property which was owned by the decedent."
(Doc. 428-56). Ruebel also again discussed Kentucky law on
self-dealing by fiduciaries, stating that "it is clear that you
and Griffy cannot sell the real property held in Mr. Griffin's
estate to Griffin Industries without violating the rule against
indirect self-dealing." (*Id.*). He further stated:

> We think the best way to get around the problem would
> be to sell the property to persons or an entity in
> which you and Griffy have no interest, since the rule
> only applies to sales made to the executors themselves
> or entities in which the executors have an interest.
> For example, the real property in Mr. Griffin's estate
> could be sold to any of Bobby, Marty, and Tommy, or
> any one or more of them, or to a partnership of the
> three of them. It might be a good idea to consider a
> partnership composed of some of the grandchildren (the
> children of you and Griffy, however, could not
> participate, at least until the conclusion of the
> estate).
>
> ***An alternative would be to get the five girls to
> consent to the sales, but this doesn't seem to be a
> realistic possibility.***

(*Id.*) (emphasis added).

On May 23, 1995, Dennis and Griffy, in their capacities as
Co-Executors of Father's estate, entered into Stock Purchase
Agreements with Martin and Thomas whereby the latter agreed to
purchase from Father's estate 500 shares each of Father's Craig
Protein stock. (Doc. 428-52).[6]

---

[6] Seven years later, in 2002, these two brothers transferred
their Craig Protein stock back to Griffin Industries in exchange
for 1,435 shares each of Company stock. (Doc. 428-54). That

Robert testified that, after Father's death, the Griffin Industries Board -- which included Dennis, Griffy, Robert, Martin, and Thomas -- wanted five of the above real properties "to maintain always in the ownership of somebody in upper management of the company" because "they were essential to those operations." (Robert Depo., Doc. 415-2, at 62).

In July 1995, Dennis and Griffy, as Co-Executors of Father's estate and Trustees of the trust, caused five of these properties to be sold to Martom Properties, a limited liability company whose members were children of Marty, Thomas, and Robert, ages 3 to 10. (Doc. 424-9, Deeds; Doc. 428-60, Letter).[7] Marty and Thomas were named as managers of Martom, but the parties dispute whether they had any real management responsibilities.

Griffin Industries personnel maintained the book and records of Martom and paid the company's bills. Martom also then leased these properties to Griffin Industries for a total

agreement required Marty and Tom to keep its terms confidential, allowing them to share the terms only with their professional advisors and immediate family. (*Id.* ¶ 6). Plaintiffs assert that these Griffin Industries shares netted Marty and Tom $21 million at the time of the Darling merger in 2010.

[7] The deeds reflect that the following amounts were received from the sale of the properties: $980,000 from the Jackson Property; $206,200 from the Henderson Property; $129,000 from the Bradford Property; and $87,000 for the Jay Gee Property and the Adams Property.

value of approximately $4.6 million over the ensuing sixteen years. (Doc. 424-10, Doc. 428-61).

The probate record for Father's estate contains no reference to the 1967 Trust or its assets, including the Jackson, Henderson, and Bradford properties. (Doc. 431-22). The references to the Jay Gee and Adams Properties described them as "vacant" land.

The record contains a letter from Dennis to the sisters dated December 1, 1997, attached to which is a spreadsheet showing the properties Father owned at the time of his death. (Def. MSJ Exh. 83). Betsy and Judy deny ever receiving this information. (Prewitt Depo. Doc. 410-1 at 168). Judy, however, remembers receiving a statement showing the property sales and amounts. (*Id.*). Cyndi denies ever receiving any accountings or financial documents pertaining to the assets in Father's rust. (Roeder Depo. Doc. 409-4 at 40, Doc. 410-3 at 67-72).

G. **The Darling Merger and Cold Spring Title Problem**

In 2010, Griffin Industries entered into a merger agreement with Darling International, Inc., in which Darling acquired all of Griffin Industries' stock. During due diligence, Darling's title company discovered that title to the Cold Spring headquarters was held in the name of "John L. Griffin, Trustee." (Doc. 428-65 at 3, 11/1/2010 email). In an email dated November

27

11, 2010, Darling's attorney stated: "Fee title to the property is held by John Griffin's five daughters. We will need a deed executed by the five daughters and their husbands." (Doc. 428-66).

Chris Griffin -- Robert's son and Griffin Industries' in-house counsel -- then began discussions with outside counsel, Keating, Meuthing, and Klekamp. Counsel discussed Kentucky law relied upon by the title company for the proposition that, because legal title to the Cold Spring property had always been held in Father's name, it had passed to the daughters through his estate. (Doc. 428-67, E-mail 12/8/2010).

In the meantime, on October 31, 2010, Cyndi received a list showing the shareholders of Griffin Industries as of October 1, 2010, which had been mistakenly included with tax forms the Company sent for Cyndi's daughter. (Doc. 428-71). Cyndi testified that this was the first time she had seen such a list and that she was "horrified" to see the percentages of stock ownership. (Roeder Depo. Doc. 409-4 at 83-85; Prewitt Depo. Doc. 410-1 at 28-32). Cyndi then shared the list with Linda and Judy, who were also "shocked." They met at Linda's house, and Linda called Robert, who volunteered to come over, accompanied by Griffy. (*Id.* at 86-87). Cyndi testified that the sisters

asked a lot of questions, including why they never got stock like Betsy. Robert said they "had enough" stock. (*Id.*).

Cyndi testified that the sisters first learned about the Cold Spring title issue at a special shareholders' meeting on November 5, 2010. (Roeder Depo. Doc. 409-4 at 76, 91). Linda asked how the title issue was overlooked in the estate, and Griffy said it was a "mistake" and he would "look into it." (*Id.* at 91-93). Cyndi testified that Dennis "blurted out" that Griffin Industries had been paying taxes on the property, and "he almost to the point threatened that we would have to pay back taxes on it if it was ours and he was very defensive." (*Id.*) Cyndi testified that Robert said "there was a possibility it could be owned by the girls" and that he would get back to them. (*Id.* at 94). Judy also testified that Robert said there was a problem with the title and "he thought the girls owned the building" and that Dennis said that the girls would have to pay back taxes and for improvements done to the building. (Prewitt Depo. Doc. 410-1 at 131-32).

On November 14, 2010, Robert again met with the sisters and told them that Father had used the headquarters for "leasing purposes" and that the girls "had no claim on the building." (*Id.* at 97).

Then, on November 22, 2010, the sisters, except Betsy, attended a meeting at Company headquarters. Robert told the sisters that they needed to sign a Special Warranty Deed, which stated in part:

> Under Kentucky law, a deed which purports to convey title to a trustee of a trust, but which does not specifically identify the trust, by operation of law vests title in the grantee in his individual capacity. **John L. Griffin died on April 9, 1995 and pursuant to the terms of his Last Will and Testament and Codicils thereto recorded in Campbell County Probate Book 1, Page 646, of the Campbell County Clerk's records at Alexandria, Kentucky and the terms of the John L. Griffin Trust Agreement dated January 20, 1967, as amended, First National Bank of Cincinnati, Ohio, Trustee, all interest in John L. Griffin's property passed to his daughters** . . . and the Trust was terminated. For the avoidance of doubt and to clarify the chain of title, Grantors hereby provide to Grantee this Special Warranty Deed.

(Doc. 428-68) (emphasis added).

The sisters testified that Robert told them that if they did not sign this deed, Griffin Industries would not be able to complete the merger and the shareholders would have to pay a $30 million penalty. (Roeder Depo. Doc. 409-4 at 100-103; Prewitt Depo. Doc. 410-1 at 116-24). Louis Solimine, counsel for Griffin Industries, was also present and told the sisters that legally it was "50/50" whether the sisters or the Company owned the property. Cyndi testified that the sisters were "confused" and exasperated, and that Judy said that if Betsy sued and won,

then "we get what Betsy gets" because they weren't "getting screwed again." (*Id.*; Prewitt Depo. Doc. 410-1 at 145).

Cyndi and Linda signed the warranty deed at this meeting. Cyndi testified that she felt like she was under a lot of pressure, especially because if they didn't sign and the deal fell through, they could be responsible for $30 million. (*Id.* at 107). Judy signed the deed in December. (Prewitt Depo. Doc. 410-1 at 106).

On November 23, 2010, Solimine sent an email to Betsy's counsel, explaining the title problem and stating: "Betsy's four sisters (and their husbands) have already agreed to [sign the deed] and I already have the signatures of Cyndi, Judy and Linda." (Doc. 428-69). He then asked that Betsy and her husband sign the deed, noting that the "other sisters did not ask for, nor did the company provide or agree to provide, any special consideration for their willingness to proceed in this matter." (*Id.*).

Shortly thereafter, Cyndi told Betsy that she, Judy, and Linda were not happy about the deed and that not everyone had signed it. (Roeder Depo. Doc. 409-4 at 109-113). After Betsy told Cyndi that Solimine had told her that everyone else had signed the deed, Cyndi called Solimine and asked for a copy of Father's will and trust and told him to revoke her, her

husband's, and Linda's signatures on the deed. (Holt Depo. Doc. 410-4 at 85-88).

On December 4, 2010, Judy met with Robert and told him she was upset about the allocation of the Company's stock, the sale of the Company, and the Special Warranty Deed pertaining to the Cold Spring Property.

The next day, Cyndi and Linda met with Griffy and expressed similar concerns. (Roeder Depo. Doc. 409-4 at 117-19). Cyndi asked Griffy why they had not seen the disbursement sheet of Father's will, and Griffy did not respond. She also asked why the sisters never got stock, and Griffy said because Dennis "thought you had enough."

On December 6, 2010, all the Griffin siblings except Betsy met at the Cold Spring headquarters. Cyndi mentioned a conversation she remembered having with Mother about the Cold Spring property going to the girls, and Griffy became "defensive" and told her she had had a "vision." (Roeder Depo. Doc. 409-4 at 126-31). The meeting became heated, and Janet called her sisters greedy. Cyndi testified that Griffy became angry, pointed fingers at the girls, and told them that it was because of people like them that they were selling the company, and said to her "What's it going to take, Cyndi, two million, one million?" (*Id.* at 129-30; Prewitt Depo. Doc. 410-1 at 146).

Robert then offered each sister $200,000 to sign the Special Warranty Deed. (Roeder Depo. Doc. 409-4 at 138-42). Griffy and Robert told Cyndi to call Betsy to see if she would agree. Cyndi did call Betsy, who said she would not agree to Robert's proposal. (Osborn Depo. Doc. 410-7 at 20, 62; Osborn Depo. Doc. 561-2 at 198). In another family meeting the next day, Cyndi informed everyone of Betsy's response. (Holt Depo. Doc. 410-4 at 101)

On December 13, 2010, Darling's title counsel communicated with Solimine in numerous e-mails, reiterating the title company's position that the Griffin daughters would need to consent to the transfer of the Cold Spring title. (Doc. 428-72). Solimine tersely responded that such consent was not needed because of the Trustees' authority under Father's trust. (*Id.*). In his final message, title counsel stated: "If you insist on going this route, we would insert an exception in the owner's policy for any loss or damage arising from any claim by an heir of John L. Griffin." (*Id.*).

### H. <u>Reopening of Father's Estate and Title Transfer</u>

On December 7, 2010, Chris Griffin contacted Keating partner Joseph Callow to look into the title problem. (Doc. 428-75). It is undisputed that another Keating partner, Joseph Mellen, had been retained in 1996 to handle estate issues for the

33

members of the Griffin family and the Griffin Family Trust. (Doc. 428-73). In October 2010, Mellen performed estate planning services for Cyndi and her family, the bill for which was not paid until February 9, 2011. (Doc. 428-74, Invoice).

Nonetheless, when Callow ran a conflict check on the title matter, he listed only Betsy and her husband as adverse parties. (Doc. 428-76).

On December 14, 2010, without plaintiffs' knowledge, Dennis, as Co-Trustee of the 1967 Trust, delegated all powers and discretion with respect to the disposition of the Cold Spring property to Griffy, the Co-Trustee. (Doc. 428-80).

On December 16, 2010, Griffy, assisted by Keating, filed a motion to reopen Father's Estate in the Campbell County Probate Court. (Doc. 424-23). The same day, Callow and another Keating attorney, Claire Parrish, along with Griffy and Chris Griffin, met with the probate judge off the record. Parrish testified that Callow told the probate judge that there was a title defect with respect to the Cold Spring property that needed to be corrected. The probate judge signed an order reopening the estate the same day (Doc. 424-24), and Griffy transferred the Cold Spring property to Griffin Industries by quitclaim and fiduciary deeds for $1.00. (Docs. 424-25, 424-26). Robert, as President of Griffin Industries, accepted both deeds.

The deeds state on their face that they were prepared by "Claire V. Parrish Esq., Keating, Muething & Klekamp PLL," with the firm's address and telephone number. (Doc. 424-25, 424-26).

The merger between Griffin Industries and Darling was completed the next day, December 17, 2010. Cyndi testified that Robert called her to tell her that the Company had sold, and she asked him what happened to the building, and he said "I'll tell you sometime" but that he never did. (Roeder Depo. Doc. 409-4 at 142).

However, plaintiffs also testified that they assumed, since the merger had gone through, that "the girls didn't own the building." (Prewitt Depo. Doc. 410-1 at 142-43; Roeder Depo. Doc. 410-3 at 313).

I. **This Litigation**

    1. **The _Osborn_ Action**

Betsy filed her lawsuit on April 27, 2011. In her Amended Complaint (Doc. 26), Betsy challenges the sales of the Martom properties, the Craig Protein stock, and the Cold Spring property.

Betsy asserts the following claims: (1) Breach of Fiduciary Duties as Trustees (Griffy and Dennis); (2) Breach of Fiduciary Duties as Executors (same); (3) Civil Conspiracy/Aiding and Abetting (all defendants); (4) Tortious Interference with

Inheritance (all defendants); (5) Fraudulent Conveyance in Violation of Kentucky Revised Statutes 378.010 (Griffy and Dennis); and (6) Negligence and/or Gross Negligence Arising out of Estate and Trust Administration (Griffy and Dennis).

Linda, Judy, and Cyndi testified that they read a copy of Betsy's First Amended Complaint in December 2011. (Holt Depo. Doc. 410-4 at 14; Prewitt Depo. Doc. 410-1 at 24; Roeder Depo. Doc. 410-3 at 37-38). Judy testified that this was the first time that she had read a copy of Father's will. (Prewitt Depo. Doc. 410-1 at 82).

Defendants filed a motion to dismiss the Amended Complaint on several grounds. The Court held a hearing on this motion on January 4, 2012, which Cyndi and Linda attended. (Holt Depo. Doc. 413-1 at 76; Roeder Depo. Doc. 410-3 at 33-34). The Court denied the motion to dismiss on January 5, 2012, stating:

> Having reviewed the written filings and heard from the parties, and being otherwise sufficiently advised, the Court finds that the facts alleged preclude a finding at this juncture that Plaintiff's claims are barred by either the statute of limitations or res judicata. *The Amended Complaint makes allegations of fraud and breach of fiduciary duty permeating all of the probate and trust transactions described and perhaps tolling the statute of limitations. In the opinion of the Court, full development of the record is required for a just resolution of this matter.*

(Doc. 45) (emphasis added).

Cyndi testified that she heard the Court discuss during this hearing the fact that the Cold Spring property had been transferred to Griffin Industries after defendants reopened Father's estate in December 2010. (Roeder Depo. Doc. 410-3 at 314).

On December 9, 2013, Betsy filed a Third Amended Complaint adding a RICO claim. (Doc. 373).

### 2. The *Holt* Action

On March 8, 2013, Linda, Judy and Cyndi filed their own lawsuit, naming as defendants Dennis, Griffy, Robert, Martom Properties, and the Keating law firm.

These sisters allege that the brothers realized in the 1980s after both parents became ill that under their wills and trusts, if Father died first, the "Non-working children"[8] would own a majority of the Griffin Industries stock. The sisters further allege that, after Mrs. Griffin died in August 1985, "the Griffin Defendants began executing a scheme to prevent the Non-Working Children from assuming control of the Company, and to garner the great bulk of the Griffin Industries stock for themselves." (Compl. ¶ 37).

---

[8] The "non-working children" were all of the daughters and one brother. (Compl. ¶ 29).

The *Holt* plaintiffs assert the following claims: (1) RICO (Dennis, Griffy, and Robert); (2) Fraud (same); (3) Breach of Fiduciary Duty with respect to Mom's Will (Griffy and Dennis); (4) Breach of Fiduciary Duty with respect to Dad's Will and Trust (Griffy and Dennis); (5) Civil Conspiracy/Aiding and Abetting (Griffy, Dennis, and Robert); (6) Tortious Interference with Inheritance (Griffy, Dennis, Robert, Martom); (7) Negligence and/or Gross Negligence with respect to Mom's Estate Administration (Griffy and Dennis); (8) Negligence and/or Gross Negligence with respect to Dad's Estate Administration (Griffy and Dennis); and (9) Professional Negligence (KMK).

### *Analysis*

### A. <u>Discovery/Evidentiary Matters</u>

Before turning to the merits of the dispositive motions, the Court must first address several preliminary discovery and evidentiary matters.

### 1. Objections to Orders of the Magistrate Judge

The parties object to several Orders of the United States Magistrate Judge.

### a. Docs 559 and 580 – Cold Spring Documents

The Court finds the objections lodged by both sides to the Magistrate's Orders entered at Doc. 559 and Doc. 580 effectively mooted given the Court's conclusion, discussed in detail below,

that equitable title in the Cold Spring property resided at all relevant times in Griffin Industries. Given that conclusion, documents reflecting actions taken by defendants in late 2010 to rectify the legal title defect do not fall within the "crime fraud" exception to the attorney-client privilege.

The Magistrate Judge ultimately so concluded in his Order with respect to the documents he had ordered be produced *in camera*, and he therefore declined to require defendant Robert Griffin and non-party Griffin Industries to produce those documents to plaintiffs. (Doc. 580).

Finally, to the extent that any of these objections are not mooted by the Court's rulings as to the Cold Spring property, the Court finds the Magistrate Judge's rulings to be thorough and well reasoned, and the Court will not disturb them.

### b. Doc. 556

Plaintiffs object to the Magistrate Judge's Order denying their motion to exclude certain documents relating to property acquired by Father in Nashville, Tennessee, as well as their motion to exclude expert testimony that relies on those documents. Specifically, these documents state that Father acquired the Tennessee property in his capacity as "Trustee" due to a pending corporate reorganization of Griffin Industries. Defendants thus wish to introduce the documents as

circumstantial evidence of Father's intent that the Cold Spring property, although acquired in his capacity as Trustee, also would be owned by Griffin Industries.

The Court first notes that it has afforded no weight to these documents in its analysis of the Cold Spring property ownership issue. To that extent, the dispute over these documents is immaterial.

Moreover, the Magistrate Judge's conclusion that defendants' late production of these documents was "substantially justified" and thus not subject to exclusion under Rule 37 is based on his detailed review of the record. The Court finds nothing in plaintiffs' objections that warrants altering his conclusion.

### c. Doc. 563

Finally, defendants object to the Magistrate Judge's Order determining the amount of attorneys' fees and costs defendants must pay plaintiffs under a prior Order imposing sanctions on defendants under Rule 37 for Dennis Griffin's failure to appear at a deposition.

The Magistrate Judge concluded that plaintiffs are entitled to $9,734.50 in attorneys' fees and $882.74 in costs. In so doing, the Magistrate Judge assessed all time entries for reasonableness and adjusted the compensable time downward from that requested by plaintiffs.

Defendants' objections to this Order largely re-argue the merits of the underlying sanctions award itself, and the Court otherwise finds nothing in the objections which justifies further decreasing the award of sanctions.

**2. Deposition Testimony of Dennis Griffin**

The next evidentiary matter before the Court is the motion by the Griffin defendants and Martom for the Court to disregard the deposition testimony of Dennis Griffin in ruling on the motions for summary judgment. (Doc. 541).

The issue of whether Dennis Griffin could be deposed was hotly litigated before the Magistrate Judge, with defendants arguing that Mr. Griffin's health and cognitive state rendered it dangerous for him to testify and that his testimony would be unreliable. The Magistrate Judge denied defendants' initial motion for a protective order but allowed them to submit medical evidence to support their position. (*See* Doc. 189 (Order)).

Upon submission of medical information for review by the Court, attorneys, and experts only, the Magistrate Judge ruled that defendants had not shown that being deposed would be dangerous to Dennis's physical or mental health. (*See* Doc. 248). The Magistrate Judge did allow, however, restrictions on the deposition to minimize the stress on Mr. Griffin. (*Id.*).

This Court overruled defendants' objections to that Order. (Doc. 293).

Dennis Griffin was then deposed over two days in October 2013, and the deposition was videotaped. (Docs. 415-3, 415-4, 550).

Defendants now argue that inconsistencies and inaccuracies in Dennis's testimony render it so unreliable as to be inadmissible. (Doc. 541). However, the Court has reviewed both the written transcripts of this deposition as well as the video recordings, and it is apparent to the Court that, while Dennis's memory may be faulty on many points, he is clearly competent to testify and his testimony, viewed as a whole, is not so lacking in meaningful, probative value that it should be excluded. Dennis is obviously a central witness in this case, and his demeanor and testimony appear to the Court to demonstrate a clear understanding of the issues herein, despite his alleged faulty recollection on many points.

To the extent that Dennis testified inaccurately as to dates and events -- even key ones -- he would not be the first witness to do so. As with any witness, the jury can afford whatever weight it deems appropriate to Dennis's testimony, given the surrounding facts. Moreover, some of the events at issue in this case date back many years, and many of the witnesses herein

have been unable to testify to certain matters given the passage of time.

Lastly, to the extent that defendants' motion is based on their argument that plaintiffs have seized upon Dennis's faulty memory to misrepresent his testimony or quote it out of context, the Court notes that it is more than capable of reading Dennis's testimony on its own, and it has done so.

For all the above reasons, defendants' motion for the Court to disregard Dennis Griffin's testimony will be denied.

**B. <u>Breach of Fiduciary Duty and Related Tort Claims</u>**

**1. General Fiduciary Principles**

"The law does not permit a person in a fiduciary capacity to handle the beneficiary's property so as to further his own ends." *Hutchings v. Louisville Trust Co.*, 276 S.W.2d 461, 464 (Ky. 1954). Rather, a fiduciary "owes the duty of utmost fidelity and loyalty to the beneficiary and if it appears that the trustee is guilty of such self-dealing the courts will not hesitate to declare such a transaction void." *Id.*

In *First State Bank of Pineville v. Catron*, 105 S.W.2d 162 (Ky. 1937), Kentucky's highest court quoted with approval the Restatement of the Law of Trusts § 170:

> A trustee is in a fiduciary relation to the beneficiary and as to matters within the scope of the relation he is under a duty not to profit at the expense of the beneficiary and not to enter into

43

competition with him without his consent, unless authorized to do so by the terms of the trust or by a proper court. *** The trustee violates his duty to the beneficiary not only where he purchases trust property for himself individually, but also where he has a personal interest in the purchase of such a substantial nature that it might affect his judgment in making the sale. Thus, a trustee violates his duty if he sells trust property to a firm of which he is a member or to a corporation in which he has a controlling or substantial interest. *** It is immaterial that the trustee acts in good faith in purchasing the property for the trust, and that he pays a fair consideration. This is true whether he purchases for the trust property which he owns individually, or property owned by a firm of which he is a member, or property owned by a corporation in which he has a controlling or substantial interest.

*Id.* at 166 (alterations in original).

The *Catron* court further stated: "Courts should not only discourage the reprehensible practice of fiduciaries bartering in trust funds to their own emolument, but, by withholding sanction, should remove any temptation to allow greed and selfish interests to supplant fidelity, good faith, and honest dealing in the administration of trust funds." *Id.*[9]

---

[9] In addition, Father's 1967 Trust specifically prohibited self-dealing, stating "[n]o Trustee shall participate in the exercise of any discretion with respect to the distribution . . . of any portion of the Trust Property in which he . . . has any beneficial interest." Further, the Trust contained a clause affording the Trustee the authority and discretion to "purchase, invest and reinvest the trust funds in, sell, change and exchange such stocks, bonds or other property, real or personal . . ." (Doc. 428-10 at ¶ 11(b)).

44

Trustees also have "a specific duty, inherent to the trust relationship, to provide information relating to the trust[,] and [] this specific duty extends to conditional or contingent beneficiaries." *JP Morgan Chase Bank, N.A. v. Longmeyer*, 275 S.W.3d 697, 701 (Ky. 2009).

In addition, and perhaps most fundamentally, an executor has a duty to distribute the assets of the estate either as directed by the will or provided by law. *Schlickman v. Citizen's Nat'l Bank of Covington*, 129 S.W. 823, 826 (Ky. 1910).

## 2. Statute of Limitations[10]

The Griffin and Martom defendants argue that plaintiffs' claims are all barred by the applicable statutes of limitations, each of which is five years.[11] While defendants recognize the applicability of the discovery rule and equitable tolling doctrine, they argue that plaintiffs cannot avail themselves of those doctrines based on the evidence. Defendants also assert that plaintiffs' claims for fraud are barred by the statute of repose. *See* Ky. Rev. Statutes § 413.130(3).

---

[10] This section addresses only the timeliness of plaintiff's state-law claims. The Court will discuss plaintiffs' RICO claims separately below.

[11] *See generally* Ky. Rev. Statutes § 413.120 (setting forth five-year statute of limitations for certain civil actions, including breach of fiduciary duty and other non-contract based claims).

Under Kentucky law, "[a]n estoppel may arise to prevent a party from relying on a statute of limitation by virtue of a false representation or fraudulent concealment." *Munday v. Mayfair Diagnostic Lab.*, 831 S.W.2d 912, 914 (Ky. 1992). The *Munday* court explained:

> Long ago a tolling statute was enacted which provides that a resident of this State who absconds or conceals himself "or by any other indirect means obstructs the prosecution of the action" shall not have the benefit of the statute of limitation so long as the obstruction continues. KRS 413.190(2). We have held that this tolling statute is simply a recognition in law of an equitable estoppel or estoppel *in pais* to prevent fraudulent or inequitable application of a statute of limitation.
>
> . . .
>
> Ordinarily, proof of fraud requires a showing of an affirmative act by the party charged. **An exception to this general rule may be found in a party's silence when the law imposes a duty to speak or disclose.**
>
> . . .
>
> **From the foregoing, it may be concluded that while concealment ordinarily requires an affirmative act, where the law imposes a duty of disclosure, a failure of disclosure may constitute concealment under KRS 413.190(2), or at least amount to misleading or obstructive conduct.**

*Id.* at 914-15 (emphasis added).

In its discussion, the *Munday* court cited *Security Trust Co. v. Wilson*, 210 S.W.2d 336 (Ky. 1948). There, the plaintiff's uncle, who was executor of plaintiff's father's estate, transferred to himself bonds that belonged to the

46

plaintiff as beneficiary. More than twenty years later, plaintiff brought an action alleging that the transfer of the bonds was fraudulent and in violation of her uncle's fiduciary duties. The defendants asserted defenses based on both the statute of limitations and statute of repose. 210 S.W.2d at 336-37.

The Court rejected these defenses, holding that where there is a fiduciary or other confidential relationship in which the fiduciary bears a duty of disclosure, a failure to speak constitutes a "means of obstruction" within KRS 413.190, thereby tolling the statute of limitations. *Id.* at 339-40.

Where such concealment or obstruction occurs in the context of a fiduciary relationship, "[t]he statute of limitations does not begin to run until actual discovery of the fraud, there being no duty on the part of the injured party to exercise due diligence to discover the fraud." *Boone v. Gonzalez*, 550 S.W.2d 571, 574 (Ky. Ct. App. 1977).[12]

---

[12] Defendants' reliance on *Emberton v. GMRI, Inc.*, 299 S.W.3d 565 (Ky. 2009), is thus misplaced because, although the Court there imposed a duty of due diligence on the injured party invoking tolling due to concealment, *id.* at 575, the case did not involve a fiduciary relationship. *Id.* at 569 (stating that case arose after a restaurant exposed a customer to Hepatitis A). Further, the imposition of a duty of due diligence in *Salmon v. Old National Bank*, No. 4:08-CV-00116-JHM, 2012 WL 4213643 (W.D. Ky. Sept. 19, 2012), is directly contrary the Supreme Court of Kentucky's holding in *Munday*. *See id.* at *10-12.

Finally, where there is such a confidential relationship, the recording of a deed or instrument does not constitute constructive notice to the injured party so as to commence the operation of the statute of limitations. *See Hernandez v. Daniel*, 471 S.W.2d 25, 26 (Ky. 1971); *Lemaster v. Caudill*, 328 S.W.2d 276, 281-82 (Ky. 1959).

The record in this case is replete with material factual disputes about whether defendants made adequate and truthful disclosures to the plaintiffs regarding their parents' estate plans, the settlement of Betsy's 1990 lawsuit, and the disputed transfers of stock and real property. These disputes are for a trier of fact. Accepting plaintiffs' testimony as to their actual discovery of the fiduciary breaches and fraud alleged, the Court thus cannot say as a matter of law that the claims are time barred.

### 3. Mother's Estate and Sale of Parents' Stock in 1985

The *Holt* plaintiffs assert breach of fiduciary claims against Dennis and Griffy premised on the administration of Mother's estate in 1985-1986, the sale of stock from her estate to defendants, and the sale of Father's Griffin Industries stock to certain grandchildren and the defendants. Betsy, of course, settled her claims based on these transactions in 1993.

It is undisputed that, at the time that Mother died, her will provided that her shares in Griffin Industries stock would pass to Father, who was still alive. However, under the 1985 plan, Father disclaimed his interest in that stock. What should have happened to the stock at that moment? Under Mother's will, the stock would have reverted to the residue of her estate, poured over into her trust, and been distributed to her children equally.

That did not happen. As detailed above, Mother's estate sold her Griffin Industries stock to the six brothers. That Stock Purchase Agreement was entered into by Dennis and Griffy as Co-Executors of Mother's estate on one side, and by Dennis, Griffy, Robert, Jim, Thomas, and Martin on the other side. (Doc. 430-20 at GII50936).[13] The proceeds from these sales flowed to Mother's trust and then were distributed to the beneficiaries, including plaintiffs.

---

[13] The Court rejects defendants' argument, raised in their reply brief (Doc. 528), that they are not the appropriate defendants as to this stock transaction because they were only the Co-Executors of Mother's estate and not the Trustees of her trust. As the above facts demonstrate, Dennis and Griffy effectively short-circuited the reversion of Mother's stock to her trust following Father's disclaimer and, *in their capacities as Co-Executors*, sold the stock to themselves and their brothers. A claim for breach of fiduciary duty based on their actions thus lies.

Thereafter, Dennis, Griffy, Jim, and Robert purchased Father's shares in the Company.[14]

It cannot be disputed that these actions contravened the terms of Mother's estate plan and thus constitute breaches of Dennis and Griffy's fiduciary duties as a matter of law. Nonetheless, defendants assert several additional defenses to plaintiff's claims premised on these transactions.

### a. Plaintiffs' Interest in Company Stock

Defendants first argue that the *Holt* plaintiffs have no claim to any Griffin Industries stock because, in the absence of the 1985 plan, they were entitled to none. The Court rejects this argument.

It is true that Mother's will left her stock to Father, and he thereafter could have done as he wished with it. However, the undisputed evidence shows that his disclaimer of Mother's stock, as well as his sale of his own stock to the sons, were actions taken pursuant to the 1985 plan and not pursuant to his or Mother's estate plans. There is no evidence that Father participated in the formulation of the 1985 plan; indeed, in September 1985, Dennis and Griffy had successfully moved to have Father removed as the Executor of Mother's will on the basis

---

[14] In addition, the *Holt* plaintiffs allege as improper defendants' actions in arranging for the Scott County property to be sold from Mother's estate to Griffin Industries in 1988.

that he was incapacitated. But for the 1985 Plan, the stock would have remained in Father's estate following Mother's death and, under Father's estate plan, it would have gone to his five daughters equally.

Defendants argue that, absent the 1985 plan, Father still would have sold his stock to the sons, leaving plaintiffs with no right to it. This assertion is, of course, entirely speculative, and the Court concludes that at a minimum there is a jury question on this issue. Defendants rely on the fact that Father "ratified" the stock sales in 1991. However, defendants obtained that ratification during the pendency of Betsy's first lawsuit, at a time when Father was still suffering from the effects of his stroke. The evidence of the meetings in which defendants and Meranus informed Father of Betsy's lawsuit and the need for his "ratification" of the 1985-1986 stock sales lends support to plaintiffs' theory that the earlier sales were irregular. In short, a reasonable jury could infer that in 1991 defendants were simply seeking to obtain Father's *post hoc* imprimatur on the prior sales that defendants orchestrated for purposes of retaining control of the Company, in contravention of their fiduciary duties.

The Court thus finds that a triable issue exists as to this defense to the *Holt* plaintiffs' claims based on the 1985-86 stock transactions.

### b. Res judicata – Claim Preclusion

Defendants next assert that the *Holt* plaintiffs are barred from bringing claims based on the 1985-86 stock transactions on the basis of claim preclusion, one form of res judicata.

"'A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were *or could have been* raised in that action.'" *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 528 (6th Cir. 2006) (quoting *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981)). "Res judicata is applied if it does not offend public policy or result in manifest injustice." *Nathan v. Rowan*, 651 F.2d 1223, 1226 (6th Cir. 1981).

Defendants rely on *Nathan* to assert that the *Holt* plaintiffs are barred from bringing the claims in question by the res judicata effect of Betsy's 1993 settlement. (Doc. 434 at 13). In *Nathan*, the Sixth Circuit held that non-parties and their privies in shareholder derivative actions "are bound by judgments *if their interests were adequately represented*." *Nathan*, 651 F.2d at 1226 (emphasis added). "It is well settled that the constitutional requirements of due process and full

faith and credit mandate that absent class members are not bound by a judgment in a class action unless the class representative provided adequate and fair representation." *Id.* at 1227 (citing *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940)).

In making the "adequacy" determination, "a court must take into consideration (1) whether the named representative has a common interest with the absent members of the class, and (2) whether the class representative vigorously pursued the interests of the class through the use of competent and qualified counsel." *Bowen v. Gen. Motors Corp.*, 685 F.2d 160, 162 (6th Cir. 1982). "Whether a named representative 'adequately represents a class depends upon all the circumstances of the case.'" *Bowen v. Gen. Motors Corp. AC Sark Plug. Div.*, 542 F. Supp. 94, 98 (N.D. Ohio 1981) (quoting *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975)), *aff'd*, *Bowen*, 685 F.3d at 162.

The Court has reviewed the circumstances of Betsy's first lawsuit and concludes that Betsy did not "adequately represent" the interests of her sisters such that the sisters should be barred by res judicata from pursuing their claims based on the 1985-1986 stock transactions.

First, it is undisputed that Betsy did not communicate with her sisters regarding the lawsuit, and the *Holt* plaintiffs

testified that they did not know what the lawsuit was about or what the claims were, only that Dennis and Griffy told them that Betsy and her husband were "greedy." (Roeder Depo. Doc. 409-4 at 30-32).

Second, it is clear from the record of the 1990 case that, not only was Betsy not "vigorously" representing her sisters' interests, but her settlement position ultimately was, at least in part, adverse to them. Under the tentative settlement reached in that case in early 1993, defendants agreed to transfer stock to all the sisters in exchange for their release of claims. *See generally* Case No. 90-209, Doc. 145 (Transcript of March 4, 1993 Hearing). Betsy's counsel, however, objected. When asked by the Court why, if Betsy was to receive stock that represented her share of Mother's stock to which she claimed entitlement, then the other sisters would not receive the same, Betsy's counsel responded: "That's between Dennis and Griffy and their own conscious [sic] and not my problem." (*Id.* at 24); *see also id.* at 25 ("That's right, and it shows that in fact Dick's client [Betsy] is getting extra consideration that the other siblings are not.").

This arrangement was confirmed by defendants' counsel in another hearing later in the year: "The siblings won't get any

stock as a part of the settlement." (Case No.90-209, Doc. 180 at 3).

Further, although the *Holt* plaintiffs were parties to the 1990 suit for purposes of the derivative claims, it cannot be said that Betsy adequately represented their interests in that capacity either, inasmuch as she agreed to the settlement of the derivative claims for the relatively modest sum of $10,000 when, in settlement of the other claims, she received many times more than that amount. This occurred despite the fact that Betsy and her sisters stood in the same legal shoes with respect to the breaches of fiduciary duty alleged in connection with the 1985-1986 stock transactions.

For all these reasons, the Court concludes that res judicata should not be applied to bar these claims. *See Spilker v. Hankin*, 188 F.2d 35, 38-39 (D.C. Cir. 1951) (declining to apply res judicata in context of fiduciary relationship because "res judicata, as the embodiment of a public policy, must, at times, be weighed against competing interests, and must, on occasion, yield to other policies").

### c. Acquiescence

Defendants also assert the equitable defense of acquiescence to the *Holt* plaintiffs' claims as to the 1985-86 stock transactions.

"Acquiescence consists of assent by words or conduct on which the other party relies." *Hazard Coal Corp. v. Ky. West Va. Gas Co., L.L.C.*, 311 F.3d 733, 740 (6th Cir. 2002). The doctrine bars a plaintiff's claim, however, only when the plaintiff has "full knowledge, or at least . . . sufficient notice or means of knowledge, of his rights, and of all the material facts." *Id.* (quoting J. Pomeroy, 2 *Equity Jurisprudence* § 965, at 2094 (5th ed. 1941)).

As the above discussion demonstrates, there are material disputes of fact as to whether plaintiffs had "full knowledge" of their rights in 1985 when defendants formulated the "redistribution" plan concerning their parents' stock in Griffin Industries. Whether defendants misrepresented their parents' estate plans and their sisters' rights thereunder is contested, and it thus cannot be said as a matter of law that plaintiffs knowingly agreed to the stock sales such that those sales are now "unimpeachable in equity." *Id.* (quoting J. Pomeroy, 2 *Equity Jurisprudence* § 965, at 2094 (5th ed. 1941)).

### d. Laches

Defendants next raise the affirmative defense of laches.

Laches constitutes "a negligent and unintentional failure to protect one's rights." *Chirco v. Crosswinds Cmtys., Inc.*, 474 F.3d 227, 231 (6th Cir. 2007) (quoting *Elvis Presley*

*Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991) (internal quotation marks omitted). "'A party asserting laches must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it.'" *Id.* (quoting *Herman Miller, Inc. v. Palazzetti Imps. & Exps., Inc.*, 270 F.3d 298, 320 (6th Cir. 2001)).

A presumption of unreasonable delay arises where the applicable statute of limitations has expired. *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 408 (6th Cir. 2002). "In order to overcome the presumption of laches, plaintiff must "(1) rebut the presumption of prejudice; (2) establish that there was a good excuse for its delay; or (3) show that the defendant engaged in 'particularly egregious conduct which would change the equities significantly in plaintiff's favor.'" *Id.* at 409 (quoting *Dana Corp. v. IPC Ltd. P'ship*, 674 F. Supp. 581, 583 (E.D. Mich. 1987)).

The Court concludes that the disputed issues of fact as to what defendants told or disclosed to the *Holt* plaintiffs regarding Betsy's prior lawsuit and the settlement thereof bar application of the doctrine of laches at the summary judgment stage under the third prong of the above test. That is, plaintiffs testified that defendants told them that Betsy's suit

57

was without merit, that she was simply greedy, and when it came time for plaintiffs to sign off on the settlement in the case, defendants refused to disclose any details thereof, telling plaintiffs that "it didn't concern" them. Further, it is undisputed that the record of Betsy's 1990 lawsuit was immediately sealed, not to be reopened until the current litigation arose.

Viewing the totality of the circumstances, the Court thus concludes that a jury question exists as to whether the doctrine of laches should bar the *Holt* plaintiffs' claims based on the 1985-1986 stock transactions.

### 4. Father's Estate

#### a. Cold Spring Property

Under Kentucky law,

> an express trust in realty may be expressed by conduct or implied from the conduct of the parties subsequent to the transaction, by which the trust is allegedly created and from circumstances surrounding that transaction, *even though there is no direct testimony to the effect that a trust was intended to be created at the time*.

*Wilson v. St. Clair*, 286 S.W.2d 554, 557 (Ky. 1955); *see also Evans v. Payne*, 258 S.W.2d 919, 921, 923 (Ky. 1953) (holding that express trust was created for benefit of investors even though other person took legal title in his name as trustee).

Such a trust in land, if parol, must be proven by clear and convincing evidence. *Wilson*, 286 S.W.2d at 556.

A parol trust may be created even "where a deed is absolute on its face." *Evans*, 258 S.W.2d at 921; *see also Winn v. William*, 165 S.W.2d 961, 965 (Ky. 1942) (recognizing, where naked trust created, the division of naked legal title and equitable title, which may be united at option of *cestui que trust*).

Here, the undisputed facts demonstrate that, although Father took the Cold Spring deed in his name as "trustee," thereby vesting legal title in him personally, it was Griffin Industries who paid for the property and thereafter treated it as its asset, with Father's knowledge and consent. Evidence of the surrounding circumstances -- board minutes, correspondence, and deposition testimony -- indicates that the property was acquired by Father in trust for Griffin Industries, and that equitable ownership at all times resided in the Company. There is no record evidence that Father ever treated the headquarters as his personal property.

Plaintiffs attempt to raise a material dispute on this issue by asserting that the check used to purchase the property was drawn on an escrow account at Paxton and Seasongood, but the only record evidence is that those funds originated from Griffin

Industries.   The correspondence accompanying the check, as recounted above, also reflects that Griffin Industries was the purchaser.

Under the above authority, therefore, although Father held naked legal title to this property, equitable title was at all times vested in Griffin Industries.[15]   Defendants are thus entitled to summary judgment on all claims based on the ownership of this property.[16]

### b. Transfer of Craig Protein Stock and Non-Cold Spring Properties

Plaintiffs also assert claims against Dennis and Griffy based on the sale of Father's Craig Protein stock to Marty and Thomas in May 1995, and on the sale of five parcels of land from Father's estate and trust to Martom Properties in July 1995.

---

[15] Given this conclusion, the Court need not address defendants' arguments regarding adverse possession.  In addition, the Court rejects plaintiffs' Statute of Frauds argument because "a parol agreement creating a trust in land does not come within the statute of frauds."  *Moore v. Terry*, 170 S.W.2d 29, 31 (Ky. 1943).  Moreover, Griffin Industries, as equitable owner of the Cold Spring property, could have demanded that Father, as Trustee, convey the legal title to the Company at any time, including within one year of the purchase.  Contrary to plaintiffs' assertion, there is no evidence that Father and the Company agreed that he would hold legal title "indefinitely."  Rather, all evidence suggests that this issue simply fell through the proverbial cracks until it surfaced in preparation for the merger with Darling in 2010.

[16] Inasmuch as plaintiffs' substantive allegations against Robert relate solely to his role in the 2010 merger and the Cold Spring title transfer, the Court also finds that Robert should be dismissed as a defendant as a matter of law.

"In the absence of any contrary provision by the settlor, a court or statute, the person entitled to the trust property on the termination of the trust must take it in kind as of the date of distribution and is not entitled to be paid in cash, but payment may be made in cash if the beneficiaries consent." G.G. Bogert, et al., *The Law of Trusts and Trustees* § 1010 (6th ed. 1987) (footnotes omitted).

"If there is a discretionary power to sell land given to the personal representative, the devisees may, nevertheless, demand distribution in kind." 2 *Kentucky Probate Practice and Procedure*, § 1668 (citing *Lucas v. Mannering*, 745 S.W.2d 654 (Ky. Ct. App. 1987)).

In *Lucas*, the executor was granted in the testator's will "the continuing, absolute, discretionary power" to deal with property in the estate, including "the right to sell and convey" such property. 745 S.W.2d at 655. The executor wanted to sell land in the estate to certain leaseholders, but the beneficiaries objected. In the executor's declaratory judgment action, the Court held that, there being no compelling evidence that the testator wanted the property sold and the proceeds divided among the beneficiaries, the executor thus had a fiduciary duty to transfer the property in kind to the beneficiaries. *Id.* at 656.

Here, the clear terms of Father's estate plan provided that all his property was devised and bequeathed to his trust, and that "all Trust property shall go to my five daughters equally, free of trust, and the Trust shall end." (Docs. 424-4, 424-5).

Thus, even accepting defendants' argument that a clause in Father's original will afforded them discretionary power to sell trust property, plaintiffs nonetheless had the right to demand distribution of the property in kind. *Lucas*, 745 S.W.2d at 656; Ky. Rev. Stat. § 395.200(3) (restricting fiduciary's authority to sell estate property where beneficiary has demanded distribution in kind). Plaintiffs were never given this choice, however, as Dennis and Griffy unilaterally made the decision to sell the Martom properties and Craig Protein stock out of Father's estate.

The Court thus concludes, as a matter of law, that the failure to inform the plaintiffs of their rights with respect to these properties and the ensuing sales were breaches of Dennis and Griffy's fiduciary duties.

In addition, the Court concludes that these sales breached Dennis and Griffy's fiduciary duties in another respect. Although Dennis and Griffy did not make the sales directly to themselves or to an entity in which they held a direct ownership interest, the evidence is clear that they had such a personal

interest in ensuring that the real properties and Craig Protein stock remained accessible for Griffin Industries' use and/or control that they could not have been acting in the primary interest of their sisters. *See Catron*, 105 S.W.2d at 166 (quoting Restatement (First) of Trusts § 170 (1935)) ("The trustee violates his duty to the beneficiary not only where he purchases trust property for himself individually, but also where he has a personal interest in the purchase of such a substantial nature that it might affect his judgment in making the sale.").

In fact, the brothers solicited legal advice as to how to effectuate a transfer of the Craig Protein stock just one month after the settlement of Betsy's lawsuit, which, of course, altered Father's estate plan to provide that all his property would pass to his daughters at his death. Notes produced by Griffin Industries' legal counsel reflect the plan to sell the Craig Protein stock to Thomas and Marty, stating "try to get sold before Betsy demands distribution." (Doc. 424-2).

Defendants assert that an "option" that Father executed on March 4, 1995, defeats plaintiffs' claim as to the Craig Protein stock. The Court rejects this argument as a matter of law, because both Marty and Thomas testified that they had never seen this option prior to being shown it in their depositions in

these cases. (Martin Griffin Depo., Doc. 415-5 at 228-29; Thomas Griffin Depo., Doc. 415-1 at 136-38). Indeed, Thomas testified that he did not even know as of the date of the option that Father owned Craig Protein stock and that he could not say for sure who offered him the stock to purchase. (Doc. 415-1 at 137-38). Therefore, no reasonable jury could conclude that a valid option contract for this stock was created prior to Father's death.

Similarly, shortly after Father's death, defendants sought legal advice about how to transfer the real properties out of Father's estate without running afoul of the law on self-dealing. (Doc. 428-56). Richard Ruebel advised Dennis that one alternative would be "to get the five girls to consent to the sales, but this doesn't seem to be a realistic possibility." (*Id.*). The "Martom" solution was then devised. Even accepting defendants' argument that Martom was an entirely separate entity in which they had no financial interest, it is nonetheless clear as a matter of law that defendants were not placing plaintiffs' interest first but were, instead, seeking ways to circumvent the provision of Father's estate that left those properties to his daughters. Defendants did this without advising the beneficiaries that they had an interest in these properties and a right under Kentucky law to demand distribution in kind.

Thus, no reasonable factfinder could conclude that Dennis and Griffy fulfilled their fiduciary duties with respect to these transactions.

The Court further rejects at the summary judgment stage defendants' defenses of acquiescence and laches for the same reasons discussed above with respect to the 1985-1986 stock transactions. Despite defendants' repeated assertion that plaintiffs had notice of these trust assets and their sales, there are material disputes of fact about what information was conveyed to the sisters regarding these matters.

For the same reason, the Court rejects at the summary judgment stage defendants' assertion that plaintiffs are barred from pursuing these claims because they "accepted the benefits" of these transactions, because two sisters purchased assets from Father's estate, and because plaintiffs have not tendered back the proceeds they received from these sales. This argument ignores the testimony that plaintiffs did not know what property Father held at the time of his death, as well as the fact that it is undisputed that some of the Martom properties were not even listed among Father's assets in the probate of his estate.

Moreover, it is well settled that beneficiaries suing for a breach of fiduciary duty by a trustee are not limited to rescission as the remedy for the breach but may instead recover

damages from the trustee. *See generally* G.G. Bogert, et al., *The Law of Trusts and Trustees* § 862 (6th ed. 1987); *see also Albert v. Black Motor Co.*, 357 S.W.2d 714, 719 (Ky. Ct. App. 1962) (holding that president of company who breached fiduciary duty in purchasing stock was properly required to pay damages rather than transfer shares back to company). The determination of what damages would make a plaintiff whole "is best left for determination by a jury." *Wiggins v. PNC Bank, Ky., Inc.*, 988 S.W.2d 498, 502 (Ky. Ct. App. 1998).[17]

Thus, the Court holds that, while Dennis and Griffy breached their fiduciary duties as a matter of law as to the Craig Protein and Martom properties transactions, triable issues of fact exist as to defendants' affirmative defenses to these claims.

C. **Professional Negligence – Keating, Meuthing & Klekamp**

The *Holt* plaintiffs assert that Keating committed malpractice against them in three ways: (1) by representing

_____

[17] Further, the Court rejects defendants' argument that plaintiffs' claims are barred by the probate exception to federal subject-matter jurisdiction. *See Wisecarver v. Moore*, 489 F.3d 747, 750 (6th Cir. 2007) (holding that probate exception does not apply where plaintiffs assert claims for breach of fiduciary duty, seek *in personam* jurisdiction over defendants, and do not seek to probate or annul a will).

Griffin Industries[18] as to the Cold Spring property transfer because the transfer of the title was directly adverse to the sisters, who had an interest in the property;[19] (2) by transferring that title, because Keating violated the Kentucky ethics rule requiring an attorney to safeguard the property of a client in which others claim an interest; and (3) by representing the Griffin defendants in Betsy's case, which was filed on April 27, 2011, when Keating still represented the *Holt* plaintiffs in their personal estate matters. *See* Doc. 426 at 51-58 (Plaintiffs' Motion for Partial Summary Judgment).

To prevail on a claim for legal malpractice, a plaintiff must prove: (1) "an employment relationship with the defendant/attorney"; (2) "the attorney breached his duty to exercise the ordinary care of a reasonably competent attorney acting in the same or similar circumstances"; and (3) "the attorney's negligence was the proximate cause of damage to the client." *Hughes v. DeMoisey*, Nos. 2010-CA-002093-MR, 2010-CA-

---

[18] Although Keating argues that Griffin Industries itself was not a client as to the Cold Spring title transfer, the firm's conflict check form identifies the Company as a client. (Doc. 428-76, 78).

[19] The Court's holding that the sisters had no equitable interest in the Cold Spring property removes this basis for their malpractice claim against Keating, but the Court will nonetheless address the independent issue of the timeliness of this cause of action.

002165-MR, 2010-CA-002166-MR, 2014 WL 2632504, at *4 (Ky. Ct. App. June 13, 2014).

The statute of limitations for legal practice provides, in pertinent part:

> [A] civil action, whether brought in tort or contract, arising out of any act or omission in rendering, or failing to render, professional services for others shall be brought within one (1) year from the date of the occurrence or from the date when the cause of action was, or reasonably should have been, discovered by the party injured.

Ky. Rev. Stat. § 413.245.

"The statute actually provides two different limitations periods: one year from the date of the 'occurrence,' and one year from the date of the actual or constructive discovery of the cause of action." *Queensway Fin. Holdings Ltd. v. Cotton & Allen, P.S.C.*, 237 S.W.3d 141, 147 (Ky. 2007).

Keating facilitated the transfer of the Cold Spring property from Father's estate to the Company on December 16, 2010. (Docs. 424-25, 424-426). Had the plaintiffs held any interest in the property, they would have been injured at that time, and the transfer thus constitutes the "occurrence" for limitations purposes. *Queensway*, 237 S.W.3d at 147. The *Holt* plaintiffs did not file their case until March 8, 2013, more than one year later.

Plaintiffs argue that their malpractice claim relating to the Cold Spring property is nonetheless timely by virtue of (1) the continuous representation rule, and (2) the discovery rule. The Court disagrees.

The "continuous representation" rule "tolls the legal negligence statute of limitations so long as the attorney continues to represent the client in *the* matter." *Nicely v. McBrayer, McGinnis, Leslie & Kirkland*, 163 F.3d 376, 386-87 (6th Cir. 1998) (emphasis added) (quoting *Alagia, Day, Trautwein & Smith v. Broadbent*, 882 S.W.2d 121, 125 (Ky. 1994) (internal quotation marks omitted).

Plaintiffs assert that, because Keating's representation of them in their personal estate matters did not end until May 2012 or later, their malpractice claim filed in March 2013 is timely.

However, the continuous representation rule requires that the attorney's legal counsel to the plaintiff "relates to the same transaction or subject matter as the allegedly negligent acts." *Id.* at 387 (quoting *Gill v. Warren*, 751 S.W.2d 33, 36 (Ky. 1988) (internal quotation marks omitted). Plaintiffs' personal estate and tax matters are not the "same" transaction or subject matter as the Cold Spring title problem discovered during due diligence in the Darling merger. Plaintiffs offer no evidence that Keating's continued representation in personal

estate matters in any way delayed plaintiffs' discovery of the alleged malpractice in the title matter, which is the policy underlying the "continuous representation" rule. *See Sae Bang Optical v. Kenmark Optical, Inc.*, No. 3:05-CV-168-JDM, 2006 WL 2846984, at *3 (W.D. Ky. Sept. 28, 2006).

Plaintiffs argue in the alternative that their claim is timely because they could not reasonably have discovered their injury until October 2012, when they retained counsel and when Cyndi was deposed in Betsy's case. This assertion is belied by the record.

Plaintiffs testified that they knew when the Darling merger closed -- on or just after December 17, 2010 -- that the Cold Spring property had been transferred to Darling. (Prewitt Depo. Doc. 410-1 at 142-43; Roeder Depo. Doc. 410-3 at 313; Holt Depo. Doc. 410-4 at 104-05). Under Kentucky law, "[a] person who knows he has been injured has a duty to investigate and discover the identity of the tortfeasor within the statutory time constraints." *Queensway*, 237 S.W.3d at 151 (quoting *Combs v. Albert Kahn Assocs., Inc.*, 183 S.W.3d 190, 199 (Ky. Ct. App. 2006) (internal quotation marks omitted).

Plaintiffs -- who had previously been informed that there was a question concerning title to the Cold Spring property and that they, in fact, might have an interest in it -- could easily

have examined the deeds related to the property, which were filed of public record and which stated on their face that they were prepared by Keating. (Docs. 424-25, 424-26). Plaintiffs thus failed to exercise "reasonable diligence," the burden imposed on them by Kentucky law, and the filing of their malpractice claim more than one year later was untimely. *See Blanton v. Cooper Ind., Inc.*, 99 F. Supp. 2d 797, 802 (E.D. Ky. 2000) (discussing the "reasonable diligence" requirement of Kentucky's discovery rule).

Moreover, it is undisputed that plaintiffs also received knowledge that would again have triggered their duty of due diligence as to the Cold Spring title transfer on two later dates: when they read Betsy's Amended Complaint in December 2011, and when they attended a hearing in her case on January 4, 2012. Both occasions placed before the plaintiffs facts regarding the title transfer that would have caused a reasonable person to inquire into that transaction, an inquiry which easily would have shown Keating's involvement.

However, plaintiffs did not file their lawsuit until March 8, 2013, more than one year after all these key dates. Their malpractice claim is thus untimely as a matter of law.

## D. <u>RICO Claims</u>

All four plaintiffs assert RICO claims against Dennis, Griffy and Robert.

Title 18 section § 1962(c) of the United States Code states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

The statute provides a civil remedy for "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c).

"A plaintiff thus must plead sufficient facts to establish the existence of a 'pattern' of racketeering activity." *Vemco, Inc. v. Camardella*, 23 F.3d 129, 133 (6th Cir. 1994). "Racketeering activity" is defined to mean "any act or threat involving" specified state-law crimes, acts under certain federal statutes, and certain federal offenses. 18 U.S.C. § 1961(1).

Further, a "racketeering act" must be "part of the execution of the fraud," a requirement the Supreme Court has held to be satisfied where the act is "incident to an essential part of the scheme" or a "step in [the] plot." *Schmuck v.*

*United States*, 489 U.S. 705, 710-11 (1989) (quoting *Badders v. United States*, 240 U.S. 391, 394 (1916)).

A "pattern of racketeering activity" requires at least two acts of racketeering activity occurring within ten years of each other. 18 U.S.C. § 1961(5). "A pattern is not automatically established, however, by a large number of unrelated acts; the acts must be ordered and arranged so as to exhibit 'relatedness' and 'continuity.'" *Camardella*, 23 F.3d at 133 (citing *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 237-38 (1989)).

Finally, to prove a RICO claim, a plaintiff must show injury proximately caused by the alleged racketeering activity. *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 266-68 (1992).

### 1. Statute of Limitations

"The Supreme Court has imposed a four-year statute of limitations on RICO claims." *Sims v. Ohio Cas. Ins. Co.*, 151 F. App'x 433, 435 (6th Cir. 2005).

In *Rotella v. Wood*, 528 U.S. 549 (2000), the Supreme Court explained that, to bring a civil RICO claim, the plaintiff need only have discovered her injury, not the other elements of her RICO claim: "[I]n applying a discovery accrual rule, we have been at pains to explain that discovery of the injury, not

discovery of the other elements of a claim, is what starts the clock." *Id.* at 555.

In so holding, the Court noted that it had previously rejected an "injury and pattern discovery" rule whereby the limitations period would begin to run anew upon each predicate act forming part of the same pattern. *Id.* at 554 (citing *Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997)). *Rotella* thus stands for the proposition that a plaintiff need not know all the elements required to bring a civil RICO claim to start the limitations period running.

Thus, "[t]he four-year period begins to run when a party knew, or through exercise of reasonable diligence should have discovered, that the party was injured by a RICO violation." *Sims*, 151 F. App'x at 435. "A plaintiff need only be aware of 'storm warnings' but does not need to 'hear [ ] thunder and see [ ] lightening.'" *Id.* at 436 (quoting *Isaak v. Trumbull Sav. & Loan Co.*, 169 F.3d 390, 399 (6th Cir. 1999)).

### a. The *Holt* Plaintiffs

The *Holt* case was filed on March 8, 2013. (Doc. 1). Thus, any RICO claim accruing prior to March 8, 2009 would be facially untimely.

The *Holt* plaintiffs allege a single RICO enterprise beginning in September 1983 and continuing until December 2010,[20] with the first alleged predicate act occurring on or about September 25, 1987. (*Holt* Complaint ¶¶ 104, 115). The first five predicate acts relate to the transfer of Griffin Industries stock out of Mother's estate in 1985-1986. (Complaint ¶ 115). Plaintiffs' RICO claim is thus facially untimely, and plaintiffs bear the burden of demonstrating defendants' fraudulent concealment of the RICO injury and their own due diligence. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194-96 (1997).[21]

Plaintiffs' claim fails under RICO's stringent duty of due diligence. Unlike the beneficiary-friendly standards under Kentucky law, a RICO plaintiff asserting fraudulent concealment must exercise reasonable diligence. *Id.* The reason for this

---

[20] Given the Court's ruling as to the Cold Spring property, plaintiffs' RICO allegations based on transactions involving that property do not constitute predicate acts as a matter of law. (*Holt* Complaint ¶¶ 134-143).

[21] The Court notes that plaintiffs improperly rely on Kentucky law as it applies to fraudulent concealment in the context of a fiduciary relationship in opposing defendants' motion as to the timeliness of their RICO claims. (Doc. 487 at 46-53; Doc. 473 at 13-25). Instead, "federal rather than state tolling doctrines should govern in civil RICO actions." *Riverwoods Chappaqua Corp. v. Marine Midland Banks, N.A.*, 30 F.3d 339, 347 (2d Cir. 1994). *See Strassman v. Almahurst*, No. 93-5137, 1994 WL 234282, at *2 (6th Cir. May 31, 1994) (noting requirement of due diligence where plaintiff relies on fraudulent concealment to toll RICO limitations period).

standard is that RICO "civil actions seek not only to compensate victims but also to encourage those victims themselves diligently to investigate and thereby to uncover unlawful activity." *Id.* at 195.

Defendants assert that plaintiffs had knowledge of these challenged stock transactions because they were informed of the 1985 plan and because they actually signed as trustees for their children's purchase of stock as part of the plan. Plaintiffs counter that they were unaware at the time of the terms of their Mother's estate plan or that these stock sales were contrary to that plan.

The Court finds that this dispute is immaterial because it is undisputed that, by the early 1990s, the *Holt* plaintiffs were aware that Betsy had filed a lawsuit against Dennis and Griffy, just months after the closure of Mother's probate estate. Even accepting plaintiffs' contention that Dennis and Griffy dissuaded them from inquiring into the substance of Betsy's claims -- which itself should arguably have alerted plaintiffs to the possibility that Dennis and Griffy were being less than candid with them -- it is undisputed that plaintiffs easily could have obtained Betsy's complaint, which was a public record from the time of its filing until approximately three years later. Even a cursory review of that complaint would have

revealed to plaintiffs exactly the same allegations regarding Mother's stock that they now assert as a basis for their RICO injury. Plaintiffs admittedly took no action, however, to look into the matter further, even after defendants demanded that they sign the 1993 settlement agreement without disclosing its terms.

The Court thus concludes as a matter of law that the *Holt* plaintiffs cannot demonstrate reasonable diligence on their part so as to equitably toll the applicable RICO limitations period.[22]

### b. Betsy

Betsy amended her complaint to add a RICO claim on December 9, 2013, which relates back to her original complaint filed on April 27, 2011. Thus, any RICO claim by Betsy accruing prior to April 27, 2007 would be facially untimely.

Betsy alleges a RICO enterprise beginning in April 1995 and continuing through January 2011. (Third Amended Complaint ¶ 84). The seventeen racketeering acts she alleges[23] relate to transactions involving the Craig Protein stock and Martom properties, beginning on May 16, 1995. (Third Amended Complaint ¶ 96).

---

[22] For this reason, the Court need not address defendants' numerous other arguments as to why plaintiffs' RICO claims fail as a matter of law.

[23] Again, allegations concerning the Cold Spring property are not cognizable. (Third Amended Complaint ¶¶ 98-103).

On the record before this Court, Betsy stands in a different position than her sisters with respect to knowledge of Father's estate plan. That is, as part of the settlement of her 1990 lawsuit, Betsy explicitly negotiated for the Seventh Codicil to Father's will and the Fifth Amendment to Father's trust, which provide that all his property would go to his five daughters equally.

Father died on April 9, 1995, and his estate and trust were administered from 1995 to 1998. At that time, Betsy knew the terms of his estate plan pursuant to the settlement to which she had agreed only two years prior. A duty of reasonable diligence would dictate that she inquire into what property he held at his death and whether it had been distributed in accord with her settlement agreement.

It is undisputed, however, that Betsy did nothing at the time. Indeed, although she received only cash from the estate, she did not question whether there was property to which she was entitled. Defendants have produced evidence that, in 1997, they sent to the sisters a spreadsheet showing the properties owned by Father when he died, including the Martom properties and Craig Protein stock. (Def. MSJ Exh. 83). Although Betsy now denies ever receiving this information, it is nonetheless evidence that demonstrates that she failed to exercise due

diligence in obtaining information that was available and which would have alerted her to the transactions she now characterizes as predicate acts of racketeering.

As a matter of law, therefore, Betsy cannot avail herself of equitable tolling of the RICO statute of limitations, and this claim is untimely.

**E. Counterclaim Against Betsy**

On December 20, 2013, defendants answered Betsy's Third Amended Complaint and asserted a counterclaim against her for breach of the 1993 settlement agreement. (Doc. 380). Betsy has now moved to dismiss that counterclaim pursuant to Rule 12(b)(6). (Doc. 400).

Defendants allege in their counterclaim that Betsy breached the settlement agreement by: (1) challenging Father's competency through the date of the settlement agreement; (2) contesting the sales of Father's stock that occurred prior to 1993; and (3) challenging the testamentary documents executed by Father pursuant to the 1993 settlement agreement. (Counterclaim ¶¶ 9-13).

The Court concludes that the Counterclaim fails to state a claim against Betsy because it does not allege facts which, if true, raise a plausible claim that she breached the terms of that agreement. That is, the fact that Betsy alleged generally

in her Third Amended Complaint that defendants intended to maintain control of Griffin Industries does not constitute a challenge to pre-1993 stock sales, when, in fact, none of Betsy's claims are based on those sales. Rather, as the above discussion details, Betsy's claims challenge only the Martom properties, Craig Protein, and Cold Spring property transactions.

Second, defendants do not allege any specific facts creating a plausible claim that Betsy has "contested" Father's competency, and the Court is not constrained to accept defendants' legal conclusions to this effect. *Ashcraft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations . . . is inapplicable to legal conclusions."). None of Betsy's claims depend on a finding that Father was incompetent to enter into the 1993 settlement agreement or any other pre-1993 transaction.

Third, defendants allege no facts which would demonstrate that Betsy has "challenged" Father's Seventh Codicil and Fifth Amendment in this litigation. In fact, Betsy's claims are premised on the allegation that defendants failed to adhere to the terms of those testamentary documents in effectuating the property transactions in dispute.

Finally, defendants' allegation that Betsy has "pooled" resources with the *Holt* plaintiffs does not cure these pleading deficiencies.

### *Conclusions*

To summarize the Court's rulings, the Court concludes that triable issues of fact remain as to: (1) whether the statutes of limitations were tolled on plaintiffs' common-law claims due to defendants' concealment or obstruction, pursuant to Kentucky Revised Statutes section 413.190 and applicable case law; (2) whether Father would have sold his Griffin Industries stock to his sons during his lifetime such that the *Holt* plaintiffs would have had no interest in that stock at the time of his death; (2) whether the *Holt* plaintiffs' claims based on the 1985-86 stock transactions are barred by the defenses of acquiescence or laches; and (3) whether plaintiffs' claims based on the Craig Protein and Martom Properties transactions are barred by the defenses of acquiescence and laches.

Therefore, having heard the parties, and the Court being sufficiently advised,

**IT IS ORDERED** that:

(1) Although the Court has dismissed the sole federal claim in the *Holt* action, the Court concludes that its exercise of supplemental jurisdiction over these

81

plaintiffs' remaining state law claims is appropriate, pursuant to 28 U.S.C. § 1367;

(2) The objections (Docs. 571, 572, 564, 575, 584, 585) to the Orders of the Magistrate Judge be, and are hereby, **OVERRULED**;

(3) The motion by the Griffin defendants and Martom for the Court to disregard the deposition testimony of Dennis Griffin in ruling on the motions for summary judgment (Doc. 541) be, and is hereby, **DENIED**;

(4) Plaintiffs' motion for leave to file a surreply (Doc. 553) be, and is hereby, **GRANTED**;

(5) Keating's motions for summary judgment (Docs. 422, 423) be, and are hereby, **GRANTED**;

(6) The Griffin defendants' motion for all claims related to the Cold Spring property (Doc. 433) be, and are hereby, **GRANTED**;

(7) Defendants' motion for summary judgment that all claims are time-barred (Doc. 432) be, and is hereby, **GRANTED IN PART AND DENIED IN PART**;

(8) Defendants' motion for summary judgment based on the 1985-86 stock transactions (Doc. 434) be, and is hereby, **DENIED**;

(9) Defendants' motion for summary judgment on all claims based on the administration of Father's estate (Doc. 435) be, and is hereby, **DENIED**;

(10) Plaintiffs' motions for summary judgment (Docs. 424, 427) be, and are hereby, **DENIED**, consistent with this Opinion;

(11) Defendants' motion for summary judgment as to the RICO claims (Doc. 436) be, and is hereby, **GRANTED**;

(12) Betsy's motion to dismiss the counterclaim against her (Doc. 400) be, and is hereby, **GRANTED**; and

(13) **A status conference be, and is hereby, SET FOR THURSDAY, NOVEMBER 13, 2014 AT 1:30 P.M.**, during which the Court intends to discuss setting a trial date in January, 2015.

This 29th day of September, 2014.



Signed By:
*William O. Bertelsman*
United States District Judge