**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**


CIVIL ACTION NO. 2011-89 (WOB-CJS)

ELIZABETH A. OSBORN                          PLAINTIFF

VS.

JOHN M. GRIFFIN; ANTHONY A.
GRIFFIN, EXECUTOR OF THE
ESTATE OF DENNIS B. GRIFFIN;
ANTHONY A. GRIFFIN, TRUSTEE OF
THE DENNIS B. GRIFFIN REVOCABLE
TRUST; MARTOM PROPERTIES, LLC                DEFENDANTS


**and**


CIVIL ACTION NO. 2013-32 (WOB-CJS)

LINDA G. HOLT, JUDITH E.
PREWITT, CYNTHIA L. ROEDER                   PLAINTIFFS

VS.

JOHN M. GRIFFIN; ANTHONY A.
GRIFFIN, EXECUTOR OF THE ESTATE
OF DENNIS B. GRIFFIN; ANTHONY A.
GRIFFIN, TRUSTEE OF THE DENNIS B.
GRIFFIN REVOCABLE TRUST; MARTOM
PROPERTIES, LLC                              DEFENDANTS


## FINDINGS OF FACT, CONCLUSIONS OF LAW. AND ORDER

These cases present a dispute over the disposition of
assets in the estates of the plaintiffs' parents, including the
stock of a company founded more than seventy years ago by their
father.  Some of the challenged transactions occurred more than

thirty years ago.  One of the plaintiffs brought and settled a related lawsuit more than twenty years ago.  In late 2010, however, a series of events caused the plaintiffs to raise new questions about their brother-fiduciaries' conduct, and these lawsuits resulted.

Although millions of dollars are at stake, at heart this is a family fight.  The dispute has turned siblings and generations against each another.  Despite its best efforts, the Court has been unable to convince the parties to compromise.  It is thus time for the Court to do what it can to bring these matters to a conclusion.

## I. OVERVIEW

Before setting out its detailed factual findings and legal conclusions, the Court believes it helpful to describe the forest before focusing on the trees within it.

As noted, this is a family fight of significant and unfortunate proportions.  Even in the family context, however, well settled principles of equity and fiduciary law apply.  The Court has already held that defendants breached their fiduciary duties to their sisters by engaging in transactions that contravened the provisions of their parents' estate plans and constituted self-dealing.  These breaches occurred amid a family dynamic in which it was the sons — or "working boys," as they

2

have been referred to — who were schooled in the business that their father had built and, ultimately, who followed in his management shoes.  Although their parents had gifted the sisters a nominal amount of company stock in their youth, the sisters were not groomed to participate in the company's management, nor did their brothers wish them to participate in any such way.

Consequently, the Griffin siblings seemingly occupied what might be termed "traditional" gender roles with respect to the family business.  Certainly, the record is clear that the sons — Dennis B. Griffin and John M. Griffin in particular — occupied positions of authority vis à vis their sisters, and no more so than when their parents' health failed and responsibility for the company and the family fell to the next generation.

However, as will be discussed in detail below, Mr. and Mrs. Griffin's estate plans called for equal treatment of their then-living eleven children.  While defendants' mantra in litigation has been that "Father wanted the boys to get stock and the girls to get a million dollars," none of their parents' estate plans created before the breaches of fiduciary duty herein reflected such an intent.  This is true despite the fact that the parents had ongoing estate planning advice from sophisticated counsel.

It appears that the family dynamic described above gave rise to a fervent belief in the sons that their sisters had no

3

business playing any role in the company's management, no business owning any property that was important to the company, and certainly no business in owning company stock that would allow them a voice in corporate decisions. Again, however, this belief was not in keeping with their parents' testamentary documents.

The record of this case reveals a pattern, spanning decades, of the brothers exercising their authority over their sisters by sharing information selectively; by leveraging their roles to discourage and, sometimes, intimidate, the sisters from seeking information or from questioning their brothers' decisions; by pitting one sister against the others; and by staunchly insisting that their actions were in keeping with their Father's wishes, even in the face of documents that reflected the contrary.

The brothers assert, in their defense, that their sisters were remiss for not ferreting out the fiduciary breaches sooner and that their claims are thus barred under several equitable theories. At first blush, this argument has appeal, for some of the challenged transactions indeed date back many years.

However, as discussed below, the above dynamics enabled defendants to successfully rebuff their sisters' inquiries over the years, not in a way that would have given the sisters full

4

knowledge that something was legally awry, but simply in a way that reinforced the message that the sisters, who had always been admonished to respect and trust their brothers' authority, had neither the need nor the right to know the details regarding their parents' estates.   This approach seems to have been effective particularly because, notwithstanding the brothers' breaches, the sisters still received handsome sums from their parents' estates.   With generous checks arriving regularly, and with assurances that the brothers would "take care of it" and do right by their sisters, the sisters toed the line.   However, this changed in 2010 with the revelation of certain information, and whatever family harmony had been restored in the preceding years dissolved.

## II.   PROCEDURAL BACKGROUND

The labyrinthine procedural background of these cases need not be recounted in full here.[1]   For present purposes, the following is relevant:   Summary judgment practice resulted in the dismissal of all plaintiffs' claims except those against two of their brothers for breach of fiduciary duty and related common law torts. *Osborn v.* Griffin, 50 F. Supp.3d 772 (E.D. Ky. 2014).   The Court held as a matter of law that certain

---

[1] The Court's summary judgment opinion (Doc. 590) recounts the procedural history of the case up to that time.

transactions by Dennis and Griffy in their administration of their parents' estates violated their duties as fiduciaries to their sisters. *Id.* at 796-98, 801-02.[2]  The Court further found, however, that triable issues remained as to equitable defenses asserted by the brothers, including tolling under Kentucky Revised Statute 413.190, acquiescence, and laches.

Both sides moved for reconsideration of the Court's rulings, which the Court denied. (Doc. 612).  The Court set the matter for trial.  (*Id.*).  Following certain discovery and collateral matters irrelevant here, the parties began filing their pretrial motions, witness lists, and exhibit lists.

On or about April 10, 2015, the Court was informed of the death of defendant Dennis B. Griffin, so it suspended all deadlines and vacated the trial date to allow for the substitution of his estate as a party.  (Doc. 681, 683). Thereafter, the trial was rescheduled for September 14, 2015. (Doc. 688).

---

[2] The Court found breaches of fiduciary duty as a matter of law in defendants' administration of both Mother's and Father's estates, including defendants' purchase of Mother's Griffin Industries stock from her estate, their purchase of Father's Griffin Industries stock from his Trust, and the sale of several properties and Craig Protein stock from Father's estate and trust after his death. *Id.*  **To be clear, defendants' mystifying statement in a recent filing that the Court "made no findings of breach of fiduciary duty regarding Father's *inter vivos* sale of Griffin Industries stock" (Doc. 855 at 3 n.1) is false.**

After reviewing the parties' pretrial submissions, the Court entered an order on August 4, 2015, dismissing plaintiffs' remaining common law claims as barred by the statute of repose. (Doc. 759 at 1). The Court also held that plaintiffs' claims for breach of fiduciary duty, for which they sought the remedy of disgorgement, sounded in equity, as did the defenses thereto, such that all disputed issues should be tried to the Court rather than a jury. (*Id.* at 1-3).

The case was tried from September 14 to September 23, 2015, after which the parties submitted proposed findings of fact, conclusions of law, and post-trial briefs, which the Court has carefully studied.

### III. FINDINGS OF FACT

#### A. Family and Company Background

1. Griffin Industries was founded by John L. Griffin in 1943. (Jt. Stip. ¶ 1)[3]. Griffin Industries was a rendering company that grew into a multi-million dollar business with operations in several states. (R. Griffin Testimony, Doc. 828: 71-74; Roeder Testimony, Doc. 809:54-55).

2. John L. Griffin ("Father") was married to Rosellen Griffin ("Mother"). (Jt. Stip. ¶ 2).

---

[3] The parties' Joint Stipulations are found at Doc. 748.

3.    John and Rosellen Griffin had twelve children, of whom nine are still alive.   Four of the daughters are plaintiffs: Elizabeth ("Betsy") Osborn, Linda Holt, Cynthia ("Cyndi") Roeder, and Judith ("Judy") Prewitt.   One daughter, Janet Means, is not a party.   The oldest surviving son, John M. Griffin ("Griffy") is a defendant.   His older brother, Dennis B. Griffin, was a defendant until his death in 2015, and his estate and trust were made defendants in his place.   Son Robert Griffin was a defendant but the Court dismissed him on summary judgment. Sons Martin ("Marty") and Thomas ("Tommy") Griffin are not parties.   (Jt. Stip. ¶¶3-4; Def. Prop. Findings of Fact, Doc. 835 ("DPFOF") ¶ 2; Doc. 590 at 60 n.16).

4.    The Griffin children were taught that the older siblings were in charge and that the younger siblings had to respect them.   (Roeder Testimony, Doc. 809: 54).

5.    All the Griffin children worked in the business after school and in summers, with the girls doing primarily office work and the boys working in the plants.   At home, the girls cleaned the house and the boys did the yard work.   When the girls married, their husbands usually worked in the company. (Roeder Testimony, Doc. 809: 55-57).

6.   Each Griffin child received about 1% of Griffin Industries stock as gifts from their parents in the 1960s or

70s.   The brothers were also given some shares from a Russellville plant, but Mother assured Linda, Cyndi, and Judy that that the children would be treated equally after their parents' deaths.   (Holt Testimony, Doc. 816: 45; Roeder Testimony, Doc. 809: 57-59: Prewitt Testimony, Doc. 813: 53-54).

7.   Between 1964 and 1978, Father and Mother purchased several properties: (1) the "Jackson property" in Jackson, Mississippi; (2) the "Henderson property" in Henderson, Kentucky; (3) three properties in Pendleton, County Kentucky (the "Bradford property," the "Jay Gee property," and the "Adams property"); and property in Scott County, Indiana (the "Scott property").   These properties were titled in Father's name and were used by Griffin Industries in its operations.   (M. Griffin Testimony, Doc. 814:187-88; J. Griffin Testimony, Doc. 821: 19-22; D. Griffin Depo., Doc. 415-4 at 122; Plf. Exhs. 19-21).

8.   In 1974, property was purchased by Father, acting as trustee for Griffin Industries, in Cold Spring, Kentucky which would thereafter be used as the company's headquarters.   (Doc. 590 at 7).

9.   In 1981, Griffin Industries purchased a rendering company in Dublin, Georgia called Craig Protein, Inc.   Father held 1,000 shares of the Craig Protein stock while Griffin

9

Industries held the remaining shares.   (Jt. Stip. ¶ 32; Def. Exh. 110; Plf. Exh. 42).

### B. **The Parents' Estate Plans**

10.    Mother executed a Last Will and Testament in 1967, naming Father as Executor.  (Jt. Exh. 5).  Mother also created a revocable trust, to which the residue of her estate would pass. (Jt. Stip. ¶ 20).  On March 28, 1973, Mother executed a codicil to her will that bequeathed the shares of Griffin Industries stock she owned at her death to Father if he survived her, and otherwise to her Trust.  (Def. Exh. 5 at GTE04917).[4]  On December 31, 1981, Mother restated her trust to name the First National Bank of Cincinnati, later known as Star Bank, as Trustee and to provide that all assets of the Trust would be divided into equal portions for her eleven children.  (Def. Exh. 5 at GTE05282).

11.    Father executed a Last Will and Testament in 1967, which provided that all his chattel property would pass to Mother and, if she predeceased him, to his eleven children in equal amounts.  A first codicil in 1967 bequeathed his stock to Mother, then to his 1967 Trust if she predeceased him.  Father's second codicil, executed in 1974, bequeathed his stock to

---

[4] Although defendants' label this exhibit as a proffer, the Court indicated that all exhibits not objected to were admitted into evidence, and this exhibit was so admitted.

Mother, with the stock to be purchased by Griffin Industries if she predeceased him.   In 1974, Father executed a third codicil changing his alternate beneficiary to his children, equally.   In 1975, Father executed a fourth codicil that left his stock to Mother, except for any stock purchased by Griffin Industries. If Mother predeceased Father, then the stock would be distributed equally to his children.   A fifth codicil was executed in 1981 that made no changes to the distribution of the stock.  (Jt. Exhs. 3, 4).

12.  Father also created a Trust in 1967 which, under a First Amendment executed on October 2, 1978, provided that its assets would be distributed among seven of the children when they turned thirty (or, if deceased, their living issue, if any): Cyndi, Marty, Tommy, Linda, Judy, Janet, and Betsy.  (Jt. Exh. 3)   These children were the seven who were not then working full-time for Griffin Industries.   (Plf. Exh. 54 at TH005141).   A further amendment in 1981 did not alter the distribution of the trust's assets.  (Jt. Exh. 3).

13.   In early 1982, Father's legal counsel prepared memoranda reflecting the fact that, due to Griffin Industries' status as a Subchapter S corporation, the four working children were receiving significantly more income from Griffin Industries that the seven non-working children.   These memoranda state that

Father wanted "to adjust this result" by making additional gifts of company stock to the non-working children. (Plf. Exhs. 54, 55).

14. The memoranda prepared by legal counsel also noted that, if Mother died before Father, the non-working children would end up with more shares than the working children. (Plf. Exh. 55 at TH-00007454-55).

15. None of Father or Mother's estate documents created up to this point in time provided that the parents' stock in Griffin Industries would be distributed unequally among their children at the time of the parents' death.

16. The testimony that Father wanted the boys to have all the stock in Griffin Industries conflicts with Father's estate plan, described above. For example, Janet Means testified that during a visit to her Florida home in 1983, Father stated that he wanted the boys "to have the company, run the company," (J. Means Testimony, Doc. 823: 108), yet only two years prior to that, Father had executed his fifth codicil which did not alter the will's provision that, if Mother predeceased Father, then Father's stock would pass to the children equally.

17. The testimony that Father wanted the boys to have all the stock in Griffin Industries also conflicts with the memoranda prepared by Father's counsel in 1982 memorializing his

12

intention to gift additional stock to the seven non-working children, which included all five sisters.

18. The Court need not speculate as to possible explanations for Father's alleged statements, but defendants' proffered construction (DPFOF ¶ 19, 21) is in direct conflict with Father and Mother's estate plans. The Court thus rejects it.

19. Father also established a Griffin Family Trust in 1983 as a joint investment pool for family members. (Blair Testimony, Doc. 823: 16-18; Plf. Exh. 14). The Trust maintained separate accounts for individual participants, who received monthly statements for their personal accounts.

**C. Father's Stroke, Mother's Death, and Ensuing Events**

20. In the late 1970s, Mother developed Parkinson's Disease, and the sisters helped care for her, particularly Cyndi and Linda. (C. Roeder Testimony, Doc. 809: 64-65). The disease was debilitating physically but it did not affect Mother's mind. (Holt Testimony, Doc. 816: 13).

21. Father had a massive stroke on September 10, 1983, and he was hospitalized for months. As a result, Father lost the ability to speak, was paralyzed on his right side, lost vision in his right eye, and was impaired cognitively. After months in a rehabilitation facility, Father returned home. Although his

13

condition improved, Father was never again able to care for himself, drive, or walk without assistance. Eventually, he could say one word, "shit." He never returned to active work at Griffin Industries. (Jt. Stip. ¶ 5; C. Roeder Testimony, Doc. 809: 65-68; M. Griffin Testimony, Doc. 814:157-58; Holt Testimony, Doc. 816: 13-14; Prewitt Testimony, Doc. 813: 56).

22. Father later relearned to print his name, with assistance, but he could not write other documents. (M. Griffin Testimony, Doc. 814: 158; Holt Testimony, Doc. 816: 14).

23. Dennis told Linda "don't let dad sign anything because you know he doesn't understand." (Holt Testimony, Doc. 816: 15).

D. **The 1985 "Redistribution" Plan and Drawbridge Inn Meeting**

24. Mother died on August 20, 1985. When Mother died, she was survived by Father. Mother's will named Father as her executor. Mother also had a Trust, and a bank was the trustee of her Trust. (Jt. Stip. ¶ 6; Jt. Exh. 5).

25. At her death, Mother owned 15,291 shares of stock in Griffin Industries, which was 13.58% of the company. Father owned 59,671 shares of Griffin Industries, which was 52.98% of the company. (Jt. Stip. ¶ 18).

26. The Griffin children owned the rest of the stock in Griffin Industries which they had bought or received from their

14

parents over the years: Dennis owned 6.47% of the company; Griffy, James, and Robert each owned 6.35% of the company; and Martin, Thomas, Janet, Judith, Cyndi, Linda, and Betsy each owned 1.13% of the company. (Jt. Stip. ¶ 19).

27. Mother's interests in her home, her possessions, and all of her stock in Griffin Industries were bequeathed to Father. Her will provided that the residue of her estate, after Father personally inherited her home, chattel property and Griffin Industries stock, was bequeathed to her Trust. Father and the eleven then-living children were the beneficiaries of Mother's Trust. (Jt. Stip. ¶ 20).

28. Under Father's then-existing estate plan, at his death the stock he inherited from Mother would pass to his eleven children in equal amounts. (Jt. Exh. 4 at GTE00041).

29. From 1943 to 1985, Father and Mother did not sell their Griffin Industries stock to anyone, including their sons. (J. Griffin Testimony, Doc. 816:121-22).

30. On September 4, 1985, Dennis and Griffy petitioned the Campbell County Probate Court to remove Father as Executor of Mother's Will on the grounds that he was "unable to act as such executor by reason of a recent stroke and current paralysis which have rendered him unable to appear before the Court or sign a statement declining his appointment as executor." Dennis

and Griffy thus became executors of Mother's will.  (Def. Exh. 5 at GTE04927-28).

31.  On September 25, 1985, Dennis and Griffy obtained Father's power of attorney.  (Plf. Exh. 13).

32.  On November 14, 1985, a Third Amendment to Father's 1967 Trust was executed that removed the bank that had been the trustee of his 1967 Trust since its creation and designated Dennis and Griffy as successor trustees.  Four days later, on November 18, 1985, Father transferred his 53% in Griffin Industries stock to his Trust.  At the time they became trustees of Father's Trust, Dennis and Griffy knew that they were going to transfer Father's stock to themselves and their brothers. They did not inform the bank of their plans.  (Jt. Exh. 3 at GTE00290; J. Griffin Testimony, Doc. 816: 109-14; Plf. Exh. 3).

33.  Dennis and Griffy consulted with counsel to develop a plan ("the 1985 Plan") to "redistribute" Father and Mother's stock in Griffin Industries.  On November 26, 1985, Dennis and Griffy, along with Dewey McDougal, Griffin Industries' Chief Financial Officer, met with Leonard Meranus, an attorney and Griffin Industries' primary outside counsel.  This meeting resulted in a plan which, when fully implemented, would result in the transfer of all of Father and Mother's company stock to the six brothers.  (Jt. Exh. 9 at Z00619-626).  Father was not

16

present at this meeting, and there is no evidence that he had any input into the terms of the plan.   The Court, therefore, rejects the defendants' proposed factual finding that it was Father who "effectuated" this plan.   (DPFOF ¶ 34).

34.   The first element of this plan was that the six sons would purchase the 15,291 Griffin Industries shares in Mother's estate, using installment notes payable over nine years.   (Jt. Exh. 9 at Z00619).

35.   The second element was that Father's Trust would sell 196 shares of Father's company stock to 23 of his grandchildren's trusts, thereby reducing Father's Trust's ownership to 48.98%.   The grandchildren's trusts would then give the six sons an option to purchase the shares within five years for 60% of their book value.   (Jt. Exh. 9 at Z00619-20).

36.   Father would disclaim all the company stock left to him by Mother, as well as his marital share of her Trust. Dennis, Griffy, Robert and James would each disclaim their right to receive all but $100,000 from Mother's Trust.   (Jt. Exh. 9 at Z00620-21).

37.   Finally, the six sons would purchase the remaining, now minority shares of the Griffin Industries' stock held in Father's Trust.   (Jt. Exh. 9 at Z00622).

38.   Dennis called a family meeting to discuss Mother's estate on November 29, 1985 at the Drawbridge Inn in Fort Mitchell, Kentucky.  (Jt. Stip. ¶¶ 21-22; Jt. Exh. 11).  All the Griffin children were there, as was Leonard Meranus.  Father did not attend. (Roeder Testimony, Doc. 809: 78; Prewitt Testimony, Doc. 813: 57; Holt Testimony, Doc. 816: 17-18; M. Griffin Testimony, Doc. 814: 158).

39.   Dennis led the Drawbridge Inn meeting. He said that Mother's and Father's wills were a "mess" and that everything had been planned on the assumption that Father would die before Mother.   He also said that there could be a $5 million tax liability which could bankrupt the company, and that shareholders would no longer receive sub-S distributions due to the financial strain.  Dennis further stated that their parents intended for all the company stock to go to the sons. (Roeder Testimony, Doc. 809: 79-80; Prewitt Testimony, Doc. 813: 57-58; M. Griffin Testimony, Doc. 814: 158-59; Holt Testimony, Doc. 816: 17-20; J. Griffin Testimony, Doc. 816: 130-31; Jt. Exh. 11 at 006005).

40.   Linda stood up and asked how their parents' estates could be such a mess, and Dennis told her to shut up and sit down.  (Holt Testimony, Doc. 816: 19).

41. Dennis said all they had was Mother's 1967 will, and he did not mention any codicils or a trust. (Prewitt Testimony, Doc. 813: 58-59; Holt Testimony, Doc. 816: 18). Dennis and Griffy did not provide the family with Mother and Father's estate documents. (Roeder Testimony, Doc. 809: 80-81; R. Griffin Testimony, Doc. 828: 95-96; Dennis Griffin Depo., Doc. 415-4, at 125-26).

42. Dennis also stated that Mother's will would not be probated and that Father's will would not be subject to probate. (Jt. Exh. 11 at 006004; Roeder Testimony, Doc. 809: 89; Osborn Testimony, Doc. 814: 16).

43. At the time of the Drawbridge Inn meeting, the sisters had never seen their mother's estate documents, did not know what their terms were, and did not know what assets were in her estate. (Roeder Testimony, Doc. 809: 77; Prewitt Testimony, Doc. 813: 56-57, 61). Similarly, Marty had never seen his mother's or father's wills, codicils, or trusts. Dennis and Griffy did not tell him in 1985 that he was a beneficiary under those trusts. (M. Griffin Testimony, Doc. 814: 160-61).

44. No one advised plaintiffs that they should obtain their own legal counsel. (Dennis Griffin Depo., Doc. 415-3 at 123-24; Roeder Testimony, Doc. 809: 86; M. Griffin Testimony, Doc. 814: 160).

19

45. Plaintiffs, their sister Janet, and their brother Marty relied on Dennis and Griffy to handle their parents' estate matters. (M. Griffin Testimony, Doc. 814:161-62; Prewitt Testimony, Doc. 813: 61, 65; Means Testimony, Doc. 823: 124, 134; Holt Testimony, Doc. 816: 70).

46. Mother and Father's estate planning attorneys had, in fact, given consideration to what would occur if either parent died first. (Plf. Exh. 55).

47. Griffin Industries was profitable in 1985 and was not facing bankruptcy. (Dennis Griffin Depo., Doc. 415-3 at 113; J. Griffin Testimony, Doc. 816: 141-44).

48. Implementation of the 1985 Plan did not generate cash for the company's use. (J. Griffin Testimony, Doc. 816: 146).

49. The 1985 Plan was contrary to the terms of Mother's estate plan and Father's then-existing estate documents. In fact, the Plan was designed "to achieve [defendants'] goal or preservation of the company control by the sons that operate" Griffin Industries." (Jt. Exh. 11 at 006005).

50. The day after the Drawbridge Inn meeting, Betsy and her husband met at Cyndi's house where Cyndi's husband stated that the girls were getting "screwed." (Osborn Testimony, Doc. 814: 42-43).

51.   About one week after the Drawbridge Inn meeting, Dennis called another family meeting at his house, attended by the sisters, their spouses, and other family members. Father did not attend. There was a family planner there who told them about another local family business that went bankrupt due to poor estate planning. After the planner left, Dennis told them he thought he had come up with a plan, mentioning the sale of stock to the grandchildren. When Betsy and her husband Bill asked questions, Dennis became agitated, smacked his fist, and said, "If you don't go along with it, we're going to buy you out right here, right now." (Prewitt Testimony, Doc. 813: 60-63; Roeder Testimony, Doc. 809: 81-85; Osborn Testimony, Doc. 814: 43-44).

52.   The Holt plaintiffs were not asked to approve the 1985 Plan and there was no vote on it. The Holt plaintiffs understood that the grandchildren were going to buy stock from Father to generate cash for the company. They did not know that their brothers were buying their parents' stock. (Roeder Testimony, Doc. 809: 85-87, 135-37; Prewitt Testimony, Doc. 813: 61).

53.   Because Dennis and Griffy did not make full disclosure of the terms of Mother's and Father's estate plans, did not advise the beneficiaries to obtain their own counsel, and did

21

not disclose their planned self-dealing, plaintiffs could not have given their informed consent to the plan. The Court thus rejects defendants' assertion that plaintiffs "agreed to" the plan. (DPFOF ¶ 40). To the extent that Leonard Meranus's memorandum of the Drawbridge Inn meeting so states (Jt. Exh. 12), the Court rejects it as inaccurate and self-serving. This finding is supported by the fact that when Betsy consulted Meranus several years later about her concerns about how her parents' stock had been handled, Meranus told her that her father never intended such an uneven distribution of wealth and that she should get her own counsel. (Osborn Testimony, Doc. 814: 10).[5]

54. The Court also rejects defendants' proffered finding of fact that Dewey McDougal, Griffin Industries' Vice-President of Finance, had a meeting in November 1985 at which the sisters were present and at which McDougal told the sisters that it was Father's intent to leave them a million dollars and leave the

---

[5] For the same reason, the Court rejects defendants' proposed finding that, had Leonard Meranus's memory not faded and had he not died prior to trial, he could have testified to the "appropriateness" of the 1985 plan. (DPFOF ¶ 49). Under the undisputed facts, as found by the Court on summary judgment, the stock transactions in which defendants engaged violated the terms of Mother's estate plan, constituted self-dealing, and breached their fiduciary duties as a matter of law. Thus, under no set of facts could they be deemed "appropriate," regardless of any testimony to the contrary.

company and the stock to the boys. (DPFOF ¶ 71). McDougal's deposition testimony, which the Court reviewed in its entirety, is fraught with inconsistencies and backtracking regarding this alleged meeting. McDougal first testified that he had a specific memory that both Mother and Father attended and that the meeting occurred at the Griffin Industries headquarters in Cold Spring, Kentucky. (McDougal Depo., Doc. 409-1 at 68-70). McDougal then conceded that could not be accurate, given that Mother had died prior to November 1985. From there, his testimony unraveled. McDougal was unable to testify exactly when or where the meeting occurred; who was present; who directed him to speak to the sisters, given that Father was unable to say more than a single word after his stroke two years prior; and whether Meranus was present. (*Id.* at 70-77). He also testified that none of the sisters asked any questions, rather he simply made the single pronouncement and the meeting ended. (*Id.* at 79-80). The Court finds that this testimony, viewed in its totality, lacks credibility.

55. On December 2, 1985, Father disclaimed all the Griffin Industries stock left to him by Mother. (Jt. Exh. 14). The same day, Griffin Industries' Board of Directors waived the company's right to buy back Mother's shares and terminated the stock-purchase agreement that gave it rights to buy back both

23

Father's and Mother's shares.   (Def. Exh. 14 at GII51061-62). Dennis and Griffy, in their capacities as Co-Executors of Mother's Estate, then immediately sold Mother's 15,291 shares of Griffin Industries stock to themselves and their brothers Robert, James, Thomas, and Martin.  (Plf. Exh. 15).

56.  On December 19, 1985, Father disclaimed 62% of his interest in Mother's trust.  (Jt. Exh. 15).  The cash proceeds of the sale of Mother's stock went into Mother's Trust and were later distributed 38% to Father (due to his disclaimer), with the balance being divided among the seven younger children (the four oldest brothers having disclaimed).

57.  On January 3, 1986, the Holt plaintiffs signed documents effectuating the sale of stock from Father's Trust to the Holt plaintiffs' children's trusts, as well as purchase agreements under which Dennis, Griffy, Robert and James would later repurchase the shares at 60% of their book value.  (Dec. Exh. 14 at GII50974-51042).

58.  On January 7, 1986, Griffin Industries waived its right to purchase Father's stock.  Father's signature and that of David Holt — Linda's husband, who was a member of the board — appear on this document.  (Def. Exh. 14 at GII51066).  The same day, Dennis, Griffy, James, and Robert purchased 55,163 shares in Griffin Industries from Father's Trust for approximately $6.9

24

million, payable by installment notes. (Def. Exh. 14 at GII50961-73).

59. These transactions resulted in the transfer of 66.56% of Griffin Industries' stock to the six sons, leaving Dennis, Griffy, Robert, and James owning 87.6% of the company stock. When James passed away several years later, his stock was divided among Dennis, Griffy, and Robert. (J. Griffin testimony, Doc. 816: 121).

60. The Court rejects defendants' proposed finding that Father "personally" sold his stock to his sons. (DPFOF ¶ 4). Instead, defendants caused Father to transfer the stock to his Trust, and then, in their capacities as Trustees, Dennis and Griffy sold the stock to themselves and two of their brothers.

61. Plaintiffs did not receive any stock under the 1985 plan. (Jt. Stip. ¶ 29).

62. Subsequently, Linda and Cyndi went to see Dennis in his office and Linda asked about Mother's will. Dennis was angry and he took out a paper and said, "Here it is." Linda started to pick it up, and Dennis yanked it out of her hand, told her she didn't need to see it, and that he was taking care of it. The sisters were embarrassed because Dennis was causing a scene, so they left. On another occasion, Linda and Judy saw Dennis in his office and again asked about Mother's will, and

25

Dennis threw a copy across the table and became very angry, yelling at them.  The sisters left without picking up the will. (Holt Testimony, Doc. 816: 64-68; Roeder Testimony, Doc. 809: 148-51; Prewitt Testimony, Doc. Doc. 813: 72-73).

63.  In September, 1987, Dennis and Griffy distributed most of Mother's remaining estate to her Trust.  In a letter to the sisters dated September 25, 1987, on which Dennis was copied, Meranus stated that Mother's estate was valued at approximately $2.75 million, and that after a reserve of $500,000 for possible additional taxes, $2.25 million was being distributed.  The letter further discussed Father's disclaimer, stating that it was motivated by tax considerations.  It also stated that under Mother's will, the proceeds remaining after Father's share should have been divided into eleven shares, but that the four oldest brothers' shares were being given to the sisters.  Checks to the sisters for $228,272.74 were enclosed with this letter. (Def. Exhs. 409, 411).

64.  Additional distributions in smaller amounts were sent with letters to the sisters in 1989 and 1990.  (Def. Exhs. 23, 35).[6]  Plaintiffs each received approximately $261,000 from Mother's legacy.  (Jt. Stip. ¶ 29).

---

[6] Defendants' proposed findings also reference their exhibits 19, 24, 25, and 26.  (DPFOF ¶ 83).  However, these exhibits were not

65.  These letters to the sisters mentioned only Mother's will and did not mention her Trust.  It did not mention the sale of her stock to the sons.  The Holt plaintiffs did not know that Mother had a trust, and they did not know that her will had been probated.  They did not know that this distribution represented proceeds from the sale of her stock.  Dennis and Griffin never provided the Holt plaintiffs with an accounting from Mother's estate or trust.  (Roeder Testimony, Doc. 809: 80, 85-86, 88-89, 131, 147-48, 153, 160; Doc. 813: 33; Prewitt Testimony, Doc. 813: 56-59, 61, 97, 107: Holt Testimony, Doc. 816: 16-19, 21-23).

66.  Mother's estate, but not her Trust, was administered from 1985 to 1990 through the Campbell County Probate Court.  Documents in the public probate file disclose the sale of Mother's Griffin Industries stock from her estate.  (Jt. Stip. ¶ 6; Def. Exh. 5).  Notice of the proposed settlement of Mother's estate was published in the legal advertising section of The Kentucky Post on June 30, 1990.  (Def. Exh. 30).

**E. Betsy's Inquiries, 1990 Lawsuit, and Settlement**

67.  Around this time, Betsy learned that Dennis was going to transfer stock to his children, and when Betsy questioned him

---

offered or admitted at trial.  (Doc. 830, Exhibit and Witness List).

about how he could do that, Dennis became upset and told her that stock "didn't concern" her. Betsy asked Griffy about it, but he said he had not read the will. Betsy then went to see Leonard Meranus, and he told her she needed to talk to Dennis, so she again approached Dennis and Griffy. Griffy told her that if she didn't like what they were doing, she should "sue them." When Betsy asked Meranus if he knew what was going on, he told here that Father never intended for such an uneven distribution of wealth. Meranus then advised Betsy to get her own counsel. (Osborn Testimony, Doc. 814: 8-10).

68. On January 20, 1990, Betsy wrote a letter to Dennis and Griffy stating that she had reviewed Mother's will and believed that they had not handled her estate in accord with her will and that she believed she was entitled to 1/11 of Mother's Griffin Industries stock. (Def. Exh. 28). Non-party sister Janet Means received a copy of this letter and retained it in her records. (Means Testimony, Doc. 823: 104-05). Cyndi did not receive a copy of this letter. (Roeder Testimony, Doc. 809: 155) Linda and Judy were not asked about this document at trial. The Court thus concludes that the Holt plaintiffs did not receive or see this letter.

69. Betsy testified that, after she got a copy of Mother's estate documents, she told her sisters that they were entitled

28

to stock from Mother's estate and that she sent them copies of Mother's will.  (Osborn Testimony, Doc. 814: 60-64).  The Court rejects defendants' proffered finding that Betsy "explained her claims to them at that time" (DPFOF ¶ 89), however, because her testimony does not so state or allow such an inference.   In fact, Betsy's 1991 deposition testimony that counsel used for cross examination at trial states the opposite: "I have not told them what happened.  You can have my sisters sit here, and I guarantee you they still do not know what happened."  (Case No. 90-209, Elizabeth Osborn Depo. #1, filed 1/29/92, at 66).

70.  By the spring of 1990, Betsy had retained counsel, who began corresponding with Meranus regarding Betsy's concerns about the way her brothers had handled Mother's estate.  (Def. Exh. 29; Def. Exh. 5 at GTE04967).  Non-party sister Janet Means produced copies of this letter and related documents during discovery in this case.  (Def. Exhs. 29, 32).

71.  Betsy filed exceptions in Mother's probate matter in July 1990 (Jt. Stip. ¶ 9), but the probate court found that she lacked standing to bring objections to the settlement of Mother's estate.  (Def. Exh. 5).

72.  In August 1990, Betsy wrote a letter to Cyndi stating that she "may want" a copy of Mother's will, trust, and codicil to better understand what Betsy's intent was in questioning

Dennis and Griffy's handling of Mother's estate. (Roeder Testimony, Doc. 809: 155-59). The Court rejects defendants' proffered finding that copies of Mother's will, trust, and codicil were enclosed with this letter to Cyndi. (DPFOF ¶ 90). Cyndi's 1991 deposition, on which defendants rely, is unclear on this issue. (Def. Exh. 43 at 51-53). Moreover, counsel's cross-examination of Cyndi at trial asked Cyndi why she took no steps to obtain a copy of these documents, which would have been unnecessary if they were sent with the letter from Betsy. (Doc. 809: 159) ("Q. When your sister told you that you should get a copy of the will and the codicil and the trust, did you take any steps to get a copy of the will and the codicil and the trust in the summer of 1990?").

73. Rather, the Court finds credible Cyndi's trial testimony that, in 1990, she did not take steps to obtain a copy of Mother's estate documents because she understood that Dennis had "taken care" of everything and that she "thoroughly trusted that whatever he did was what the will said to do." (Roeder Testimony, Doc. 809: 158-59). This finding is supported by the tone of Cyndi's 1991 deposition, in which Cyndi exhibits hostility to Betsy's counsel's questions regarding alleged wrongdoing by Dennis. (Def. Exh. 43 at 54) ("It is my opinion that I feel that mom trusted Dennis and Griffy to do whatever

the hell they wanted to do with the will because they were executors.").

74. The Court finds, however, that as of November 1991, Cyndi was aware that Mother had a trust, will, and codicil.

75. The August 1990 letter to Cyndi from Betsy did not enclose the correspondence from Betsy's counsel to Meranus referenced in paragraph 69 above. (Roeder Testimony, Doc. 809: 155-56).

76. Betsy filed a federal lawsuit on December 7, 1990, in this Court against Dennis, Griffy, the law firm of Thompson, Hine & Flory, Leonard Meranus, Star Bank, and Griffin Industries. The lawsuit challenged the 1985 Plan and the sales of Mother and Father's Griffin Industries stock. The suit alleged claims by Betsy for fraud and breach of fiduciary duty, among others, and it also asserted a shareholder derivative claim on behalf of all Griffin Industries shareholders. All the Griffin children then living were shareholders and thus parties to the derivative claim. (Jt. Stip. ¶¶ 10-11; Def. Exh. 39).

77. The shareholders, including the Holt plaintiffs, were not served with Betsy's 1990 complaint. (Storm Testimony, Doc. 827: 5; Prewitt Testimony, Doc. 813: 66; M. Griffin Testimony, Doc. 814: 169; T. Griffin Testimony, Doc. 816: 87).

78.   After Betsy filed her 1990 lawsuit, plaintiffs attended a shareholders meeting.   Dennis asked all the non-family members to leave and then berated Betsy, asking where did she "get off thinking she could file a lawsuit" against Dennis and Griffy.   Dennis said Betsy's suit had no merit and blamed it on her husband, Bill, being greedy.   Dennis also told the Holt plaintiffs that the suit didn't involve them.   Dennis did not say what the suit was about at this meeting, and he testified that he "never said a word to any of them" about what Betsy's suit was about.   When Cyndi asked Dennis what the suit was about, he told her he had a confidentiality agreements and could not discuss it.   (Roeder Testimony, Doc. 809: 91-94; Osborn Testimony, Doc. 814: 27-30; Prewitt Testimony, Doc. 813: 65-67, 96-97; Holt Testimony, Doc. 816: 27-28, 74); Plf. Exh. 7, Dennis Griffin Depo. Vol. II, Doc. 415-3 at 138-39[7]: Means Testimony, Doc. 823: 122-23).

79.   Similarly, younger brothers Marty and Tommy were never told what Betsy's 1990 lawsuit was about or given information about it.   (M. Griffin Testimony, Doc. 814: 169-70; T. Griffin Testimony, Doc. 816: 87-88).

---

[7] This deposition was made a trial exhibit in the form of a video, so for ease of reference, the Court cites to the written transcript of the deposition as it appears in the record.

80.  The sisters thought that the suit might have something to do with Dennis passing stock to his children and Betsy being upset that her children did not get stock.  (Roeder Testimony, Doc. 809: 92-93; Prewitt Testimony, Doc. 813: 66; Holt Testimony, Doc. 816: 28).

81.  The Holt plaintiffs were not told that they were nominal parties to a derivative suit.  (Roeder Testimony, Doc. 809: 98; Holt Testimony, Doc. 816: 28-29).  Neither were Marty or Tommy.  (M. Griffin Testimony, Doc. 814: 170; T. Griffin Testimony, Doc. 816: 87-88).  No one advised the sisters that they should get counsel.  (Prewitt Testimony, Doc. 813: 67; Holt Testimony, Doc. 816: 29).

82.  The Holt plaintiffs believed what Dennis said about Betsy's suit, Betsy was ostracized, and Dennis and Griffy told the sisters not to talk to Betsy.  They told Betsy she was "dead" to her sisters.  Betsy was estranged from the family until the mid-2000s.  (Roeder Testimony, Doc. 809: 96-99; Osborn Testimony, Doc. 814: 11, 21, 30, 107; Prewitt Testimony, Doc. 813: 67; Means Testimony, Doc. 823: 123-24).

83.  In connection with Betsy's 1990 lawsuit, Cyndi spoke with Betsy's counsel, Richard Trautwein, on the telephone from her home.  Linda and Judy were present.  Trautwein told Cyndi that the dispute was a disagreement between Betsy and Dennis and

33

Griffy, but he did not discuss the merits of Betsy's claims. Cyndi also spoke to Trautwein regarding the scheduling of her deposition. (Roeder Testimony, Doc. 809: 102; Doc. 813: 20-23; Prewitt Testimony, Doc. 813: 96). The Court finds this testimony credible and rejects defendants' proffered finding that the Holt plaintiffs "were aware of the issues in the [Osborn] litigation through [Trautwein]." (DPFOF ¶ 102).[8] The Court also does not find that these communications occurred during an in person meeting. During Cyndi's 1991 deposition, Trautwein never stated that he "met" with Cyndi, but only that they had "talked." (Def. Exh. 43 at 4-6). Moreover, whether these discussions were over the phone or in person is ultimately irrelevant.

84. Beverly Storm and Mark Arnzen, counsel for Dennis and Griffy in Betsy's 1990 lawsuit, met with the Holt plaintiffs in October 1991 at Linda's house in Cold Spring, Kentucky. Storm and Arnzen later wrote a memorandum about this meeting. (Storm Testimony, Doc. 823: 155-56; Def. Exh. 41).

---

[8] Further, the Court does not find Beverly Storm's cited testimony persuasive on this point because she had no personal knowledge of whether the Holt plaintiffs "met" with Trautwein or what they discussed with him. (DPFOF ¶ 102). Her notes do not make any mention of the sisters meeting with Trautwein. (Storm Testimony, Dc. 827: 17).

34

85.  Storm's notes state that the Holt plaintiffs "believe that the problem stems from Dennis' desire to pass the stock to the third generation."  The Court finds that this evidence supports the above finding that the Holt plaintiffs did not, at that time, understand the actual basis for Betsy's claims in her 1990 suit.  (Def. Exh. 41).

86.  At this meeting, Storm did not provide the Holt plaintiffs with a copy of Betsy's complaint.  (Storm Testimony, Doc. 823: 163).  These notes also reflect that the sisters did not know what Mother's will said.  (Def. Exh. 41).  The Court thus finds that the Holt plaintiffs had not seen Betsy's 1990 complaint, because a copy of Mother's will had been attached thereto.  (Def. Exh. 39 ¶ 14).  Storm also did not tell the sisters the terms of Mother's will.  (Storm Testimony, Doc. 827:18).

87.  The notes also state that the sisters said that Bill Osborn "had everything figured out and that Dennis had cheated the girls."  However, this statement is followed by the sisters' statements that they believed Dennis "was the best person in the world" who "did the best he could."  It is thus not reasonable to draw from this evidence the conclusion that the sisters actually believed Bill Osborn's assertion, or that they believed or suspected that they had been wronged by Dennis.

35

88.  Storm's notes do not state that she told the Holt plaintiffs that they should get their own counsel.  Her trial testimony on this point is internally inconsistent.  (Doc. 823: 164) (Q. Did you advise these sisters to get counsel during this meeting?  A.   No.   We made it very clear that if they had questions, they could contact us or they could contact an attorney of their own choice.").

89.  At this meeting, Storm did not discuss the 1985-1986 sales of stock.  She also did not tell the sisters that they were beneficiaries of Mother's estate, that Dennis and Griffy owed them fiduciary duties, or that Father had a trust of which they were beneficiaries.  (Storm Testimony, Doc. 827: 14-15).

90.  These notes also reflect that the sisters told Storm that they "did not know if dad fully understood what was going on in 1985" and that he "would have gone along with what Dennis said."  (Def. Exh. 41).

91.  Storm and Arnzen had arranged to have Father evaluated by a psychologist, which was scheduled for three days after the meeting with the sisters.  Storm did not tell the sisters that fact or that they were planning to have Father sign some important documents.  (Storm Testimony, Doc. 827: 26-27).

92.  On October 5, 1991, Father was evaluated by a Dr. George Parsons, at Storm's and Arnzen's request.  Dr. Parsons

36

performed a number of evaluations and concluded that Father had an IQ of 67 and a mental age of eight years. Storm and Arnzen did not inform the Holt plaintiffs or the Court of these results, and they had no further meetings or discussions with the sisters. (Storm Testimony, Doc. 827: 28-34; Plf. Exh. 110 at Holt-Osborn 000550).

93. On November 30, 1991, Father executed his Sixth Codicil to his Will, which states, in part: "I have provided for my sons in other ways, including my sale of Griffin Industries stock. I again approve that sale. I now change my Will so that my other property will go to my trust as set out in my Will. In this way, my other property will go to my five daughters or their children." (Jt. Exh. 4 at GTE00046).

94. The Fourth Amendment to Father's Trust states, in part: "I have provided for my sons in other ways, including my sale of my Griffin Industries stock. I again approve that sale. I now change my . . . Trust so that at my death, the rest of the trust property shall go to my five daughters equally, free of trust, and the trust shall end." (Jt. Exh. 3 at GTE00294).

95. The Sixth Codicil and Fourth Trust Amendment were executed in Dr. Parsons's office and witnessed by Dr. Parsons and an assistant. (Jt. Exh. 4 at GTE00046; Jt. Exh. 3 at GTE00294; Plf. Exh. 110 at Holt-Osborn 000021).

96.  On January 20, 1992, Father purportedly executed an affidavit which states, in part, that he "approve[s] the sale of my stock in Griffin Industries, Inc. to my sons" and "I want my sons to have the company now and my daughters to have cash when I die." (Def. Exh. 47).  Bev Storm identified the document at trial but could not personally testify as to the circumstances under which Father signed his name on it.  (Storm Testimony, Doc. 823: 174).

97.  On September 10, 1992, attorney Mark Arnzen wrote a letter to Dennis and Griffy about the Court's summary judgment opinion in Betsy's 1990 case.  (Def. Exh. 51).  This letter discusses the legal basis for the Court's denial of defendants' motion for summary judgment, as well as the Court's view that the case should be settled.  The letter was produced from defendants' files with a post-it note written by Dennis directing his then-assistant to forward a copy of the letter to Linda, Cyndi, Judy, and Janet.  The assistant, Teri Pagan, testified that it would have been her practice to immediately comply with Dennis's instructions and mail the copies as instructed.  However, she admitted on cross-examination that she could not specifically remember doing so.  (Pagan Testimony, Doc. 823: 140-42, 150).

38

98.  None of the plaintiffs produced a copy of this letter, including non-party Janet Means, who produced copies of many documents that none of the other sisters possessed.  Means testified that her husband "keeps everything" and that he had a box of documents in their attic that were produced in discovery. Means was questioned at trial about numerous documents that she retained pertaining to her parents' estates, Betsy's lawsuit, and related matters.  The September 10, 1992 letter was not among them.  (Means Testimony, Doc. 823: 97-108).  The Court finds this persuasive evidence that the sisters did not, in fact, receive a copy of this letter.  Further, defendants did not question the plaintiffs about this document such that the Court would have a basis to evaluate their credibility on the issue.

99.  Further, the sharing of this letter with the sisters would be directly contrary to Dennis's testimony that he never shared any information about Betsy's lawsuit with his sisters. (D. Griffin Depo. Vol. II, Doc. 415-3 at 138-39).

100. The Court thus finds that the Holt plaintiffs did not receive a copy of Arnzen's letter.  In addition, the letter does not set forth the basis for Betsy's claims in the 1990 litigation or disclose the 1985-86 stock transactions.  Instead,

the letter reiterates what plaintiffs testified Dennis told them: that Betsy's claims were unjust and without merit.

101. In early 1993, a settlement of Betsy's lawsuit, including the derivative claims, was proposed. Dennis called the Holt plaintiffs to his office to sign a document. He told them that they had to sign it and get it back to Betsy's counsel. Cyndi asked what it was and if they could read it, and Dennis said no, that it didn't pertain to them but it was just necessary to keep Father off the stand and get the family back together. Dennis did not explain that it was a settlement agreement. The sisters signed the document, as did Marty and Tommy. (Def. Exh. 52; Roeder Testimony, Doc. 809: 97; Prewitt Testimony, Doc. 813: 69-70; Holt Testimony, Doc. 816: 30-31).

102. This proposed settlement agreement provided for the settlement by the Holt plaintiffs, Marty, and Tommy of the derivative claims, as well as the tort claims against Dennis and Griffy based on conduct in their capacities as officers and directors of Griffin Industries, in exchange for 1390 shares each of non-voting Griffin Industries stock. (Def. Exh. 52 ¶ 3). Betsy was not a party to this agreement.

103. The Holt plaintiffs did not know the terms of the agreement until the instant litigation. (Roeder Testimony, Doc. 809: 98) Similarly, Marty and Tommy, who also signed the

40

document, did not know that it was a settlement agreement or what its terms were.  (M. Griffin Testimony, Doc. 814: 170-72; T. Griffin Testimony, Doc. 816: 87-88).

104.  Non-party sister Janet Means produced during discovery a copy of a Notice of Proposed Settlement of Derivative Claim which Father's counsel certified was mailed to each of the Griffin Industries shareholders on February 19, 1993.  (Def. Exh. 55).  This notice stated that fairness hearing as to a proposed settlement of "the derivative claim" would be held on March 4, 1993.  The notice also references the proposed issuance of 1390 shares of treasury non-voting stock to each of the listed shareholders, including the Holt plaintiffs.  The Court rejects defendants' proposed finding that this notice "gave additional information to the *Holt* plaintiffs about the nature of the 1990 Osborn litigation" or "its direct impact on the *Holt* plaintiffs," (DPFOF ¶ 112), because the notice contains no information regarding Betsy's personal claims against Dennis and Griffy or proposed terms of any settlement of those claims.

105.  The proposed February 1993 settlement was not finalized because Betsy would not agree to settle her claims if Griffin Industries issued new treasury stock to give to her siblings because it would dilute her own percentage ownership in the company.  Betsy did not object to her siblings receiving

41

stock from the existing shares that Dennis and Griffy acquired in 1985-86. (*Osborn v. Griffin*, Case No. 90-209, Doc. 145, Transcript of March 4, 1993 Hearing, at 8-15; Storm Testimony, Doc. 823: 176-77; J. Griffin Testimony, Doc. 816: 158-59; Osborn Testimony, Doc. 814: 66-67).

106.  On September 10, 1993, the Court held a conference in which counsel informed the Court of a settlement reached by the parties.  (Def. Exh. 57).  Betsy's counsel stated that Dennis and Griffy would transfer to Betsy 1,390[9] of their personal shares of Griffin Industries, but that Betsy would assign back the voting rights thereto; they would give a total of 392 of their shares to Betsy's two children; and they would pay Betsy approximately $104,000 for past distributions.  (*Id.* at 2).  This settlement did not include the transfer of stock to any of Betsy's siblings.  (*Id.* at 3).  Defendants' counsel noted that the agreement must release all claims up to that point, known or unknown.  (*Id.*).

107.  During this hearing, counsel for Dennis and Griffy also stated that the settlement was conditioned on getting "a release and resolution of the shareholder derivative suit."

---

[9]  The original transcript of this hearing contains a typographical error on page 2, line 12, stating that the number of shares was 11,390 instead of 1,390.  This error was later corrected.  (Case No. 90-209, Doc. 184).

(*Id.* at 7).   Betsy's counsel stated he would give his "best effort" to settle the derivative claims, and that it would probably involve a payment of not more than $10,000 to the shareholders, but that had not yet been determined.  (*Id.* at 5). The Court noted that the derivative claims presented a class action such that a new notice would have to issue and the Court would have to approve any settlement.  (*Id.* at 9).

108.  The settlement of the derivative claims was memorialized in a "Settlement Agreement and Release" dated September 10, 1993.   (Doc. 850-1).[10]   This document was not produced during discovery in this matter and thus was not utilized at trial; rather, it was the subject of a motion to reopen the evidence filed after the bench trial concluded. (Doc. 836).  As discussed in the Court's legal conclusions that follow, this document will be admitted into evidence.

109.  The September 10, 1993, settlement agreement is signed by all the Holt plaintiffs.   The Court thus rejects plaintiffs' proposed finding that a written settlement agreement from September 1993 was never signed by them.  (PPFOF ¶ 133).

110.  Section 3 of the agreement states that Griffin Industries will pay the Griffin siblings who were parties to the

---

[10]  The Court orders herein that this document be admitted as Defendants' Trial Exhibit 415.

agreement $10,000 to settle "the derivative claim against Griffin Industries . . . and any tort claims that could have been asserted by the Griffin Siblings against Dennis Griffin, John M. Griffin and Robert Griffin in their capacities as officers and directors of Griffin Industries."

111. Betsy was not a party to this September 1993 agreement. The document does not describe the nature of Betsy's individual claims in her 1990 lawsuit or the terms of her settlement of those claims.

112. A check in the amount of $10,000 marked "Settlement of Derivative Claim" was issued to Janet Means on September 10, 1993. (Def. 58). The Holt plaintiffs also received checks for $10,000. Dennis told the Holt plaintiffs that Betsy got "very damn little" from her 1990 lawsuit and led them to believe that they would receive whatever Betsy received. (Roeder Testimony, Doc. 809: 98-99; Prewitt Testimony, Doc. 813: 71; Holt Testimony, Doc. 816: 31).

113. On September 20, 1993, the parties to the Osborn suit moved the Court for an order approving notice of the settlement of the derivative claim, for dismissal of the action with prejudice, and to seal the record. The same day, the Court set a fairness hearing for September 24, 1993 and directed Father's

counsel to mail the notice to Griffin Industries shareholders. (Def. Exh. 59).

114. The notice was mailed on September 21, 1993, three days before the hearing. It was not sent by certified or registered mail. (Def. Exh. 62; Storm Testimony, Doc. 827: 43-44). The notice stated the date for the fairness hearing and the proposed $10,000 payment to the listed shareholders[11] in settlement of the derivative claim. The notice stated that the pleadings in the case were open for inspection at the Court. (Def. Exh. 59). The notice contained no information regarding Betsy's personal claims against Dennis and Griffy or proposed terms of any settlement of her claims.

115. Non-party sister Janet and Marty received and retained the notice. (Def. Exhs. 60, 61; Means Testimony, Doc. 813: 112). Cyndi also received the notice, but she was scheduled to go on a field trip with her daughter. She called Dennis to tell him she could not go, and he told her that she did not need to go, it didn't pertain to her, and that he would take it up with the judge. (Roeder Testimony, Doc. 809: 99-100). Linda and Judy did not receive the notice. (Holt Testimony, Doc. 816: 29-30; Prewitt Testimony, Doc. 813: 68). Similarly, Tommy testified that he did not receive this notice.

---

[11] Betsy, Linda, Cyndi, Tommy, Janet, Judy, and Marty.

(T. Griffin Testimony, Doc. 816: 87-88).   None of the Holt plaintiffs attended the fairness hearing.

116.  Following the fairness hearing on September 24, 1993, the Court dismissed the derivative claim as settled.  (Def. Exh. 63).

117.  The nature of Betsy's claims in her 1990 lawsuit and terms of her settlement, including her receipt of company stock, were discussed in an article published in the *Cincinnati Business Courier* on November 15, 1993.  (Def. Exh. 64).  Cyndi first saw this article in 2010.  (Roeder Testimony, Doc. 809: 167-69).  Dennis was extremely upset that this article appeared in the paper.  (Storm Testimony, Doc. 823:187).

118.  As part of the settlement of Betsy's claims, Father executed on December 6, 1993, the Fifth Amendment to his 1967 Trust and the Seventh Codicil to his will.   The Fifth Trust Amendment states:

> This Fifth Amendment to the January 20, 1967 Trust Agreement of John L. Griffin is made pursuant to my Contract with Dennis B. Griffin, John M. Griffin, and Elizabeth Griffin Osborn made on <u>December 21</u>, 1993.  I have contracted not to change the provisions of this Fifth Amendment hereafter, and the said Contract is incorporated in this Fifth Amendment by reference.
>
> I now change my January 20, 1967 Trust to provide that at my death, the Trust property shall go to my five daughters equally, free of trust, and the Trust shall end.  If any of my daughters dies before me, her part shall go to her children, as the Trust now provides.  All of the Trust terms which are different from this change are revoked.

46

(Jt. Exh. 3 at GTW00295).

119.   The Seventh Codicil states, in part:

I now change my Last Will and Testament, and all previous
Codicils, to provide that all of my property is devised and
bequeathed to my 1967 Trust as set forth in my Last Will
and Testament.  I have previously made a Fifth Amendment to
my Trust, dated this same date, which, together with this
Seventh Codicil to my Last Will and Testament, will cause
all of my property to go to my five daughters or their
children at my death.

(Jt. Exh. 4 at GTE00048).

120.   The Holt plaintiffs were unaware of changes to
Father's estate plan made as part of Betsy's settlement.
(Roeder Testimony, Doc. 809: 101; Holt Testimony, Doc. 816: 31-
32; Prewitt Testimony, Doc. 813-70-71).

121.   The Holt plaintiffs attended a board meeting on
December 17, 1993, at which the settlement of Betsy's 1990
lawsuit was discussed.  The minutes reflect that Leonard Meranus
reported that the final settlement would be executed on December
21, 1993; that the Board ratified both the derivative settlement
agreement and Betsy's settlement agreement; and that Griffin
Industries would make the $10,000 payments to the Holt
plaintiffs and Marty and Tommy.  The minutes further state that
independent counsel had opined that Dennis and Griffy "acted in
good faith and in a manner reasonably believed to be in the best
interests of the Corporation in connection with their actions

47

that were the subject of the Litigation." The minutes do not mention the stock transfers to Betsy or her children, or the monetary payments to Betsy. (Def. Exh. 66).[12]

122. The settlement agreement between Betsy and the defendants was executed on December 21, 1993. In addition to the transfers of stock to Betsy and her children and the payment of $104,000 (Def. Exh. 67), Father agreed to execute the Fifth Trust Amendment and Seventh Codicil discussed above, and Thompson Hine agreed to pay Betsy $200,000 towards her attorney's fees. All parties agreed that the settlement was confidential, that they would not disclose its terms, and that they consented to the sealing of the court record of the case. Betsy did not tell her sisters what she received in the settlement. (Osborn Testimony, Doc. 814:31-32).

123. The next day, December 22, 1993, the Court dismissed the case as settled and sealed the record. (Case. No. 90-209,

---

[12] Robert was asked on direct examination: "And what was the discussion at the board meeting regarding the settlement of Betsy's lawsuit?" He responded: "*It wasn't much of anything about the settlement itself.* It just talked about it was going to be settled and they thought they would have it signed in four days." (R. Griffin Testimony, Doc. 828: 55) (emphasis added).

The Court also notes that, while counsel's next question to Robert states that "there's a reference in the board minutes to stock going to Lacey Osborn and Blake Osborn," (*id.* at 55-56), the minutes in fact contain no reference to stock whatsoever. (*Id.* at 99-100).

Doc. 187; Storm Testimony, Doc. 823: 186-87).  The record was
not unsealed until July 30, 2013.  (Doc. 240).

### F. **Father's Death and the Administration of His Estate**

124.  One month after the settlement of Betsy's 1990
lawsuit, Richard Ruebel, a member of Meranus's law firm, wrote a
memorandum to Meranus stating that he had reviewed Father's
estate plan, as well as the settlement agreement in Betsy's 1990
case, to determine whether Dennis and Griffy, as executors of
Father's estate, could sell Father's Craig Protein stock.  (Def.
Exh. 68).  Ruebel opined that Dennis and Griffy could not sell
the stock to Griffin Industries because it would "constitute a
prohibited act of indirect self-dealing."  Ruebel suggested,
however, that a sale might pass muster if Father granted an
option to Griffin Industries to purchase his Craig Protein
stock.

125.  On March 4, 1995, Father purportedly gave an "option"
to purchase his Craig Protein stock to Marty and Tommy, stating:

> As a favor to me and to help the family, I want
> you to keep working with the company.  If you do,
> in return when I die, you will have the right []
> to buy my Craig [Protein] stock for the price the
> taxes are paid on.  I want all of the brothers
> and sisters to honor this agreement.

(Def. Exh. 102 at TH000679).  Marty and Tommy both testified in
their depositions that they had never seen this option prior to

49

being deposed.    (M. Griffin Depo., Doc. 415-5 at 229-29; T. Griffin Depo., Doc. 415-1 at 136-38).   The Court held on summary judgment that no valid option contract was created.   (Doc. 590 at 63-64).   Marty and Tommy were not asked about this document at trial.

126.   Father died on April 9, 1995.   His estate and trust were administered from 1995 to 1998.   Dennis and Griffy were the executors of Father's estate and the trustees of his trust. (Jt. Stip. ¶ 14; Def. Exh. 90).

127.   At Father's death, the Jackson, Henderson, and Jay Gee properties were held in his 1967 Trust, and the Bradford and Adams properties were owned in his name.   Father also still owned the 1,000 shares of Craig Protein stock.   (Jt. Stip. ¶ 32; Jt. Exh. 27-30).

128.   On May 19, 1995, Ruebel wrote a letter to Dennis stating that he had "reviewed Kentucky law concerning the authority of an executor to sell real property which was owned by the decedent."   (Def. Exh. 76).   Ruebel reviewed Kentucky law on self-dealing by fiduciaries, stating that "it is clear that you and Griffy cannot sell the real property held in Mr. Griffin's estate to Griffin Industries without violating the rule against indirect self-dealing."   He further stated:

> We think the best way to get around the problem would
> be to sell the property to persons or an entity in

which you and Griffy have no interest, since the rule only applies to sales made to the executors themselves or entities in which the executors have an interest. For example, the real property in Mr. Griffin's estate could be sold to any of Bobby, Marty, and Tommy, or any one or more of them, or to a partnership of the three of them. It might be a good idea to consider a partnership composed of some of the grandchildren (the children of you and Griffy, however, could not participate, at least until the conclusion of the estate).

**An alternative would be to get the five girls to consent to the sales, but this doesn't seem to be a realistic possibility.**

(*Id.*)(emphasis added).

129. Dennis and Griffy had the Craig Protein stock appraised. The appraisal valued Father's 23.7% interest in Craig Protein at $665,000. The appraisal used an "estate tax" value. (Def. Exh. 110).

130. On May 23, 1995, Dennis and Griffy, in their capacities as Co-Executors of Father's estate, entered into Stock Purchase Agreements with Marty and Tommy whereby the latter agreed to purchase from Father's estate 500 shares each of Father's Craig Protein stock for $332,500, or a total of $665,000. (Jt. Exhs. 21, 22; Jt. Stip. ¶ 36). Marty and Tom did not ask to see the appraisals and did not negotiate the purchase price. The sale of the stock was not Marty and Tommy's idea. (M. Griffin Testimony, Doc. 814: 181-82; T. Griffin Testimony, Doc. 816:94).

131. At that time, Marty and Tommy sat on the board of Griffin Industries, along with Dennis and Griffy. (M. Griffin Testimony, Doc. 814: 173; T. Griffin Testimony, Doc. 816: 94). The same people who were involved in the management of Griffin Industries were involved in the management of Craig Protein. (D. Griffin Depo., Doc. 514-4 at 153-54).

132. Dennis and Griffy did not consider offering their sisters the chance to buy Father's Craig Protein stock. They wanted the stock to stay within the ownership of the brothers. (D. Griffin Depo., Doc. 415-4 at 90; J. Griffin Testimony, Doc. 821: 32-33; Blair Testimony, Doc. 823: 54).

133. In April 2002, Marty and Tom each traded their 500 shares of Craig Protein stock for 1,435 voting shares of Griffin Industries stock. (M. Griffin Testimony, Doc. 814: 183; T. Griffin Testimony, Doc. 816: 91; Plf. Exh. 42). From 2002 to 2010, Marty and Tommy received a total of $30,414,000 in distributions from the Griffin Industries stock that they exchanged for the Craig Protein stock. Further, on account of the additional Griffin Industries shares that they owned as a result of the Craig Protein stock exchange, Marty and Tom received 240,837 shares of Darling International stock in 2010 when that company merged with Griffin Industries, as discussed below. (Chilton Testimony, Doc. 821: 82-84; Plf. Exh. 86 at 3).

52

134.  Dennis and Griffy also had the real properties that were in Father's estate and Trust appraised.  The Jackson property was appraised at $980,000; the Henderson property was appraised at $206,200; the Bradford property was appraised at $129,000; the Jay Gee property was appraised at $22,000; and the Adams property was appraised $65,000.  (Def. Exhs. 105-09).  Dennis and Griffy did not tell the appraiser that the properties were income-producing or that they were being leased to Griffin Industries.  (Whaley Testimony, Dc. 827: 80-82).

135.  A new company called Martom Properties, LLC was formed in 1995 after Father's death for the purpose of purchasing the real properties from Father's estate and Trust.  Marty and Tommy each owned 1% of Martom, and they were the managing members.  The remaining equity interest in Martom was owned by some of the children of Marty, Tommy, and Robert, who were aged between three and ten years old.  (Jt. Stip. ¶ 33; T. Griffin Testimony, Doc. 816: 97).

136.  The Griffin Industries board — including Dennis, Griffy, Robert, Marty, and Tommy — approved the creation of Martom.  Griffy testified that they wanted these properties to remain in the ownership of upper management of Griffin Industries.  (J. Griffin Testimony, Doc. 828: 101-03; D. Griffin Depo., Doc. 415-4 at 83).

53

137. Marty and Tommy were aware that Martom was formed to purchase the properties from their Father's estate. The creation of Martom, who its members would be, and its purchases of the real estate were not their idea. They knew that their sisters were the beneficiaries of Father's estate, but they do not recall any discussions about conveying the properties to sisters. (M. Griffin Testimony, Doc. 814: 186-88; T. Griffin Testimony, Doc. 816: 95-97).

138. Martom had no employees of its own. Instead, until 2010, Griffin Industries personnel handled all Martom's, operations, accounting, paperwork, tax work, leases, and insurance. Griffin Industries, not Martom, set the rental rates in the leases between the companies. Marty described his involvement in Martom as "pretty minimal." Tommy testified that Martom was "essentially" operated by Griffin Industries, that he had no responsibilities for Martom, and that he never saw Martom's financials. (M. Griffin Testimony, Doc. 814: 189-90, 195-97; T. Griffin Testimony, Doc. 816: 98) Dennis testified that Martom, although a new holding, was "just [the] same as Griffin Industries." (D. Griffin Depo., Doc. 415-4 at 83).

139. The Court thus rejects defendants' proffered finding that there "is no evidence that Dennis Griffin or John M. Griffin controlled Martom, Martin Griffin, or Thomas Griffin."

(DPFOF ¶ 157). Instead, the Court finds that Martom was created, with Dennis's and Griffy's knowledge and approval, in order to retain control of the real properties held in Father's estate and Trust, in contravention of his estate documents, and to attempt to circumvent the law against indirect self-dealing. Through their positions and ownership of Griffin Industries, Dennis and Griffy controlled Martom from its formation to 2010.

140. In July 1995, Dennis and Griffy, as Co-Executors of Father's estate and Trustees of this Trust, caused the five real properties to be sold to Martom. Martom took out loans and paid Father's Trust $1,315,200 for the Jackson, Henderson, and Bradford properties, and it paid Father's estate $87,000 for the Jay Gee and Adams properties. The publicly recorded deeds identify the seller, the purchaser (Martom), and the purchase prices. (Jt. Exh. 27-30; Jt. Stip. ¶ 34; Def. Exhs. 113, 114; D. Griffin Depo., Doc. 415-4 at 78-80).

141. Martom then leased these properties to Griffin Industries until 2010, when it assigned the leases (then extended to 30 years) to Darling International. From 1995 to June 1, 2015, Martom received approximately $5.1 million in operating income from the leases. (Jt. Stip. ¶ 35; Jt. Exhs. 31-34; Plf. Exh. 87 at 3; Chilton Testimony, Doc. 821: 86-88; Plf. Exhs. 48, 49).

142.   The proceeds from the sale of the Craig Protein stock to Marty and Tommy and the real properties to Martom were paid into Father's estate and Trust and were distributed to the five sisters equally.  (Jt. Stip. ¶ 37).

143.   Dennis and Griffy never talked to their sisters about Father's estate and trust; never gave them a copy of Father's will and trust; never told them about the probate proceedings; never told them about the five properties or the Craig Protein stock owned by Father, and never told them about the transfers of those properties to Martom and Marty and Tommy.  Griffy also never told the sisters that the real properties were income producing.  No one told the sisters that they had a right to receive the properties and Craig Protein stock from Father's estate and Trust.  (J. Griffin Testimony, Doc. 821: 29-36; D. Griffy Depo., Doc. 415-4 at 79-87, 125-26, 151-52; Roeder Testimony, Doc. 813: 37-39, Doc. 809: 80, 104; Osborn Testimony, Doc. 814: 15-21, 26, 76; Holt Testimony, Doc. 816: 32-35, 38).

144.   Griffy never disagreed with Dennis about how to handle Father's estate.  (J. Griffin Testimony, Doc. 821: 27).

145.   Steve Blair, Griffin Industries' Chief Financial Officer, also had no conversations with the sisters about the assets in Father's estate.  (Blair Testimony, Doc. 823: 89).

146.   The sisters thus did not know what property was in Father's estate when he died.   The Holt plaintiffs also did not know that Father had left his property, including real estate, to his daughters.   (Prewitt Testimony, Doc. 813: 77-79; Osborn Testimony, Doc. 814: 15-19; Roeder Testimony, Doc. 609: 104; Holt Testimony, Doc. 816: 33-35).

147.   Similarly, Dennis and Griffy never gave non-party sister Janet Means a copy of Father's will or Trust, they did not tell her the substance of his estate plan, they did not tell her they were the co-trustees of Father's trust, and they did not tell her that she and her sisters were the beneficiaries of his will and Trust.   (Means Testimony, Doc. 823: 132-134).

148.   Judy purchased a farm from Father's estate after being offered it by Dennis, and Cyndi's father-in-law bought Father's car from his estate.   (Prewitt Testimony, Doc. 813: 77-79;

149.   Judy told Tommy that Dennis had offered for her to buy the Dennie farm from Father's estate, and Tommy told her that he thought he and Marty were going to buy some property from the estate as well.   Judy did not know about Martom at the time or that the properties to which Tommy was referring had been left by Father to the sisters.   (Prewitt Testimony, Doc. 813: 79-80

150. Defendants introduced an agenda for a Griffin Industries shareholder meeting of December 15, 1995, following which is a one-page document titled "Listing of Assets, John L. Griffin Estate and Trust." (Def. Exh. 120). This list shows Father's Craig Protein stock and the properties sold to Martom. The document does not show the disposition of the assets of Father's estate and trust. Cyndi testified that she never saw this document. (Roeder Testimony, Doc. 813: 26-27). Linda, Judy, and Betsy were not asked about this document at trial. Further, although the corporate records separately introduced by defendants contain the notice, agenda and minutes of this meeting, (Def. Exh. 405 at GII37968-970), they do *not* contain the list of assets that is attached to Def. Exh. 120. The Court thus finds that this accounting of assets was not distributed to Plaintiffs at the shareholder meeting.

151. Father's estate was publicly probated in Campbell County, Kentucky. (Def. Exh. 90). The probate matter was opened on May 5, 1995, (*id.* at GTE00835), a final settlement was filed on April 17, 1998 (*Id.* at GTE00763), and the Court entered the final settlement on June 9, 1998 (*id.* at GTE00764).

152. Dennis and Griffy sent partial distributions of $1 million to each of the sisters with a letter dated August 4,

1995.  The checks were drawn on the account of the Griffin Family Trust.  (Def. Exh. 117).

153.  An Inventory and Appraisement was filed in Father's probate case on October 27, 1995.  The inventory lists, among other assets, the 1,000 shares of Craig Protein stock, the Adams property and the Jay Gee property, as well as the appraised values of this property.  The Adams and Jay Gee properties are described as "vacant land."  (Def. Exh. 90 at GTE00831-834).

154.  The Court rejects plaintiffs' proffered finding that Father's probate file contains "no reference to the 1967 Trust." (PPFOF ¶ 188).  The file does reference the 1967 Trust, in the codicils attached to the original petition for probate, in a partial settlement which shows distributions from the estate to the Trust, and in several related documents.  (Def. Exh. 90 at GTE00794-795, 806, 822-824, 860, 865-866, 871).  The probate file does not contain, however, information as to the assets of the Trust, including the Jackson, Henderson, and Bradford properties.

155.  The Court rejects defendants' proffered finding that a partial settlement filed in Father's probate case on July 9, 1997 "further disclosed the handling of properties at issue in Plaintiffs' claims."  (DPFOF ¶ 198).  This filing shows that, at Father's death, his estate included the Craig Protein stock,

Adams property, and Jay Gee property. (Def. Exh. 90 at GTE00782-783). It further shows that, as of 3/31/97, those assets were no longer in his estate. (*Id.* at GTE00796). In an Information Schedule, it also shows that the Adams property was sold on 7/14/95 for $65,000 and that the Craig Protein stock was sold on 5/30/95 for $665,000. (*Id.* at GTE00797-798). This schedule does not show the sale of the Jay Gee property. *The partial settlement does not disclose to whom these properties were sold.*

156. The partial settlement and final settlement of Father's probate matter were advertised on July 29, 1997 and May 22, 1998, respectively. (*Id.* at GTE00764, 871).

157. Non-party sister Janet Means produced during discovery a letter dated December 1, 1997 from Dennis and Griffy to the sisters. (Def. Exh. 123). Attached to the letter is a two-page spreadsheet titled "Listing of Assets John L. Griffin Estate and Trust." The schedule shows the balance of Father's estate as of 11/30/97, and it states distributions from the estate to each sister of $1,947,337.80 had been made. (*Id.* at J. Means 000153). The schedule lists the real properties that were sold to Martom, as well as the Craig Protein stock, and the properties' appraised value. Neither the letter nor the spreadsheet discloses the terms of Father's will and Trust, the

fact that four of the listed properties were sold to Martom, or that the Craig Protein stock was sold to Marty and Tommy.

158. A fax cover sheet from Steve Blair to Richard Ruebel dated December 4, 1997 with the subject line of "John L. Griffin Estate" states: "Enclosed are the reports sent to the sisters regarding the summary of activity in Mr. Griffin's estate." A copy of the spreadsheet referenced above (Def. Exh. 123) is attached. (Def. Exh. 125). Blair testified that he did not recall ever personally sending the sisters this spreadsheet. (Blair Testimony, Doc. 823:85-86).

159. Janet was the only sister who produced the December 1, 1997 letter and spreadsheet in discovery.

160. Judy retained and produced during discovery a spreadsheet similar to the one above with a balance of Father's estate as of March 23, 1998, which shows distributions from Father's estate to each sister as of that date as $1,970,982.81. (Def. Exh. 129). Judy testified that she called Dennis after receiving this list and asked him what Craig Protein was because she had never heard of it. Dennis said it was "just something that dad did" and that dad owned it. (Prewitt Testimony, Doc. 813: 75-76).

161. Non-party sister Janet Means produced a letter to the sisters from Dennis and Griffy dated March 24, 1998, which

references a "final summary" of Father's estate and appears to be a cover letter that accompanied the March 23, 1998 spreadsheet. (Def. Exh. 128).

162. Cyndi produced during discovery a copy of the first page of the March 23, 1998 spreadsheet. (Def. Exh. 130). This copy has a handwritten note: "Call to Denny?? Ask if he could explain — said it 'is all there' Don't you trust me???" Cyndi testified that she only received one "disbursement sheet." This sheet had a reference to an attachment which she did not receive, so she called Dennis. Dennis was very offended and accused her of not trusting him. He also said it was "all there," and Cyndi "took his word for it." (Roeder Testimony, Doc. 809: 105-06, 177-181).

163. Betsy and Linda testified that they did not receive any accountings or inventories with respect to Father's estate and Trust. (Osborn Testimony, Doc. 814:16-18; Holt Testimony, Doc. 816: 33-35).

### G. The Darling Merger and This Litigation

164. In 2010, Griffin Industries entered into a Merger Agreement with a company called Darling International ("Darling"), in which Darling bought all of Griffin Industries' stock. (Jt. Stip. ¶ 17).

165.  During due diligence, Darling learned that Griffin Industries' headquarters in Cold Spring, Kentucky was titled in the name of "John L. Griffin, Trustee," which caused concern that, under Kentucky law, the property would have passed under his estate to the sisters.   The sisters were told at a shareholders meeting on November 22, 2010, that they needed to sign a special warranty deed to clear up the title problem. (Doc. 590 at 27-30; Osborn Testimony, Doc. 814: 23).[13]

166.  Meanwhile, on October 31, 2010, Cyndi received a list showing the shareholders of Griffin Industries as of October 1, 2010, which had been mistakenly included with tax forms sent to her daughter.   Cyndi called Linda and Judy, and they met a few days later.   The Holt plaintiffs had never seen a shareholder list before, and they were shocked to see that Betsy owned 1,390 more shares of stock than they did, that the brothers owned far more stock than the sisters, and that their brothers' children owned substantial amounts of stock.   The sisters called Robert, who came over, accompanied by Griffy.   They began asking their brothers questions about the stock.   Robert told the girls that Dennis said they had "enough" stock.   The girls met with Robert

---

[13] The Court held on summary judgment that, although Father held naked legal title to the Cold Spring property, equitable title at all times resided with Griffin Industries.  It thus dismissed plaintiffs' claims premised on the ownership of that property. (Doc. 590 at 60).

and Griffy several times, and the brothers said they had nothing to do with the situation and that Dennis "did some bad shit." (Roeder Testimony, Doc. 809: 109-115; Prewitt Testimony, Doc. 813: 80-81; Holt Testimony, Doc. 816: 35-37; Plf. Exh. 2).

167. Because of the confusion over the Cold Spring building and the merger, Cyndi asked Griffy if they could see a copy of their parents' estate documents. Griffy indicated he would try to do that, but he never did. (Roeder Testimony, Doc. 809: 115-16).

168. In January 2011, Betsy learned that Griffy had gone into the Campbell County probate court to reopen Father's estate and had conveyed the Cold Spring property to Griffin Industries for $1.00. (Osborn Testimony, Doc. 814: 25; Def. Exh. 90 at GTE00759-61).

169. Betsy filed a lawsuit in this Court on April 27, 2011, alleging claims based on the transfer of the Cold Spring property out of Father's estate. She invoked the Court's diversity jurisdiction. (Doc. 1). After learning of the Martom and Craig Protein transactions, Betsy amended her complaint on August 29, 2011, to add claims based on those property sales. (Doc. 26).

170. Linda, Judy, and Cyndi first read Betsy's amended complaint in December 2011, when they were at a Christmas party

at Cyndi's house, and Betsy also showed them Father's will. This was the first time they had seen their Father's estate documents. (Roeder Testimony, Doc. 809: 77-78, 121; Prewitt Testimony, Doc. 813: 82-83; Holt Testimony, Doc. 816: 37-38).

171. The Holt plaintiffs filed a suit in this Court on March 8, 2013, invoking the Court's federal question jurisdiction as to a claim under the Racketeering Influenced and Corrupt Organizations Act ("RICO") and the Court's supplemental jurisdiction as to their state law claims. (*Holt v. Griffin*, Case No. 13-32, Doc. 1).[14]

### H. Other Facts Relevant to Knowledge or Notice

172. From the early 1980s, Griffin Industries was structured as a Sub-S Corporation, and the taxes on company profits thus flowed to shareholders. As such, each year a tax document called a "K-1" was generated showing the individual shareholder's percentage ownership in the company. The K-1s were part of Griffin Industries' corporate tax return. The K-1s were either sent to the shareholder or, if the company tax accountant did the shareholder's tax returns, the K-1s would be retained at the corporate office. (Blair Testimony, Doc. 823:

---

[14] The Holt plaintiffs did not have diversity jurisdiction because they, like their brothers, are citizens of Kentucky. The RICO claims were dismissed on summary judgment. (Doc. 590 at 72-79).

17-18, 63-65, 94; Ewing Testimony, Doc. 827: 58-59).  The K-1s show only the share percentage ownership of the individual shareholder for whom they are issued.  (Def. Exhs. 27, 206-09, 226-29, 246-49, 266-69, 286-89, 306-09).

173. Non-party sister Janet Means produced from her records a Griffin Industries shareholder list as of 3/25/92. (Def. Exh. 49).  The document bears a facsimile transmission heading of "Sent by Thompson, Hine & Flory" with a date in February 1993.  This list shows the number of shares owned by all company shareholders as of the stated date.  Means did not testify at trial as to the circumstances under which she came into possession of this document, and in her deposition she testified that she had no memory regarding it.  (Means Depo. Doc. 411-2 at 73-74).  Lou Solimine from Thompson Hine testified he recognized it as a Griffin Industries shareholder list that Meranus maintained and periodically updated.  (Solimine Testimony, Doc. 827: 115-16).[15]  There was no evidence that this shareholder list was ever provided to or seen by the Holt plaintiffs.

---

[15] Solimine is an attorney at Thompson Hine who worked with Leonard Meranus on Griffin Industries matters as an associate and continued representing the company when Meranus retired. (Solimine Testimony, Doc. 827: 86-87).

174. Marty testified that the first time he ever learned how many shares of Griffin Industries his siblings owned was during the company's merger with Darling in 2010. (M. Griffin Testimony, Doc. 814: 200). Similarly, Tommy testified that, although he had been a director of Griffin Industries for fifteen years, the first time he ever saw a shareholders list was also during the Darling merger. (T. Griffin Testimony, Doc. 816: 88-89).

175. Approximately a month after Father's death, an attorney and friend of Betsy's, Timothy Neubauer, wrote a letter to Dennis and Griffy, stating that he represented Betsy and requesting information regarding the administration of Father's estate and Trust. Neubauer stated that Betsy had given him a copy of Father's 1967 Trust and the Fifth Amendment to it. (Def. Exh. 132).

176. On May 26, 1995, Richard Ruebel wrote a letter to Neubauer stating that he had been asked to respond to Neubauer's letter. He stated he was enclosing Father's will and seven codicils, that the will had been admitted to probate on May 5, 1995, and that he was looking into the other information requested. (Def. Exh. 133).

177. On June 23, 1995, Ruebel and Neubauer spoke on the telephone. Ruebel told Neubauer that there was about $18

67

million in assets in Father's estate and that he would send Neubauer an inventory when it was ready.  (Def. Exh. 134).

178.  On March 4, 1996, Neubauer again wrote to Ruebel requesting the same information as in his first letter, as well as "all real estate documentation representing sales of real estate holdings by Mr. Griffin within one (1) year from the date of his death and for all estate sales."  (Def. Exh. 135).

179.  On March 19, 1996, Ruebel wrote back to Neubauer, stating "[n]either Kentucky law nor the terms of Mr. Griffin's trust require that the Trustees furnish you with the sort of information requested in your letter.  The Trustees will, of course, fulfill all of their legal obligations with respect to the distribution of information about the trust which they are required to distribute, but they do not intend to go beyond those obligations at anyone's request."  They further stated that Betsy would be furnished a Schedule K-1 for her share of the Trust.  (Def. Exh. 137).

180.  Neubauer gave this letter, which he called the "kiss off" letter, to Betsy and told her, "This is what you are going to get from these fellas.  You are going to get a K-1 and you are not going to get another thing.  They are not giving you anything."  (Neubauer Depo., Doc. 409-13 at 22).

181. On April 25, 2003, Neubauer wrote a letter to Dennis and Griffy on Betsy's behalf asking for information concerning ownership of Griffin Industries shares and whether any new shares had been issued since the beginning of 2002. (Def. Exh. 412).

182. Defendants introduced at trial a letter dated May 20, 2003, from Solimine, writing on behalf of Griffin Industries, to Neubauer. (Def. Exh. 413). The letter purports to be a response to Neubauer's April 25, 2003 letter. Attached to it is a list showing Griffin Industries' share ownership as of January 1, 2002 and March 31, 2003, as well as excerpts from two board meetings. The letter describes the issuance of new shares to Marty and Tommy in 2002 for which they traded their Craig Protein shares.

183. The circumstances of this document's production were irregular. Solimine testified that he conducted an exhaustive search of Thomson Hine's files when he received plaintiffs' discovery requests in this case. (Solimine Testimony, Doc. 827: 91-92). However, unlike copies of the firm's other correspondence with Neubauer, (Def. Exhs. 133-35, 137), this document was not produced by the firm. (*Id.* at 142). Instead, the letter was not produced until after the close of discovery when, after Dennis's death, his son and executor, Anthony

Griffin, discovered the letter in Dennis's home.  (Doc. 756).
The Court allowed the document's admission but permitted
plaintiffs to have it examined by a forensic expert.  (Docs.
768, 802).  That testing proved inconclusive.  (Doc. 814: 80-
81).

184.  The letter bears an original ink signature by
Solimine, and Dennis is blindcopied on it.  (Def. Exh. 413).
Solimine testified that his practice was to have one signed
original letter without the blind copy line prepared to send to
the addressee, so that he or she would not see who was blind
copied.  His assistant then would print a second original which
Solimine would also sign which had the blind carbon copy line at
the bottom to send to the person blind copied.  (Solimine
Testimony, Doc. 827: 132-33).  Thus, the Court finds that
Defendants' Exhibit 413 is a blind copy that was sent to Dennis
and not a copy of an original that was purportedly sent to
Neubauer.

185.  Defendants also introduced a draft of this letter
that Solimine faxed to Dennis on the same date as the letter,
which states: "Dennis:  Please call me regarding the attached."
A handwritten note on the fax cover page, presumably by Dennis,
states: "Griffy, Here is what Lou S will send today.  Pls review
& offer any comments."  (Def. Exh. 414).

186. Solimine testified that he gave the final signed version of this letter to his secretary to mail to Neubauer but that he had no evidence that it was actually mailed. (Solimine Testimony, Doc. 827: 142-43). Neubauer testified that he never received this letter, that he had never seen the attachments thereto until provided a copy on July 3, 2015 in this litigation, and that he would have remembered the documents had they been provided in response to his April 25, 2003 letter to Dennis and Griffy. (Plf. Exh. 115). Betsy testified that she never saw this letter or the attachments until it was produced in this case. (Osborn Testimony, Doc. 814: 82-83).

187. The Court thus finds that neither Neubauer nor Betsy ever received this letter. This finding is supported by the fact that Solimine conceded that Griffin Industries treated its shareholder list and board minutes as confidential documents. (Solimine Testimony, Doc. 827: 145-47). As noted above, even Marty and Tommy, who were on the board, never saw such a list until the 2010 merger. Moreover, for Dennis and Griffy to approve sending this letter and its attachments to Betsy's counsel would have been a sea change from their longstanding refusal to provide information to Betsy, as reflected in the 1996 "kiss off" letter. Defendants offered no testimony that would explain such an about-face.

188.   Steve Blair testified on direct that Linda Holt asked him sometime in 2007 or 2008 what Martom was, and he explained it to her.   On cross, Blair testified that the conversation could have occurred as late as 2010.   (Blair Testimony, Doc. 823: 45-46, 82).   Linda Holt testified that she never talked to Blair about Martom and that she first heard of Martom when she read Betsy's amended complaint.   (Holt Testimony, Doc. 816: 38).   The Court thus concludes that Linda did not know, more than five years before the filing of her complaint in 2013, about Martom or about the sale of Father's real properties to that company.

## IV.   CONCLUSIONS OF LAW

### A. Equitable v. Legal Nature of Claims and Defenses

189.   On August 4, 2015, the Court held that, since the only remaining claim was "the equitable claim for breach of fiduciary duty, seeking the equitable remedy of disgorgement," there was no longer a right to trial by jury that could be invoked by any party.   (Doc. 759).

190.   The Court reaffirms that ruling and rejects defendants' proposed conclusion to the contrary.   (DPCOL, Doc. 835 at 87 n.13).   *See Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 570 (1990) (noting that "we have characterized damages as equitable where they are restitutionary, such as in 'action[s] for disgorgement of

improper profits'") (quoting *Tull v. United States*, 481 U.S. 412, 424 (1987)); *United States v. Ford*, 64 F. App'x 976, 982 (6th Cir. 2003) ("Restitution and disgorgement are part of courts' traditional equitable authority."); *Ferrari S.P.A. v. Roberts*, 944 F.2d 1235, 1248 (6th Cir. 1991) (holding that defendant had no right to jury trial where plaintiff sought only equitable relief). *See also Fifty-Six Hope Rd. Music v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1075 (9th Cir. 2015) (noting that "the current law recognizes that actions for disgorgement of profits are equitable in nature").

### B. 1993 Signed Settlement Agreement

191. As noted above, the copy of the September 1993 settlement agreement signed by all the Holt plaintiffs was not produced during discovery, rather it was produced by non-party Thompson Hine in November 2015. Defendants have moved the Court to reopen the record to admit this document. (Doc. 836-1).

192. A motion to reopen the record to take additional evidence, although similar to a Rule 59 or Rule 60(b) motion, "does not require that the evidence be newly discovered or that it could not have been discovered during the pendency of the trial by a party acting with due diligence." 12 James Wm. Moore et al., Moore's Federal Practice § 59.13[3][c] (3d ed. Supp.

73

2015).   Such a motion is addressed to the Court's sound discretion.  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 331 (1971) (citations omitted).

193.  This document is relevant to the issues before the Court, and the Court will thus allow the record to be reopened to permit its admission.[16]

194.  On summary judgment, the Court rejected defendants' argument that, because they were Co-executors of Mother's estate but not the trustee of her Trust, they owed no fiduciary duty to the beneficiaries of the Trust.  (Doc. 590 at 49, n.13).  The Court reaffirms that ruling.

195. Under Kentucky law, a fiduciary relationship is defined as "one founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking."  *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991).  "The relation may exist under a variety of circumstances; it exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith

---

[16] The Court also notes that it gave the parties a brief period of additional discovery and briefing concerning this document. *See* Doc. 842.

and with due regard to the interests of the one reposing confidence." *Sec. Trust v. Wilson*, 210 S.W.2d 336, 338 (Ky. 1948) (citation omitted).

196. The Court concludes that, although the probate of Mother's estate concluded in 1990, Dennis and Griffy nonetheless stood in a fiduciary and confidential capacity as to the Holt plaintiffs in relation to the settlement of Betsy's suit in 1993. The record is clear that the sisters reposed both trust and confidence in Dennis and Griffy as brothers and family leaders in handling the Osborn litigation, which the brothers said "did not concern" them. They described Dennis to Beverly Storm as the "best person in the world," and when Cyndi told Dennis she could not attend the fairness hearing, he told her he would handle it. Moreover, the 1993 settlement agreement purported to obtain a release from the sisters of claims based on actions taken by Dennis and Griffy during the time they served as fiduciaries of Mother's estate.

197. Considering the fact that Dennis and Griffy were the Holt plaintiffs' brothers; that they were directors of the company in which the sisters held stock; that they had undertaken to manage their parents' affairs; that they had been the administrators of Mother's estate; and that they told the sisters that they would handle Betsy's lawsuit, all the while

75

sharing no information about the case with their sisters, the Court concludes that a fiduciary relationship existed between these siblings in relation to the 1993 settlement agreement. *See Strode v. Spoden*, 284 S.W.2d 663, 665 (Ky. 1955) (holding that fiduciary relationship existed between uncle and his niece; there were close family ties, uncle had managed family business after his brother's death for the benefit of niece and her mother, and uncle had considerable authority under brother's will); *Wilson*, 210 S.W.2d at 339 (holding that uncle was fiduciary as to his niece due to family relationship and authority he exercised over her father's estate); *Loy v. Nelson*, 258 S.W.2d 303, 304 (Ky. 1924) (confidential relationship existed between mother and son such that she had no duty to discover his fraud as to property title). *See also Gonzalez v. Gonzalez*, 887 P.2d 562, 565 (Ariz. Ct. App. 1995) (confidential relationship found between mother and son where she placed trust and faith in son and signed documents he told her to sign without explaining what she was signing); *Mills v. Mills*, 305 P.2d 61, 64-65 (Cal. Ct. App. 1956) (confidential relationships existed between deceased man and his brother; deceased assumed position of trust and confidence with brother, advised and counseled him on business affairs, and told him he would look after their parents and their business affairs).

198.  Thus, the 1993 settlement agreement constitutes a contract between fiduciaries and their beneficiaries.

199.  The Restatement (Second) of Contracts § 173 ("When Abuse of a Fiduciary Relation Makes a Contract Voidable) states:

> If a fiduciary makes a contract with his beneficiary relating to matters within the scope of the fiduciary relation, the contract is voidable by the beneficiary, unless
>
> > (a)  It is on fair terms, and
> >
> > (b)  All parties beneficially interested manifest assent with full understanding of their legal rights and all relevant facts that the fiduciary knows or should know.

200.  The comment to this Restatement notes that when "a fiduciary makes a contract with the person beneficially interested, it is not enough that he make a complete disclosure of the facts known to him."  Rather, "the person beneficially interested must be put on an equal footing, with full understanding of his legal rights and of all relevant facts that the fiduciary knows or should know."  *Id.*

201.  In *Mazak Corp. v. King*, 496 F. App'x 507, 511 (6th Cir. 2012), the Sixth Circuit held that this Restatement reflects the majority view in state and federal courts, and that it believed that Kentucky courts would embrace it.  *See also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-82 (6th Cir. 1989) (applying § 173 as matter of federal common law).

77

202. Further, in *Hale v. Moore*, 289 S.W.3d 567, 573 (Ky. Ct. App. 2008), the Kentucky Court of Appeals refused to enforce a release signed by beneficiaries who were not "fully advised" of all material facts by their fiduciary.

203. Finally, over one-hundred years ago, the Sixth Circuit stated:

> It is clear, however, that the duty of a trustee or person occupying a fiduciary relationship to exercise the utmost good faith in all dealings with his cestui que trust or beneficiary extends to the matter of obtaining a release from such beneficiary; that it is his duty in making settlement to put the beneficiary in possession of a full and fair statement of the affairs of the trust, uberrima fides on his part being required; and that a release obtained from the beneficiary through concealment or misrepresentation of essential or material facts is of no effect.
>
> . . .
>
> A release by the cestui que trust will not be binding, unless the parties are made fully acquainted with their own rights, and the nature and full extent of the liabilities of the trustee. Any concealment, misrepresentation, or other fraudulent conduct will vitiate such a release. There should, therefore, be a full statement and detailed explanation of the accounts, * * * especially if there is anything in the nature of a breach of trust. Even if the accounts are clearly stated, the release will be set aside, if there is any misapprehension as to the basis upon which they are made up.

*Maas v. Lonstorf*, 194 F. 577, 587-88 (6th Cir. 1912) (citations omitted).

204. Viewing the evidence through the lens of these principles, it is abundantly clear that the 1993 settlement

agreement signed by the Holt plaintiffs is voidable. Although the parties debate the fairness of the agreement, the Court need not reach that issue because it concludes that Dennis and Griffy did not make complete disclosures of all material facts to the Holt plaintiffs such that they were put on "equal footing" with their fiduciaries. As noted above, Dennis testified that he "never said a word" to the sisters about what Betsy's claims were; he told them her suit had "no merit" and that it didn't involve them; they did not explain to the sisters that they were nominal parties to the derivative claims; they did not advise them to get counsel or tell them that they too might have viable tort claims against Dennis and Griffy; they did not tell the sisters that they were giving Betsy and her children company stock as part of the settlement, or that they were paying Betsy $104,000; Dennis instead told them that Betsy got "very damn little" and led them to believe that they would receive whatever Betsy received; Dennis told Cyndi she did not need to attend the fairness hearing; and they did not tell the sisters that Father was changing his will and trust as part of the settlement.[17]

205. This conclusion is supported by the testimony of Marty and Tommy, who also signed the settlement agreement but

---

[17] The Court was unaware of these facts at the time it approved the 1993 settlement agreement.

similarly testified that they had no understanding of Betsy's claims, the terms of the settlement, or other material information.

206. It is immaterial that plaintiffs were not questioned at trial about the fully executed settlement agreement, as opposed to the unsigned copy, because it is defendants who bear the burden to prove that they fulfilled the conditions required to render such a fiduciary-beneficiary contract valid. For the above reasons, the evidence did not come close to satisfying that burden.

207. The Court thus need not address plaintiffs' alternative arguments for denying defendants' motion to enforce this agreement.

### C. **KRS 413.190(2)**

208. The Court held on summary judgment that the five-year statute of limitations on plaintiffs' breach of fiduciary duty claims could be tolled under KRS 413.190(2), due to defendants' alleged concealment, obstruction, and failure to speak, until plaintiffs made "actual discovery" of the fraud. The Court held that there were triable issues of fact on these issues, and that where concealment or obstruction occurs in the context of a fiduciary relationship, there is no duty on the injured party to

exercise due diligence to discover the fraud.  (Doc. 590 at 45-48).  The Court also held that the claims were not barred by the statute of repose.  The Court reaffirms those holdings here and rejects defendants' proposed conclusions to the contrary. (DPCOL ¶¶ 214-17).

209.  "[W]here the law imposes a duty of disclosure, a failure of disclosure may constitute concealment under KRS 413.190(2), or at least amount to misleading or obstructive conduct."  *Munday v. Mayfair Diagnostic Lab.*, 831 S.W.2d 912, 915 (Ky. 1992).

210.  It is the duty of a fiduciary "to disclose all of the material facts that would put the beneficiary upon notice that a breach of trust may have been committed."  *Hutchings v. Louisville Trust Co.*, 276 S.W.2d 461, 465 (Ky. 1955).

211.  Given the above factual findings, the Court concludes that plaintiffs proved by a preponderance of the evidence that Dennis and Griffy failed in their duty to disclose to their sisters all material facts pertaining to the 1985-86 stock transactions, the sale of properties from Father's estate to Martom, and the sale of Father's Craig Protein stock to Marty and Tommy.

212.  The Court thus concludes that plaintiffs proved by a preponderance of the evidence that defendants engaged in

concealment or obstruction under KRS 413.190(2), such that the statutes of limitations on their fiduciary duty claims were tolled.

213.  The Holt plaintiffs testified that that they did not learn of the vastly disproportionate stock ownership until October 2010, when Cyndi received the shareholder list in her daughter's tax forms, and they did not learn of Dennis's and Griffy's fiduciary breaches until December 2011, when they read Betsy's amended complaint at a Christmas gathering.  Betsy testified that she did not learn of the Martom and Craig Protein transactions until after filing her lawsuit on April 27, 2011.  *See* ¶¶ 64, 84—88, 98, 101-02, 112, 118-19, 141, 144, 147-48, 164, 167-68.  Under the Court's factual findings, defendants' evidence contains no proof to contradict this testimony.  None of the documents that defendants introduced in an effort to impute knowledge to plaintiffs disclose all the material facts regarding defendants' handling of their parents' estate plans or their fiduciary breaches.  Dennis and Griffy had an affirmative duty to make full disclosures to their sisters, and this they did not do.

214.  The Court also concludes that the 1993 signed settlement agreement does not establish actual notice because there is no evidence that the Holt plaintiffs were allowed to

read the document before signing it, that they were otherwise informed of its terms, or that they were advised to obtain independent counsel. All testimony concerning the unexecuted copy that was introduced at trial supports the contrary inference.

215. The Court thus concludes that defendants did not prove by a preponderance of the evidence that plaintiffs had "actual knowledge" of defendants' fiduciary breaches more than five years before filing suit on their claims. Plaintiffs' breach of fiduciary claims thus are not barred by the statute of limitations.

### D. **Unclean Hands**

216. The Court next proceeds to consider defendants' equitable defenses.

217. Under the "unclean hands" doctrine, "a party is precluded from judicial relief if that party 'engaged in fraudulent, illegal, or unconscionable conduct' in connection 'with the matter in litigation.'" *Mullins v. Picklesimer*, 317 S.W.3d 569, 577 (Ky. 2010) (quoting *Suter v. Mazyck*, 226 S.W.3d 837, 843 (Ky. App. 2007)). "'In a long and unbroken line of cases this court had refused relief to one, who has created by his fraudulent acts the situation from which he asks to be

extricated.'"   *Id.* (quoting *Asher v. Asher*, 129 S.W.2d 552, 553 (Ky. 1939)).

218.  Unclean hands "can be asserted in opposition to an equitable defense as well as being assertible as a defense to a claim for equitable relief." *Greenwood v. Raznick*, 326 F. App'x 362, 369 (6th Cir. 2009) (internal quotations and citation omitted). *See, e.g., Am. Air Filter Co., Inc. v. Universal Air Prod., L.L.C.*, No. 3:14-CV-665-TBR, 2015 WL 1541937, at *4 (W.D. Ky. April 7, 2015) (holding that unclean hands may bar assertion of laches defense); *Days Inn Worldwide, Inc. v. Adrian Motel Co., LLC*, No. 07-13523, 2009 WL 3199882, at * (E.D. Mich. Sept. 30, 2009) (defendants' unclean hands barred their defenses of laches, acquiescence, and equitable estoppel).

219.  Under the facts found above, Dennis and Griffy have unclean hands as it pertains to their administration of their parents' estates and the subject matter of these lawsuits.  In sum, their testimony establishes that they knew they were not following the terms of their parents' estate plans when they engaged in the transactions which this Court has found violated their fiduciary duties as a matter of law.  "A person who knowingly and purposefully violates a legal duty has unclean hands." *Am. Air Filter*, 2015 WL 1541937, at *4 (citation omitted).  Further, they committed the breaches related to

Father's estate even after having been sued by Betsy for the 1985-1986 stock transactions, deliberately seeking legal advice as to how to circumvent the law on self-dealing.  Their decades-long refusal to fulfill their fiduciary duty to deal fairly and openly with their sisters, and to see that the sisters received the property left to them by their parents, prevents them from asserting any defense that sounds in equity.

220.  Notwithstanding this conclusion, the Court will consider the merits of defendant's equitable defenses.

### E. **Laches**

221.  Laches constitutes "a negligent and unintentional failure to protect one's rights."  *Chirco v. Crosswinds Cmtys., Inc.*, 474 F.3d 227, 231 (6th Cir. 2007) (quoting *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991) (internal quotation marks omitted).  "'A party asserting laches must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it.'"  *Id.* (quoting *Herman Miller, Inc. v. Palazzetti Imps. & Exps., Inc.*, 270 F.3d 298, 320 (6th Cir. 2001)).

222.  Under the Court's ruling above, the statute of limitations did not begin to run on plaintiffs' breach of

fiduciary claims until 2010 at the earliest. The limitations period thus had not expired when they filed these actions.

223. In the Sixth Circuit, "we recognize a strong presumption against asserting a laches defense to shorten a statute of limitations." *Operating Eng'rs Local 324 v. G&W Constr. Co.*, 783 F.3d 1045, 1054 (6th Cir. 2015) (citing *Chirco*, 474 F.3d at 233). The Court has "cautioned that 'only rarely' might a laches defense bar relief before the applicable statute of limitations has run." *Id. See also City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 589 (6th Cir. 2001) ("Having already concluded that the City brought the claim within the applicable statute-of-limitations period, the doctrine of laches has no role in this case.").

224. Further, "[w]here the parties sustained a confidential relation to each other, and the claim arises from an alleged breach of trust, or fraud is imputed, in the interest of justice a Court of equity will look upon the delay with much more indulgence." *Richardson v. Blue Grass Mining Co.*, 29 F. Supp. 658, 665 (E.D. Ky. 1939), *aff'd*, 127 F2d 291 (6th Cir. 1942).

225. The Court concludes that defendants have not shown that plaintiffs' claims are barred by laches. In light of the facts adduced at trial, it is clear that plaintiffs did not

knowingly sit on their rights for an unreasonable time. They did not learn of the breaches which form the basis of their claims until 2010 at the earliest; Betsy filed suit within a year, and the Holt plaintiffs within two years. The latter, who had not been actively involved in Betsy's 1990 lawsuit, understandably thought long and hard before taking the serious step of suing their brothers.

226. Moreover, whenever plaintiffs made inquiries over the years, their brothers either brushed them off or simply lied to them. The Sixth Circuit considered similar facts in *Thropp v. Bache Halsey Stuart Shields, Inc.*, 650 F.2d 817 (6th Cir. 1981). There, a wife sued her stockbroker agency for breach of fiduciary duty where one of its brokers (Gregory) mishandled her investment account, allowing the wife's husband to forge her signature on numerous documents and steal nearly $40,000. The agency invoked laches, arguing that the wife was remiss for failing to discover the theft and that monthly statements should have alerted her to a problem.

227. The Court affirmed the trial court's finding that laches did not apply because the stockbroker rebuffed the wife's inquiries and misled her:

> The District Court found that Mrs. Thropp questioned Gregory about her account on several occasions. He always avoided any specific discussion, spoke in vague terms of general market conditions, pleaded ignorance

when confronted with Mrs. Thropp's suspicions, and told her to "talk to" her husband. Thropp, in turn, protected Gregory. The record clearly shows that Gregory helped to perpetuate Mrs. Thropp's ignorance. *[The agency] cannot claim that her delay was "unreasonable" in light of its own evasion.*

*Id.* at 823 (emphasis added).

228. In addition, defendants have not shown that any delay by plaintiffs in asserting their claims has "worked such prejudice or disadvantage to parties adversely interested or such changed conditions have occurred in the mean time (*sic*) that enforcement of the claim is rendered inequitable." *Richardson*, 29 F. Supp. at 665. Despite the passage of time, the key witnesses — plaintiffs, Dennis, and Griffy — were all available to give testimony in the case. Although Dennis's memory had faded, the Court permitted the admission of his deposition from Betsy's 1990 lawsuit. And although he passed away before trial, his 2013 deposition was admitted.

229. Furthermore, because Father's and Mother's estate plans speak for themselves, the testimony of Meranus and Ruebel, while relevant, could not have "exculpated" Dennis and Griffy, as defendants assert. (DPCOL ¶ 234).

230. That Dennis and Griffy lived for some years possibly assuming that they would not be called upon to explain their actions does not constitute the sort of prejudice contemplated by the equitable doctrine of laches.

88

**F. Acquiescence**

231.  "Acquiescence consists of assent by words or conduct on which the other party relies." *Hazard Coal Corp. v. Ky. West Va. Gas Co., L.L.C.*, 311 F.3d 733, 740 (6th Cir. 2002).  The doctrine bars a plaintiff's claim, however, only when the plaintiff has "full knowledge, or at least . . . sufficient notice or means of knowledge, of his rights, and of all the material facts."  *Id.* (quoting J. Pomeroy, 2 *Equity Jurisprudence* § 965, at 2094 (5th ed. 1941)).

232.  The record is clear that at no time prior to 2010 did the Holt plaintiffs have what would approach "full knowledge" of the facts and circumstances giving rise to their claims regarding the 1985-86 stock transactions.  Defendants urge that plaintiffs had the "means" to acquire such knowledge, but the Court concludes that Dennis's various misrepresentations to the sisters caused them to continue placing their utmost trust in him — until 2010 — such that they had no reason to launch independent investigations to determine if Dennis and Griffy had followed their parents' estate plans.

233.  Equally, the record establishes that plaintiffs did not have "full knowledge" of the Martom and Craig Protein property transactions until 2010 or 2011.

89

234. In sum, plaintiffs could not have acquiesced in breaches of fiduciary duty of which they were unaware. Defendants have not proven that this defense should preclude plaintiffs' claims.

## G. **Equitable Estoppel**

235. Defendants also invoke the defense of equitable estoppel. "Equitable estoppel is a defensive doctrine founded on the principles of fraud, under which one party is prevented from taking advantage of another party whom it has falsely induced to act in some detrimental way." *Ping v. Beverly Enter.*, 376 S.W.3d 581, 594-95 (Ky. 2012). Under Kentucky law, "equitable estoppel requires both a material misrepresentation by one party and reliance by the other party." *Id.* at 595 (internal quotations and citation omitted).

236. This defense has no application here. There is no evidence that plaintiffs made any misrepresentations to defendants. Such an assertion turns the evidence on its head. To the extent that defendants "relied" on plaintiffs' silence or inaction in relation to their fiduciary breaches, the situation was of their own making due to their failure to thoroughly and truthfully inform their beneficiaries of all material facts concerning their parents' estates and the tainted transactions.

90

The Court concludes that defendants did not prove the elements of this defense.

### H. **Martom**

237.  The Court previously ruled that third parties such as Martom may be liable to beneficiaries to disgorge benefits and the consequential gains thereof which they acquire as a result of another's fiduciary breach, unless the third party purchased the property for value and without notice of the breach.  (Doc. 790).  The Court reaffirms that ruling and incorporates by reference the authorities cited there.  *See also In re Arctic Express, Inc.*, 636 F.3d 781, 801 (6th Cir. 2011) (trust beneficiary may seek disgorgement of profits from third party who received trust property through trustee's breach); *Curtis v. Drybrough*, 70 F. Supp. 151, 153-54 (W.D. Ky. 1947) (same).

238.  The Court concludes that Martom was not an innocent purchaser for value of the real properties transferred to it from Father's estate and trust.  As noted above (¶¶ 133-139), Dennis and Griffy caused Martom to be created after Father's death for the purpose of purchasing those properties, and Marty and Tommy were aware of that purpose.  They also knew that their sisters were the beneficiaries of Father's estate and recalled no discussion about offering the properties to them.  Marty and Tommy were mere figureheads, Martom was operated as part of

Griffin Industries, and Dennis and Griffy controlled Martom through their positions at Griffin Industries until the merger with Darling in 2010. Martom was created in an attempt to circumvent the law against indirect self-dealing.

239. Therefore, Martom is liable to plaintiffs for profits derived from these properties, as discussed below.

240. The Court rejects defendants' proffered conclusion that recovery against Martom is barred by the doctrine of adverse possession. (DPCOL ¶ 242). Plaintiffs do not seek ownership of the properties in question but instead seek the profits Martom derived from owning those properties. Adverse possession does not apply.

## I. **Remedies**

241. The Court rejects defendants' proffered conclusion that plaintiffs did not prove that they are entitled to relief in this matter. (DPCOL ¶ 245).

242. The Court also rejects defendants' proffered conclusion that the proper measure of relief is the difference between what the plaintiffs received and what they should have received at the time of the alleged wrongdoing. (DPCOL ¶ 250). As stated in the *Restatement (Third) of Restitution and Unjust Enrichment*, "the unjust enrichment of a . . . defaulting fiduciary without regard to notice or fault, is the *net profit*

*attributable to the underlying wrong.*" *Restatement (Third) of Restitution and Unjust Enrichment* § 51(4) (Am. Law Inst. 2015). (emphasis added).  "Profit includes any form of use value, proceeds, or consequential gains . . . that is identifiable and measurable and not unduly remote." *Id.* § 51(5)(a).

243.  "A claimant who seeks disgorgement of profit has the burden of producing evidence permitting at least a reasonable approximation of the amount of the wrongful gain.  Residual uncertainty in calculating net profit is assigned to the defendant." *Id.* § 51(5)(d).

244.  The purpose of this rule is "the identification and measurement of those gains to the defendant that should be regarded as unjust enrichment, in that they are properly attributable to the defendant's interference with the claimant's legally protected rights." *Id.* § 51 cmt. a.

245.  The Restatement provides the following example:

Embezzler uses $100,000 of Employer's money to purchase Blackacre, an investment Embezzler would not otherwise have been able to make.  Property values have increased, and by the time the embezzlement comes to light the value of Blackacre is more than $150,000.  By the rule of § 51(4), Employer would be entitled to a money judgment against Embezzler for the present value of Blackacre, thereby stripping Embezzler of the gain attributable to the wrong.

*Id.* § 51 cmt. b.

246.  The Court also rejects defendants' proffered conclusions that the disgorgement figures plaintiffs' expert

93

witness calculated are flawed because they do not separate the amounts attributable to defendants' wrongdoing from other factors that impacted the growth and success of Griffin Industries.   (DPCOL ¶¶ 251-52, 271-74).   The Restatement directly rejects this type of causation argument:

> To say that a profit is directly attributable to the underlying wrong, or (as sometimes expressed) that the profit is the "proximate consequence" of the wrong, does not mean that the defendant's wrong is the exclusive or even the predominant source of the defendant's profit. Indeed, because the disgorgement remedy is usually invoked when the defendant's profits exceed the claimant's provable loss, it should be possible in almost every case to identify additional *causes* of the profit for which the defendant is liable. *So if the defendant embezzles $100 and invests the money in shares that he later sells for $500, the $500 that the claimant recovers is largely the result of causes independent of the wrong: favorable market conditions and the defendant's investment acumen or simply luck. The determination in this easy case that the embezzler's profit is properly attributable to the underlying wrong rests on a number of related judgments.* The first, evidently a matter of causation, is a finding (or a presumption) that the defendant would not have made the investment (and realized the profit) but for the wrong. But causation in this sense gives only part of the answer. *The conclusion that the defendant's profit is properly attributable to the defendant's wrong depends equally on an implicit judgment that the claimant, rather than the wrongdoer, should in these circumstances obtain the benefit of the favorable market conditions, acumen, or luck, as the case may be. The conclusion draws further support from another implicit judgment, that there would be an incentive to embezzlement if the defendant were permitted to retain the profits realized in such a transaction.*

*Id.* § 51 cmt. f (emphasis added).

247.   The   Court   also   rejects   defendants'   proposed conclusion that Dennis and Griffy cannot be held accountable for

profits that flowed to third parties, such as Marty and Tommy, rather than to them personally.  (DPCOL ¶ 253).  *See Sec. and Exch. Comm'n v. Contorinis*, 743 F.3d 296, 307 (2d Cir. 2014) ("Thus, ordering a violator to disgorge gain the violator never possessed does not operate to magnify penalties or offer an alternative to fines, but serves disgorgement's core remedial function of preventing unjust enrichment."); *Avianca v. Corriea*, Civ. A. No. 85-3277, 1993 WL 797455, at *4 (D.D.C. May 13, 1993) ("Only in the context of a violation of fiduciary duties may a court order such seemingly unrealistic remedies as the disgorgement to plaintiff of the profits earned by a third party even though the defendant enjoyed no benefits.").

248.  Defendants may have been entitled to "a credit for money expended in acquiring or preserving the property or in carrying on a business that is the source of the profit subject to disgorgement." *Restatement (Third) of Restitution and Unjust Enrichment* § 51(5)(c) (Am. Law Inst. 2015).  For example, defendants argue that the valuations of the Martom properties are too high because they include "improvements built and owned by Griffin Industries," (DPCOL ¶ 262), and that they paid taxes on the Griffin Industries stock they held.  (DPCOL ¶ 269).  However, defendants presented no evidence of such expenses from which the amount of any such credits could be determined.  *See*

95

*Avianca*, 1993 WL 797455, at *5 (noting that defendant bears the burden of proving expenses which could be credited against disgorgement amount).   The Court thus rejects defendants' argument that these values should be reduced.

249. Based on the totality of the evidence, including Father's pre-stroke estate documents, and the credibility of the witnesses, the Court concludes that, even in the absence of the 1985 Plan, Father would not have sold his stock to his sons during his lifetime.  Rather, as was its impression at summary judgment, the Court concludes that Father's purported ratifications of those sales — in the Sixth Codicil to his will, the Fourth Amendment to his Trust, and the affidavit he purportedly executed on January 20, 1992 — were orchestrated by Dennis and Griffy, with the assistance of counsel, "to obtain Father's *post hoc* imprimatur on the prior sales that defendants orchestrated for purposes of retaining control of the Company." (Doc. 590 at 51).  This conclusion is supported by the fact that these actions were taken during the pendency of — and most likely in response to — Betsy's 1990 lawsuit.

250. The Court further concludes that, given the testimony about Father's condition after his stroke, Dr. Parsons' evaluation, and the surrounding circumstances, Father did not have "full knowledge of the material facts" such that any valid

96

ratification occurred.  *See Intl Shoe Co. v. Johnson*, 252 Ky. 440, 508 (Ky. 1934) (citations omitted).

251.  The cash proceeds that plaintiffs received from their parents' estates as a result of the improper transactions are simply offsets against the disgorgement amounts.

252.  In support of their disgorgement claim, Plaintiff presented the testimony and reports of John E. Chilton, a Certified Public Accountant ("CPA") who is Accredited in Business Evaluation by the American Institute of CPAs, and is also a Certified Valuation Analyst.  (Plf. Exhs. 84-87).

253.  Defendants did not present any expert testimony as to remedies.

254.  Chilton testified that, in calculating his disgorgement figures, he relied on information and figures corporate federal tax returns and financial reports and made computations.  (Chilton Testimony, Doc. 821: 69-70).

255.  "Where state law claims come before a federal court on supplemental jurisdiction, the award of prejudgment interest rests on state law."  *Mills v. River Terminal Ry Co.*, 276 F.3d 222, 228 (6th Cir. 2002) (citation omitted).

256.  "In diversity cases, state law governs damage awards because damages are a matter of substantive law."  17A James Wm.

Moore et al., Moore's Federal Practice § 124.07(3)(a) (3d ed. Supp. 2015).

257. Therefore, whether the Holt plaintiffs and Betsy are entitled to prejudgment interest and, if so, at what rate, is governed by Kentucky law.

258. "[E]quity and justice demand that one who uses money or property of another should generally pay for its use." *Ford Contracting, Inc. v. Kentucky Trans. Cabinet*, 429 S.W.3d 397, 414 (Ky. Ct. App. 2014) (internal quotations and citation omitted). "Indeed, equity and justice serve as the foundation upon which an award of prejudgment interest rests." *Id.*

259. Prejudgment interest "is awarded as a matter of right on a liquidated demand, and is a matter within the discretion of the trial court or jury on unliquidated demands." *Id.*

260. A damages claim is liquidated if it is "of such a nature that the amount is capable of ascertainment by mere computation, can be established with reasonable certainty, can be ascertained in accordance with fixed rules of evidence and known standards of value, or can be determined by reference to well-established market values." *Id.*

261. The Court concludes that the disgorgement amounts calculated by Chilton are liquidated amounts because they were ascertained by performing calculations based on known values.

98

(Chilton Testimony, Doc. 821: 130). Plaintiffs are thus entitled to prejudgment interest at the Kentucky statutory rate of 8%. KRS 360.010(1). Even if the amounts were deemed unliquidated, the Court would exercise its discretion to award prejudgment interest based on equitable considerations.

262. Chilton's expert opinion is that the Holt plaintiffs are each entitled to a disgorgement remedy in relation to the 1985-86 stock transactions, including prejudgment interest at 8% compounded annually, of $167,148,421. (Plf. Exh. 85, Chilton Report at 6).

263. Chilton's expert opinion is that all plaintiffs are each entitled to a disgorgement remedy in relation to the Craig Protein stock, including prejudgment interest at 8% compounded annually, of $9,734,766. (Plf. Exh. 86, Chilton Report at 3).

264. Chilton's expert opinion is that all plaintiffs are each entitled to a disgorgement remedy in relation to the Martom properties, including prejudgment interest at 8% compounded annually, of $1,872,654. (Plf. Exh. 87, Chilton Report at 3).

265. The Court concludes that these opinions are reliable and accepts them as the measure of disgorgement herein. The Court concludes, however, that monthly compounding would be unreasonable.

266.  Thus,  the  Holt  plaintiffs  are  each  entitled  to disgorgement in the amount of $178,755,841 and Betsy is entitled to $11,607,420.

267.  Defendants make several other criticisms of Chilton's analysis  (DPCOL  ¶¶  263-64,  266-68),  but  they  offered  no  expert testimony  of  their  own  from  which  the  Court  could  consider adjustments  to  Chilton's  figures.   Moreover,  equity  resolves uncertainties  in  the  measure  of  a  culpable  defendant's  profits in  favor  of  the  claimant.   *See  Restatement  (Third)  of Restitution  and  Unjust  Enrichment*  §  51  cmt.  i  (Am.  Law  Inst. 2015) ("Underlying the rules about evidentiary burdens in these cases  is  the  equitable  disposition  that  resolves  uncertainty  in favor  of  the  claimant  against  the  conscious  wrongdoer. 'Reasonable  approximation'  will  suffice  to  establish  the disgorgement  liability  of  a  conscious  wrongdoer,  when  the evidence  allows  no  greater  precision,  because  the  conscious wrongdoer  bears  the  risk  of  uncertainty  arising  from  the wrong.").

268.  Under  Kentucky  law,  no  recovery  of  punitive  damages may  be  had  against  a  deceased  tortfeasor's  estate.   *Stewart  v. Estate of Cooper*, 102 S.W.3d 913, 916 (Ky. 2003).  No claim for punitive damages thus lies against Dennis's estate.

269.  Further, since the disgorgement remedy results in a very large recovery, allowing punitive damages in addition thereto would be constitutionally questionable.  *State Farm. Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003).  The Court concludes, therefore, that punitive damages should not be awarded in this matter.  *See also Burton v. Zwicker & Assoc.*, 577 F. App'x 555, 565 (6th Cir. 2014).

### J. **Attorneys' Fees and Costs**

270.  In the exercise of its discretion, the Court concludes that an award of attorneys' fees in this matter is not warranted.  Given the size of the recoveries herein, and the fact that this was a purely private dispute conferring no benefit on the public, the Court concludes that an award of fees is unnecessary and that the American Rule applies.

### V. CONCLUSION AND ORDER

THEREFORE, the Court being advised,

**IT IS ORDERED** that:

1.  Defendants' motion to reopen and supplement the trial record (Doc. 836) be, and is hereby **GRANTED**.  The Settlement Agreement dated September 10, 1993, attached to this motion at Doc. 836-1 at 4-11, is hereby **ADMITTED AS DEFENDANTS' TRIAL EXHIBIT 415**.  The Clerk of Court is directed to file a separate

copy of this document, designating it as defendants' Trial Exhibit 415, concurrently with the filing of these Findings of Fact and Conclusions of Law;

2. Defendants' motion to enforce the 1993 settlement agreement (Doc. 838) be, and is hereby, **DENIED**;

3. The Holt plaintiffs' emergency motion for a hearing, for default judgment, for a protective order, and for referral for criminal prosecution (Doc. 843) be, and is hereby, **GRANTED IN PART AND DENIED IN PART**. The matter in question is already the subject of an investigation by the United States Attorney for the Eastern District of Kentucky. *See* Doc. 846. Should the outcome of that investigation not address plaintiffs' concerns, plaintiffs may renew their motion. The request for a default judgment is now moot given these findings and conclusions.

4. Betsy's motion to join in the Holt plaintiffs' emergency motion (Doc. 845) be, and is hereby, **GRANTED**;

5. Plaintiffs' motion for leave to file surreply (Doc. 854) be, and is hereby, **GRANTED**;

6. **Not later than fourteen (14) days of the date of entry of these findings and conclusions**, plaintiffs shall tender to the Court a proposed judgment, consistent with these Findings of Fact and Conclusions of Law;

7.    Defendants may, **within fourteen (14) days of the service of plaintiffs' proposed judgment(s),** file objections to the form thereof, including the mathematical calculations;

8.    Plaintiffs may file any reply(ies) **not later than seven (7) days thereafter.**

This 21st day of March, 2016.



**Signed By:**

_**William O. Bertelsman**_  *WOB*

**United States District Judge**